KIM

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.7.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:24-cv-06284

Peak Chiropractic Health and Wellness LLC v. Multiplan, Inc.

Assigned to: Honorable Martha M. Pacold

Cause: 15:15 Antitrust Litigation

Date Filed: 07/24/2024

Jury Demand: Plaintiff

Nature of Suit: 110 Contract: Insurance

Jurisdiction: Federal Question

**Plaintiff**

**Peak Chiropractic Health and Wellness LLC**

represented by

**Bret Koch Pufahl**
Foote, Mielke, Chavez, & O'Neil, LLC
1541 East Fabyan Parkway
Suite 101
Geneva, IL 60134
630-232-7450
Email: bkp@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Christine Chavez**
Foote, Mielke, Chavez & O'Neil, LLC
Illinois
1541 East Fabyan Parkway
Suite 101
60134, Suite 200
Geneva, IL 60134
630-232-7450
Fax: 630-232-7452
Email: ecc@fmcolaw.com
*ATTORNEY TO BE NOTICED*

**Kathleen Currie Chavez**
Foote, Mielke, Chavez & O'Neil, LLC
1541 East Fabyan Parkway
Suite 101
60134, Suite 200
Geneva, IL 60134
630-232-7450
Fax: 630-232-7452
Email: kcc@fmcolaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Multiplan, Inc.**

represented by

**Deborah Elman**
Garwin Gerstein & Fisher LLP
88 Pine Street
10th Floor

New York, NY 10005
2123980055
Fax: Not a member
Email: delman@garwingerstein.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2024 | 1 | COMPLAINT filed by Peak Chiropractic Health and Wellness LLC; Jury Demand. Filing fee $ 405, receipt number AILNDC-22280201.(Chavez, Kathleen) (Entered: 07/24/2024) |
| 07/24/2024 | 2 | ATTORNEY Appearance for Plaintiff Peak Chiropractic Health and Wellness LLC by Kathleen Currie Chavez (Chavez, Kathleen) (Entered: 07/24/2024) |
| 07/24/2024 | 3 | CIVIL Cover Sheet (Chavez, Kathleen) (Entered: 07/24/2024) |
| 07/24/2024 | 4 | ATTORNEY Appearance for Plaintiff Peak Chiropractic Health and Wellness LLC by Elizabeth Christine Chavez (Chavez, Elizabeth) (Entered: 07/24/2024) |
| 07/24/2024 | 5 | ATTORNEY Appearance for Plaintiff Peak Chiropractic Health and Wellness LLC by Bret Koch Pufahl (Pufahl, Bret) (Entered: 07/24/2024) |
| 07/24/2024 | 6 | ATTORNEY Appearance for Defendant Multiplan, Inc. by Deborah Elman (Elman, Deborah) (Entered: 07/24/2024) |
| 07/24/2024 | | CASE ASSIGNED to the Honorable Martha M. Pacold. Designated as Magistrate Judge the 1). (man, ) |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

Peak Chiropractic Health and Wellness LLC,
*on behalf of itself and a class of all others
similarly situated*,

Plaintiff,

v.

MultiPlan, Inc.,

Defendant.

**Case No. 1:24-cv-6284**

**Jury Trial Demanded**

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Peak Chiropractic Health and Wellness LLC brings this Class Action Complaint individually and on behalf of a class of all others similarly situated (collectively, "Plaintiffs") against Defendant MultiPlan, Inc. (as defined herein), upon information and belief, and alleges the following:

### I.  Introduction

1.  Defendant MultiPlan is a data analytics and cost management company that reprices out-of-network health insurance claims on behalf of health insurance companies and self-insured payors in the United States.

2.  MultiPlan also facilitates a conspiracy among insurers, including the 15 largest in the country, to suppress the payments that healthcare providers, like Plaintiff and the Class (as defined herein), receive for providing out-of-network health care services to patients. The scheme works like this. MultiPlan charges Insurers for subscriptions. In return, MultiPlan provides claims handling and repricing services, i.e., it negotiates with providers the amounts they will receive from health care payors for out-of-network services. On rare occasions, MultiPlan handles these

1

negotiations manually. But the vast majority of the time, MultiPlan uses its "analytics based" services to set the price that subscribing insurers will pay for a given service. These analytics-based services include MultiPlan's "repricing" algorithms, such as Data iSight and Viant.

3.     The repricing algorithms that MultiPlan uses to set prices rely on a large database of claims information to which all of MultiPlan's Co-Conspirators (as defined herein) contribute their sensitive, proprietary and non-public claims information on a real-time basis.

4.     These Co-Conspirator insurers rely on MultiPlan's repricing algorithms to set the reimbursement rates for out-of-network healthcare claims while knowing that their competitors are doing the same thing.

5.     Co-Conspirators could not agree with one another on payment levels based on directly shared, non-public data and information, including proprietary pricing information; that would obviously be illegal price fixing among competitors. But it is no more legal for payors to launder their price fixing through MultiPlan.

6.     The prices MultiPlan extracts from providers on behalf of the Co-Conspirators are take-it-or-leave-it offers that providers must accept lest they face extended delays or the risk of receiving no payment at all.

7.     And MultiPlan extracts prices from providers that are dramatically lower than what providers bill—as low as 3-5% of the billed amount—and lower than providers need to sustain their practices. The rates are so low that they contribute to a national crisis of independent and local health care providers closing up shop, while curtailing the ability of others to expand the care and services they provide.

8.     When MultiPlan pays a healthcare provider just a fraction of the provider's

2

reasonable rate for its services, MultiPlan then rewards itself with a percentage of the "savings" its algorithm achieved (the Co-Conspirator insurers get a cut too). Meanwhile, MultiPlan turns around and charges employers and others that are ultimately on the hook for health insurance costs a substantial "processing fee" for reducing this amount. MultiPlan thus faces incentives to pay providers as little as possible. The less money an insurer pays to a provider, the more money MultiPlan makes. As a result, MultiPlan and its Co-Conspirators extract and pocket as profit payments that can exceed the unlawfully diminished amount paid to the provider for providing the medical care.

9. If any individual insurer were to offer reimbursement rates as low as MultiPlan offers, providers would simply stop accepting patients who carry such insurance. Through the scheme, MultiPlan assures each participating insurer that none of its competitors will do any better. This extinguishes the competitive mechanism that compels health care payors to pay reasonable reimbursement rates. While providers could turn away one insurer, they cannot turn away them all. Because the top 15 insurers in the United States use MultiPlan's repricing services, refusal to accept patients from those insurers would be fatal to many healthcare providers' bottom lines.

10. While the conspiracy enables MultiPlan and its Co-Conspirators to force providers to swallow reimbursement rates that can barely cover their costs, there is no benefit to consumers or to employers who often bear the expense of health insurance, nor is there any benefit to competition. MultiPlan and its Co-Conspirators use the scheme detailed herein to squeeze money out of healthcare providers like Plaintiffs and the Class, to no one's benefit but their own.

## II. Parties

### A. Plaintiff

11.      Plaintiff Peak Chiropractic Health and Wellness LLC ("Plaintiff" or "Peak Chiropractic") is an Alabama corporation with its principal place of business at 3054 Morgan Road, Bessemer, AL, 35022. On information and belief, Plaintiff has received out-of-network reimbursements from insurers that subscribe to MultiPlan's repricing services, which reimbursements were suppressed below a competitive rate by the conduct described herein.

### B. Defendant

12.      Defendant MultiPlan, Inc., is a New York corporation with its principal place of business at 115 Fifth Avenue, 7th Floor, New York, New York 10003. MultiPlan Corporation, a publicly traded company, is the parent company of MultiPlan, Inc. and the various entities that carry out MultiPlan's operations.

13.      MultiPlan Corporation was formerly known as Churchill Capital Corporation III, which was a special-purpose acquisition company incorporated in Delaware and formed to take MultiPlan, Inc., public. Churchill Capital Corporation III changed its name to MultiPlan Corporation after it and its related entities acquired MultiPlan, Inc., and its related entities in October 2020. Since MultiPlan's public offering, private equity firm Hellman & Friedman and the Saudi Arabian sovereign wealth fund have become two of its largest shareholders.

14.      In 2010, MultiPlan acquired Viant Holdings, Inc., a healthcare cost management company.

15.      In 2011, MultiPlan acquired National Care Network, LLC.

16.      Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan

4

Corporation, Churchill Capital Corporation III, Viant Holdings, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC, and any other MultiPlan parents, subsidiaries or affiliates that may be involved in the conduct described herein collectively as "MultiPlan."

### C. Co-Conspirators

17. The conspiracy includes any person or entity that has entered into an out-of-network repricing agreement with MultiPlan.

18. Each healthcare insurance company that has executed an out-of-network repricing agreement with MultiPlan (the "Co-Conspirators") has participated in, and performed acts and made statements in furtherance of, the conspiracy. MultiPlan is jointly and severally liable for all of the acts and omissions of its Co-Conspirators, whether or not named in this complaint.

19. As set forth herein, the Co-Conspirators includes virtually every major health care insurance payor in the United States.

## III. Jurisdiction and Venue

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

21. This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interests and costs; and (3) Defendant and at least one Class member

are domiciled in different states.

22.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because Defendant MultiPlan maintains business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

23.     This Court has personal jurisdiction over Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22 and Illinois's long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a). Defendant, directly or through its divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health insurance plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network healthcare services provided in Illinois to MultiPlan for use in MultiPlan's database; and using MultiPlan and its claim repricing tools to reprice, pay, and negotiate reimbursements for out-of-network commercial health insurance claims arising from out-of-network healthcare services provided in Illinois.

## IV.     Factual Allegations

### A.     The PPO Value Proposition

24.     Most commercial health insurance plans fall into one of two buckets: Health Management Organizations ("HMOs") and Preferred Provider Organizations ("PPOs").

25.     An HMO is a lower cost, but more rigid, option. Typically, HMO care is available only to the network's in-network providers, except in emergencies. The tradeoff for this limited choice is typically a lower premium.

26.     A PPO can be more expensive, but offers more flexibility. A PPO tends to have

a larger network of providers, who agree to provide care at contracted rates in exchange for being marketed to the plan's members as "in-network." PPOs steer their subscribers to in-network providers by offering lower co-pay or co-insurance obligations.

27.     But PPO subscribers also have the option of seeing providers outside of their network. This enables a subscriber to secure care that no in-network provider offers, or at a time and location that is more convenient to them. While a subscriber often faces a higher co-pay or co-insurance obligation for out-of-network providers, or the services might affect a subscriber's deductible differently, this flexibility makes PPO plans appealing.

28.     This crucial difference between PPO and HMO plans is one reason that subscribers are willing to pay more for PPO plans. According to a recent study by the Kaiser Family Foundation, PPOs are the most common type of employer-provided healthcare plan, covering 47% of all covered employees. Yet they are also the most expensive.

29.     When a PPO subscriber sees a provider on an out-of-network basis, because there is no applicable insurer contract rate, a provider will submit an invoice to the insurer and then negotiate with the insurer to be paid for its services. But a provider does not need to accept all patients; depending on the context, a provider may refuse to accept patients who are out-of-network if they carry coverage from an insurer that is known to deny providers a reasonable rate for their services.

30.     In a competitive market, PPO plans would offer reasonable rates to providers for out-of-network care, in order to retain their subscribers' access to these providers.

**B.     The Shift Away from "Usual, Customary and Reasonable" Rates**

31.     Historically, each Co-Conspirator decided how much to pay for out-of-network

7

services unilaterally and independently.

32.     Insurers determined reimbursement rates for out-of-network care by reference to a benchmark referred to as the "Usual, Customary, and Reasonable," or "UCR," rate. A charge is considered "usual" if it represents a healthcare provider's usual charge for a specific medical procedure. It is "customary" if it falls within a range of fees that most healthcare providers in the relevant geographic area charge for that procedure. And it is "reasonable" if it is both usual and customary, or if it is otherwise justified because of special circumstances. Out-of-network reimbursements were commonly expressed as a percentage of the UCR rate; a common reimbursement amount was 80% of UCR.

33.     Databases of UCR rates were available from two companies. First, the Health Insurance Association of America, an insurance industry trade association, developed a database called the Prevailing Healthcare Charge System ("PHCS") beginning in 1974.[1] Second, Medicode maintained the Medical Data Research (MDR) database. Healthcare providers and insurers would individually consult either of these databases, or both, to determine rates for reimbursement of out-of-network care.

34.     Despite the incentive to pay reasonable reimbursement amounts for out-of-network care in order to preserve their subscribers' access to a broad universe of providers, insurers came to view out-of-network payments as a "pain point" and "major area of concern" cutting into their profits. So payors employed various tactics to decrease how much they paid for out-of-network services.

35.     When acting alone, however, their tactics failed. In 2015, UnitedHealthcare (a

---

[1] MultiPlan acquired PHCS in 2006.

subsidiary of UnitedHealth Group, Inc. ("UnitedHealth")) settled two lawsuits—one for $11.5 million and one for $9.5 million—that it underpaid doctors and delayed or denied payment to them, including by using automated software that improperly adjudicated healthcare claims. This litigation was one avenue providers had available to them to push back on improper underpayments.

36.     Another option providers used to push back against insufficient reimbursement for out-of-network care was to refuse to accept patients for non-emergency care who carried coverage from insurers who did not pay enough. This operated as a competitive constraint that enabled insurers to differentiate themselves, and ensure that providers like Plaintiff and the Class would receive reasonable compensation for the medical care they provided.

37.     But the insurers were not happy. To confront these competitive restraints on their market power, commercial health insurers realized that they must act collectively to suppress out-of-network reimbursement rates.

### C.     Insurers Attempt to Fix Prices Through Ingenix

38.     In the late 1990s, UnitedHealth's subsidiary, Ingenix, purchased the two leading databases for UCR reimbursement rates, PHCS and Medicode's MDR. Using these resources, Ingenix created schedules to help its users—including not only UnitedHealth but also its large competitors, including Aetna and Cigna—to determine their reimbursement rates for out-of-network care.

39.     In 2008, however, the New York Attorney General ("NYAG") began a year-long investigation of Ingenix and its use by commercial insurance providers.

40.     The investigation revealed that competing health insurers were sharing detailed

9

information on their out-of-network claims with Ingenix for it to calculate out-of-network reimbursement rates for commercial health insurers. Ingenix's database, according to the investigation, resulted in underpayments of 10 to 25% for out-of-network claims.

41. In January 2009, several insurers settled with the NYAG. UnitedHealth agreed to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database, FAIR Health, that would house more aggregated information but did not raise the same sort of anticompetitive issues that Ingenix had. UnitedHealth agreed to use FAIR Health for a period of five years. Aetna agreed to end its relationship with Ingenix and pay $20 million toward FAIR Health's development. Cigna paid $10 million. The next month, the insurer WellPoint, Inc. agreed to stop using Ingenix and contribute $10 million to FAIR Health.

42. Private class action litigation also led to substantial settlements, totaling over $2 billion, including $350 million from UnitedHealth alone.

43. In the wake of the Ingenix litigations, FAIR Health became the industry standard for pricing out-of-network care. The database, run by a nonprofit corporation, contains some 46 billion healthcare claim records—with two billion added every year. The database is available to consumers, researchers, and businesses alike.

44. Those Co-Conspirators involved in the Ingenix conspiracy came away with a lesson, but not the right one: Instead of learning that it was illegal to pool their claim information in order to determine the lowest possible reimbursement rates they could impose upon providers, they determined that this was unlawful only if one of the insurers maintained the database itself. For instance, in an internal email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-

10

network reimbursements).” Instead, it “need[ed] someone (external to Cigna) to develop acceptable” reimbursement rates.

45.     That’s where MultiPlan comes in.

**D.     MultiPlan Acquires Other Repricing Services and Data Companies**

46.     In the 2010s, MultiPlan embarked on an effort to diversify its business, largely through “key acquisitions”:







47.     First, in 2006, MultiPlan acquired PHCS. While MultiPlan’s presentation focused on PHCS’s primary PPO network, the largest  in the United States, PHCS also maintained a large database of usual and customary provider charges, as noted above.

48.     In 2010, MultiPlan further strengthened its analytics-based repricing data business by acquiring Viant from Welsh, Carson, Anderson & Stower. United States antitrust regulators expressed concerns regarding this acquisition, which led the Department of Justice’s Antitrust Division to open an investigation and issue a “second request” for several categories of detailed information concerning the transaction. But the acquisition went through, giving MultiPlan access to additional “negotiation and network solutions” and “repricing solutions.”

49.     In 2011, MultiPlan acquired National Care Network (“NCN”) and its Data iSight tool, another repricing algorithm.

50.      MultiPlan describes the period including and following these latter two acquisitions—2010 to 2019—as “MultiPlan 2.0,” the period from 2010 to 2019, during which

11

MultiPlan focused on acquiring "repricing" tools to reduce the money spent on out-of-network claims.

51.     This series of acquisitions formed the "Analytics-Based" prong of MultiPlan's three-pronged strategy to underpay providers: "reduce claims using data, algorithms and IP to determine a fair price, negotiate an agreement before payment, or support the recommended price after payment."

52.     In 2011, MultiPlan acquired National Care Network ("NCN") and its Data iSight tool, another repricing algorithm.

53.     MultiPlan stores this information in an internal database. When a payor submits a new claim to MultiPlan, pursuant to the contracts between MultiPlan and its Co-Conspirators, the database reroutes the claim to one of MultiPlan's repricing tools. These algorithms use the aggregation of claims data from this gathering of competitors to determine how little the submitting party can pay a healthcare provider for the good or service in question.

54.     The exact methodology behind MultiPlan's claims suppression tools is non-public and proprietary, but a patent held by its subsidiary NCN sheds light on how it works.

55.     NCN's United States Patent No. 8,103,522 explains that when MultiPlan receives an out-of-network claim, it groups that claim into a refined diagnosis related group ("rDRG"), a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity. MultiPlan then identifies all claims at similar hospitals for the same rDRG code. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on that group of hospitals' cost report submissions to the U.S. Centers for Medicare and

Medicaid Services ("CMS") and the wage index of the hospital submitting the out-of-network claim. Next, MultiPlan calculates the markup and margin for each submitted rDRG-coded out-of-network claim using the following equation: ((Average Charge) - (Average Cost) / (Average Cost)) x 100.

56.　　In the 2020 presentation to investment analysts, MultiPlan executives put this mechanism into plain English. First, MultiPlan "ingest[s] data from [its] customers" by "integrat[ing]" its systems "quickly and easily" with its customers' systems. "[T]his data is in the form of a claim." MultiPlan then "store[s] and move[s] this claim across our platform to our various products, algorithms and intelligence engine" "to develop solutions" to its customers' problems, such as "out-of-network claims" that were "the biggest pain point for our customers." MultiPlan does all of this in "real-time." As a result, MultiPlan is "deeply embedded in its [customers'] claims adjudication process." This "deep integration into" their customers' systems gives MultiPlan "far better data sets" than their competitors.

57.　　MultiPlan is only able to offer this service because it is a clearinghouse for data from hundreds of competitors that would otherwise be severely restricted in sharing the information directly with one another. Facilitating this conspiracy preserves MultiPlan's value to its Co-Conspirators. According to Paul Galant, operating partner of MultiPlan's former owner Churchill Capital, MultiPlan minimizes "the risk . . . of [its] clients internalizing [its] solution set" by combining all its customers' private, real-time data into its repricing tools. He explained:

> [W]e see data across 700 payers. That data is much, much larger and more diverse than what any single payer has within their system . . . . And so that is a massively important point of differentiation. We build our algorithms on a much larger data lake. And because we do that, we believe our products generate bigger savings . . . .

13

58.     In other words, when repricing an out-of-network claim for a customer, MultiPlan does not simply rely on that customer's data, but on data from the customer's competitors as well. And the Co-Conspirators can't achieve the same outcome—and inflict the same injury on Plaintiff and the Class—unless they join forces.

59.     Top insurers rely on MultiPlan as their exclusive provider of repricing services. As MultiPlan stated in a securities filing, "[w]ith three of the top five payor customers, MultiPlan is the only out-of-network cost management service provider and with the other two is in position to get first look at 100% of such payor's claims (and any competing vendors see only those claims MultiPlan was unable to reduce)."

60.     This approach makes sense for all the conspirators because, as Galant put it,

> ***if a payer decides to do everything on their own*** . . . [then] their ability to go back to providers, and push for saving is fundamentally different than ours. We are the third-party independent source. The gold standard, if you will, of that data that we capture and analyze. And so ***we can talk to the entire industry***, we don't have to talk to any one specific payer when we do that. And so . . . we are a much better mechanism by which payers can reduce the cost of healthcare versus doing it themselves.

61.     Put differently, MultiPlan can more aggressively underpay providers than any individual payor because it is bringing to bear the market power of the entire industry.

62.     The conspiracy described herein has been so successful that MultiPlan is now moving beyond MultiPlan 2.0 to MultiPlan 3.0, pursuant to which MultiPlan is "extend[ing] into in-network" repricing services. MultiPlan projects that implementing MultiPlan 3.0, including by "[f]urther deploy[ing] artificial intelligence/machine learning" and continuing to "[c]ombine proprietary data with 3rd party data to develop more powerful analytics," will increase revenue by up to $1.15 billion and profits by $720 million.

63.    Put bluntly, MultiPlan intends to continue putting "savings" for its customers ahead of healthcare providers and consumers whom it "target[s]," all while claiming to be "on the right side of healthcare."

**E.    MultiPlan Invites Major Payors to Join Its Conspiracy**

64.    Acquiring these repricing tools was only one part of "MultiPlan 2.0." The scheme would not work if MultiPlan were the only PPO network operator using these tools; providers would simply stop accepting any payor that used MultiPlan for repricing out-of-network care. MultiPlan needed to expand its scheme to include the Co-Conspirators. So MultiPlan began signing up all of the country's major health insurance payors. Today, it boasts of over 700 such payors among its subscribers, including the 15 largest insurers in the country.

65.    When the payors' agreement to use FAIR Health expired in 2014, insurers immediately undertook efforts to get back to the way things were—that is, collectively using repricing tools to undervalue reimbursements. At around that time, MultiPlan began signing up every major insurer in the country to its repricing services.

66.    Indeed, following the NCN acquisition (during the MultiPlan 2.0 period), MultiPlan saw exponential revenue growth from the Data iSight platform, which "Enabled MultiPlan to grow target market with 36 Blue Cross Blue Shield health plans":



67.     The Co-Conspirators agreed among themselves and with MultiPlan to allow MultiPlan to reprice their claims and use their claims data to optimize pricing in the payors' favor. Under their agreements with MultiPlan, the Co-Conspirators send their claims to MultiPlan by way of an electronic data interchange. The data MultiPlan receives includes detailed information such as the procedure code, dates of service, the billed amount, and an alphanumeric code indicating whether the claim is subject to an insurance network's previously disclosed UCR rates.

68.     By the time it approached UnitedHealth, MultiPlan could boast that it had signed up enough of its competitors to account for 70% of the market. Although MultiPlan "did not specifically name competitors," UnitedHealth executive Lisa McDonnel wrote that "from what he did say we were able to glean who was who." Before joining the conspiracy, a United executive lamented in sworn testimony that the company had fallen "behind some of [its] largest

16

competitors" when it came to using MultiPlan's repricing tools. That made UnitedHealth susceptible to MultiPlan's pitch: that subscribing to Data iSight and other repricing tools would "bring[] UnitedHealth back into alignment with its primary competitor groups Blues, Cigna, Aetna on managing out-of-network costs."

69.    UnitedHealth joined the MultiPlan conspiracy on July 1, 2017. According to United's Vice President of Out-of-Network Payment Strategy, Rebecca Paradise, knowing that MultiPlan's services were "widely used " in the industry factored critically into United's decision to join the conspiracy. Former UnitedHealth executive John Haben has similarly remarked that "MultiPlan is a third-party entity used by many in the industry. Not only United, but our competitors."

70.    MultiPlan directly advised UnitedHealth that it should set the prices it offered to match those of its competitors. For instance, MultiPlan advised UnitedHealth that it should never pay more than 350% of the unsustainably low Medicare reimbursement rate. UnitedHealth got on board to make sure it was "in line with the competition."

71.    Haben testified that, throughout the conspiracy, MultiPlan provided UnitedHealth with information about competitor pricing. In fact, MultiPlan, as the conspiracy's hub, arranged for Client Advisory Board meetings in which the Co-Conspirators could come together to discuss how to better use MultiPlan to effectuate their anticompetitive scheme.

72.    MultiPlan encouraged continued commitment to the conspiracy—"alignment" among the competitors—by telling its Co-Conspirators about which of their competitors used the claim repricing tools and how those tools allowed those competitors to profit by artificially suppressing reimbursements for out-of-network claims. Each Co-Conspirator, therefore, knew

that its competitors had adopted or were considering adopting the MultiPlan repricing tools to underpay out-of-network healthcare service providers. Indeed, in defending their use of MultiPlan's repricing tools and the exorbitant shared savings fees they generate, UnitedHealth has called the tools and fees "an industry-standard approach." Similarly, Cigna describes the shared savings fee as in "align[ment] with industry standards." These statements make clear that MultiPlan and its Co-Conspirators intended to, and did successfully, maintain and protect the conspiracy because they know that their Co-Conspirators have agreed to do the same.

73.     It would be against the individual self-interest of any insurer to pay providers as little as MultiPlan does, because it would drastically increase the risk that the provider would simply stop accepting patients with coverage from that insurer for non-emergency services.

74.     With the comfort that all of their competitors were also using MultiPlan, however, the Co-Conspirators could rest assured that providers would swallow MultiPlan's paltry rates *and* keep accepting their insurance. After all, the providers had nowhere else to turn.

75.     Today, MultiPlan has contracts with nearly every healthcare payor in the United States—over 700 payors in total. In June 2023, MultiPlan told investors that "all of the top 15 insurers" based on market share used its claim repricing tools to artificially suppress out-of-network reimbursement rates. Those 15 insurers dominate the health insurance market, giving the conspiracy enormous power in the out-of-network reimbursement market and over healthcare providers.

76.     Almost all of those contracts include agreements to use one of MultiPlan's repricing tools to suppress out-of-network payments to providers, and for MultiPlan and the payor to split the "savings." Commercial insurance payors admit they have agreements with

MultiPlan to reprice out-of-network claims. For example, UnitedHealth states that healthcare providers may be offered a "rate recommended by Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate."

77.     MultiPlan and its Co-Conspirators have created new "industry partnerships" that give them additional opportunities to privately discuss increasing the conspiracy's ruthless efficiency. For instance, in a 2020 presentation, MultiPlan's Chief Information Officer, Michael Kim, touted the founding of the Synaptic Blockchain Alliance alongside UnitedHealth, Humana, and Aetna. He explained that leveraging blockchain technology would "significantly reduce our provider data management costs" and "improve the quality of our data." The Alliance's website further explains that the organization is "a provider data exchange—a cooperatively owned, synchronized distributed ledger to collect and share changes to provider data," which "is now a shared resource of more than two million records collectively managed by payers, providers, and data suppliers."

### F.     MultiPlan Enticed Payors to Join the Conspiracy By Offering Them a Share of Its Anticompetitive Profits

78.      MultiPlan's analytics business derives revenue in two ways. First, it derives fees from subscription fees that insurers pay for the use of MultiPlan's repricing algorithms.

79.     Second, MultiPlan's repricing tools are "priced at a percentage of savings identified." In other words, MultiPlan charges employers a fee based on the difference between a healthcare provider's original claim and the amount the provider accepts following MultiPlan's repricing of the claim. This fee often falls in the range of 5–7% of the "savings," but can be as high as 9.75%. MultiPlan thus faces incentives to pay providers as little as possible. The less

money an insurer pays to a provider, the more money MultiPlan makes.

80.     Of course, the insurers benefit as well. An insurer would always want to pay a provider as little as possible, but it would be constrained by the risk of that provider ceasing to accept its subscribers. MultiPlan's scheme eliminates that risk by suspending the competition among insurers for reimbursements to providers.

81.     At the same time that payors were abandoning UCR pricing in favor of repricing algorithms like MultiPlan's, they were also shifting their relationships with administrative services only ("ASO") insurance plans in ways that dovetailed with the repricing scheme.

82.     Under ASO plans, the employer carries the risk of loss if a claim exceeds the premiums. The premiums are paid to the employer and the employer is on the hook for paying its employees' claims. As part of this plan, the employer pays a monthly administrative services fee to an insurance company—a per member, per month ("PMPM") fee—to administer the ASO plan. The insurance company then enters into "shared savings agreements" that permit it to send out-of-network claims for ASO employers to MultiPlan for repricing. Large employers, which make up a substantial portion of the commercial insurance market, are almost all part of ASO insurance plans.

83.     At approximately the same time that insurers began abandoning UCR pricing in favor of MultiPlan's repricing algorithms, each co-conspirator added new terms to its ASO contracts in order to ensure they would profit from out-of-network reimbursement reductions. Following these changes, in addition to PMPM fees, ASO plans require self-insured groups to pay a percentage (as high as 35%) on the difference between a billed out-of-network charge and the amount paid on that out-of-network claim, known as the "shared savings fee" or "processing

fee."

84.     MultiPlan and the insurer then takes a percentage of the "savings" or "processing" fee. But this innocuous language conceals an ugly truth: MultiPlan is not really saving money at all. MultiPlan is suppressing payments to health care providers like Plaintiff and the Class; taking credit for this illusory "savings"; and then splitting the ill-gotten gains with its payor Co-Conspirators.

85.     These shared savings agreements generate tremendous profits for insurance companies and MultiPlan at the expense of medical providers. UnitedHealth made approximately $1.3 billion from its shared savings agreements to suppress out-of-network claims in 2020. And in an internal presentation, UnitedHealth stated that it intends to cut its out-of-network reimbursements by $3 billion by 2023.

86.     One example illustrates the perverse outcomes that the conspiracy generates. A New Jersey-based trucking company called New England Motor Freight received a $50,650 charge for a "processing fee" on a single hospital bill. And when New England Motor Freight questioned the fee, UnitedHealth executive William T. Raha pushed back against the idea of providing a partial refund because of "concern[] about setting precedent" on an issue that "cuts across not only all of Key Accounts, but National Accounts as well" and the company's "unwilling[ness] to enter into one-off agreements that cap our revenue."

87.     While independent health care providers like Plaintiff and the Class have struggled due to these underpayments, and employers have suffered from the fees, MultiPlan has profited handsomely. In 2020, analytics-based services—which include the repricing tools—accounted for 59% of MultiPlan's revenue. In 2021, this figure rose to 64%: $709 million of

MultiPlan's $1.1 billion in total revenue. In 2022, it rose to 66%. During this time, MultiPlan consistently had profit margins "in excess of 70%." Revenue generated by just a single claim repricing tool, Data iSight, increased from $23 million in 2012 to $323.7 million in 2019.

88.　　MultiPlan's reach is extensive—it touts that it "extends to more than 100,000 health plans covering more than 60 million people." Subscribers to MultiPlan's repricing services include all of the top 15 commercial health insurers in the country. Because the insurers that participate in the MultiPlan scheme control so much of the market, providers like Plaintiff and the putative Class have no choice but to accept MultiPlan's ridiculously low offers, or risk not being paid at all.

### G.　MultiPlan and its Co-Conspirators Drastically Underpay Providers for Out-of-Network Care

89.　　MultiPlan's repricing tools generate significant underpayments when compared to traditional methods of pricing out-of-network healthcare claims. An April 2020 study published by the Office of the New York State Comptroller compared UnitedHealth's average reimbursement payment to a healthcare provider for an out-of-network claim using a UCR methodology, which was $225, to the average payment using MultiPlan repricing, which was $96—a 57% drop. The same study found that, depending on the service provided, reimbursement payments made using MultiPlan repricing were 1.5 to 49 times lower than UCR rates for that service.

90.　　For example, Jeffrey Farkas, M.D., LLC submitted a claim for $332,300 to Great-West Healthcare d/b/a Cigna Corp. for brain surgery performed on an out-of-network basis on February 17, 2016. Farkas received a response via fax not from Cigna but from MultiPlan, which revealed that Cigna had contracted with MultiPlan to handle the claim. MultiPlan offered Farkas

only $12,407 as reimbursement for the out-of-network services performed—3.7% of the billed amount. As a condition of accepting the offer, MultiPlan required the provider to refuse to seek any further compensation from the patient. MultiPlan demanded an answer within two days.

91.     Indeed, MultiPlan and its Co-Conspirators sometimes suppress payments to healthcare providers so much that the fees that MultiPlan and its Co-Conspirators charge for these "savings" exceed the amount the provider receives for providing medical care. For instance, when a facility providing outpatient substance abuse treatment received $134.13 on a claim, Cigna, the payor, received $658.75—almost five times as much—as a processing fee. MultiPlan received $167.48—more than the provider—for its role in suppressing the claim. Court records shows this pattern repeats itself frequently. Ultimately, therefore, while Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California, the providers received only $2.56 million. MultiPlan received $1.22 million for its role in repricing those claims.

92.     MultiPlan admits that underpayments come from reducing the money healthcare providers receive for services provided. MultiPlan claims that its repricing tools generally result in payments "61%-81% off billed charges." For example, UnitedHealth, using MultiPlan's services, paid a doctor just $5,449.27 for performing a lengthy, complicated procedure to repair tissue and close a wound on a patient whose incision from heart surgery had failed to heal. In another example, United covered only $7,879 of a $152,594 bill, or just more than 5% of the bill.

93.     MultiPlan's sales executives repeatedly tout the ability of their repricing tools to create savings by underpaying out-of-network claims. MultiPlan advertises that its repricing

tools achieve "optimal reimbursement"—i.e., the lowest-possible payments to healthcare providers—when "compared to Usual and Customary and Medicare-Based pricing."

94.     A rural Virginia provider of behavioral therapy services for children with autism charges the Medicaid reimbursement rate for her services. Nevertheless, Aetna, relying on MultiPlan's repricing tools, would only pay her half the already-low rate that Medicaid pays.

95.     When sworn to tell the truth, the Co-Conspirators' executives admit to the reasonableness of healthcare providers' charges for out-of-network services. For example, at trial, Haben undercut United's mischaracterization of emergency department charges as "egregious." He specifically refused to label a $1,428 bill as "egregious," saying that the life-saving care justified the "reasonable" charge. He testified that, "[i]f you put it in the perspective of saving somebody's life, $1,400 is not a lot of money." Conversely, he admitted that UnitedHealth's reimbursement rate of $254, which MultiPlan facilitated, was "low."

96.     The MultiPlan repricing tools also generate parallel repricing offers for every entity that uses them. With the use of these tools, MultiPlan and its Co-Conspirators can offer parallel reimbursement amounts for out-of-network services regardless of the location where the service is offered. This makes no sense absent the existence of a conspiracy.

97.     Any legitimate manner of calculating out-of-network reimbursements by commercial health insurers would take into account the geographic differences in the cost of providing medical care. The cost of living, and therefore wages, varies widely state-by-state; and within states, it varies according to whether an area is urban, suburban, or rural. An hour of a physician's time generally costs more in New York City, NY than it does in Bessemer, AL. The cost of medical supplies varies widely as well, based on the size of the facility (smaller

communities tend to have smaller hospitals) and the transportation costs of delivering those supplies to the provider.

98.     Although MultiPlan claims its algorithm takes these regional differences into account by applying a wage index adjustment before recommending a reimbursement, in reality, MultiPlan offers the same payment regardless of where medical care is provided, and sometimes without regard for the service at issue.

99.     For example, consider a complaint that a group of emergency physician groups filed containing allegations regarding, inter alia, eight emergency room physicians' bills for moderately complex emergency room services across the country in a four-month period in 2019. The providers of those services billed one of two insurers, UnitedHealth and BlueCross & BlueShield ("BCBS"), for those services:

- On January 21, an emergency physician in Wyoming charged $779;
- On January 25, an emergency physician in Arizona charged $1,212;
- That same day, an emergency physician in New Hampshire charged $1,047;
- On February 8, an emergency physician in Oklahoma charged $990;
- On February 10, an emergency physician in Kansas charged $778;
- That same day, an emergency physician in New Mexico charged $895;
- On March 25, an emergency physician in California charged $937; and
- On May 20, an emergency physician in Pennsylvania charged $1,094.

100.     Upon information and belief, each of these bills represented a charge for UCR, adjusted for the facility's location.

101.     But after subjecting the providers' bills to MultiPlan's Data iSight algorithm and applying the secretly agreed upon pricing overrides, MultiPlan recommended—and UnitedHealth and BCBS paid—the exact same amount down to the penny for every one of those treatments: $413.39.

102.     MultiPlan and its insurer partners did not adjust these amounts to account for

geography, different services, or anything else, despite their representations to providers, plan sponsors, patients, and the public to the contrary.

103. These $413.39 payments, which result from Defendant and the Co-Conspirators' collusive agreement, represented between 46% and 66% reductions from a UCR payment, or a payment calculated using a fair and independent benchmark like FAIR Health.

104. MultiPlan brags that, due to this power, healthcare providers accept MultiPlan's artificially suppressed out-of-network reimbursement rates 98-99% of the time. MultiPlan specifically cites these acceptance rates as a "key benefit" of its claim repricing tools when attempting to entice additional payors to join the conspiracy.

105. But providers do not accept MultiPlan's offers 99% of the time because the offers reflect fair and competitive rates for the services they offer. Providers like Plaintiff and Class members accept these rates because, as a result of the conspiracy, they have no choice.

106. Various factors make it impossible for healthcare providers to reject MultiPlan's paltry offers. First, due to the conspiracy's size and conspirators' market share, healthcare providers cannot practically turn elsewhere to seek reimbursement for out-of-network claims. They cannot refuse to do business with the conspiracy's members and remain economically viable.

107. Second, healthcare providers cannot meaningfully negotiate with MultiPlan or its conspirators. As a "mafia enforcer for insurers," in the words of one industry analyst, MultiPlan gives providers an "offer" they cannot refuse: accept the offer within a window as short as several days, or watch it get cut even further. In one fax to a doctor, MultiPlan gave the doctor only eight days to accept its cut-rate offer. Failing that, MultiPlan threatened to drop its

offer "as low as 110% of Medicare rates." Others have reported deadlines of mere hours. Refusing the offer can also cause delay, placing additional pressure on a provider to accept the initial offer.

108.    Further, MultiPlan traps providers in a catch-22. If a provider tries to negotiate with a MultiPlan representative, it goes nowhere because MultiPlan has instructed its employees to refuse to answer more than five questions before ending the call. But because MultiPlan serves as claims handler, providers do not have the alternative of negotiating directly with payors, which have outsourced not only pricing decisions, but also claim collection, to MultiPlan. This purported efficiency is only possible as a result of the conspiracy: because MultiPlan knows that its Co-Conspirators' prices are fixed to match one another, MultiPlan has no need to waver. Some payors have recently become more aggressive and insisted that MultiPlan's offers are entirely non-negotiable not just in practice, but in fact.

109.    Third, most providers cannot devote the resources that would be necessary to contest all of MultiPlan's anticompetitively suppressed reimbursement offers. MultiPlan processes 370,000 claims daily. Attempting to negotiate reimbursements on all those claims would require substantial investments in time and resources that Plaintiff and class members could and should be devoting to patient care.

110.    MultiPlan and its Co-Conspirators exploit this limitation. They know that medical billing departments handle droves of out-of-network claims and lack the time to fight every individual claim. This emboldens MultiPlan and its Co-Conspirators to impose sub-competitive reimbursement rates on healthcare providers and give them unreasonable deadlines by which to accept them.

27

111.    Bureaucratic indifference and perverse incentives exacerbate these problems for providers. As one analyst noted, "MultiPlan's key strategy for forcing doctors to accept low prices is by erecting a bureaucratic layer so thick and complicated that few can navigate it. . . . MultiPlan preys on physicians using subtly forceful [communications], expecting physicians' medical billing staff to not have time to fight through layers of bureaucratic tape." MultiPlan's former employees explain that the company fostered a culture that promoted artificially suppressing reimbursement rates in part by linking employee bonuses to these suppressed rates. Predictably, therefore, MultiPlan, through its employees, would employ harsh negotiation techniques. One former negotiator described herself as "a bit of viper," who "wanted to go in as hard as I could because my bonus is affected." Another negotiator admits that she "knew [the artificially suppressed reimbursement rates] were not fair" and would call providers from her cellphone to advise against accepting the artificially suppressed reimbursement.

112.    The conspiracy has substantially affected the out-of-network reimbursement market and healthcare providers such as Plaintiff. In 2020, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $18.8 billion. In 2021, the figure was $21.7 billion. In 2022, the figure was $22.23 billion. By 2023, the figure was $22.9 billion.

### H.    MultiPlan Polices the Conspiracy

113.    At several points, the nation's largest insurer, UnitedHealth, indicated it might leave the conspiracy. MultiPlan pulled out all the stops to keep UnitedHealth in the fold.

114.    As the nation's largest commercial health insurance provider, UnitedHealth could easily analyze its own historical claims database to ascertain the most efficient pricing for

out-of-network reimbursements. Bringing its repricing decisions in-house would eliminate MultiPlan as a middleman, saving UnitedHealth potentially hundreds of millions of dollars per year.

115.    In 2021, UnitedHealth created Naviguard, intended to act as an in-house replacement for MultiPlan. With this creation, UnitedHealth created a "roadmap" to terminate its contract with MultiPlan in 2023. But UnitedHealth abandoned its plan and renewed its agreement with MultiPlan instead.

116.    This decision makes no economic sense from the perspective of UnitedHealth's unilateral self-interest. UnitedHealth has an economic incentive to compete against other health insurance providers to ensure that United's insureds can see out-of-network healthcare providers—and to do that, it must pay competitive reimbursement rates. UnitedHealth developed Naviguard with an eye toward achieving this competitive edge.

117.    But UnitedHealth's plan to abandon MultiPlan in favor of Naviguard would not just deny MultiPlan the revenue it derived from UnitedHealth; it risked destabilizing the MultiPlan agreements and causing other payors to reevaluate their participation in the conspiracy. So MultiPlan stepped in with a sweetheart deal. Upon information and belief, in 2022, MultiPlan and UnitedHealth negotiated a new contract for MultiPlan's repricing

118.    As a result of the new terms it gave to UnitedHealth, MultiPlan experienced a 20.6% drop in revenues for the first quarter of 2023 compared with the first quarter of 2022. But MultiPlan was willing to sacrifice short-term revenues to stabilize the conspiracy and keep its largest members in the fold.

119.    To further sweeten the deal, on June 27, 2023, MultiPlan announced that John

Prince, the recently retired President of Optum—UnitedHealth's health services subsidiary—would join MultiPlan's board of directors.

120. MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy will have long-term benefits.

## V. The Conspiracy is Per Se Illegal.

121. The agreement among MultiPlan and its Co-Conspirators to share claim information with one another and collectively use that repository of claim information to fix the prices they pay for out-of-network health services produces clear anticompetitive effects and offers no procompetitive benefits, rendering it a facially anticompetitive, per se illegal restraint of trade.

122. Indeed, MultiPlan acknowledges that it "is deeply integrated into the proprietary claims adjudication system of its customers" and uses all these proprietary data sources to "drive" its analytics system.

123. Although this conspiracy harnesses new technology to accomplish its anticompetitive ends, it is a classic price-fixing conspiracy that courts have long deemed per se illegal.

124. MultiPlan and its Co-Conspirators also cannot escape scrutiny under the per se rule simply by pointing to the absence of an agreement on the final reimbursement rate for a given service. The per se rule applies because MultiPlan and its Co-Conspirators agreed to use the same method—MultiPlan's repricing tools, databases and algorithms—to set reimbursement rates, and they knew that all other conspirators would rely on those same tools and algorithms because MultiPlan specifically informed them of this before and throughout the conspiracy.

30

Calling MultiPlan's price offers merely a "recommendation" elevates form over substance; in reality, providers like Plaintiff and the Class have no choice but to accept whatever meager compensation MultiPlan presents. Because each member of the conspiracy understood that the others would rely on MultiPlan's algorithm to set reimbursement rates and proceeded anyway, the conspiracy is per se unlawful.

### A. MultiPlan Operates a Hub-and-Spoke Conspiracy

125.     In the alternative, the conspiracy among MultiPlan and its Co-Conspirators could also be characterized as a hub-and-spoke conspiracy.

126.     Under this rubric, MultiPlan is the conspiracy's hub. The agreements between MultiPlan and its Co-Conspirators are the spokes. The Co-Conspirators' knowledge that the others are also using MultiPlan's claim repricing tools to reprice out-of-network reimbursement claims is the rim.

127.     MultiPlan serves as the hub by operating a clearinghouse for all of its Co-Conspirators' claims data. No valid independent business reason exists for the Co-Conspirators to share their proprietary data with MultiPlan and agree to use MultiPlan's claim repricing tools to artificially suppress out-of-network reimbursement rates. Large payors, like UnitedHealth, could, and did, create internal repricing tools that do not rely on the sharing and use of competitors' sensitive claim data. Small payors could use the FAIRHealth benchmark to reprice claims. Instead, essentially all payors, including the largest 15, agreed to use MultiPlan's claim repricing tools to suppress out-of-network claim reimbursements. Why? MultiPlan, as the conspiracy's hub, assured its conspirators that they could conspire without worrying that their competitors would challenge them by offering higher reimbursement rates.

128. The MultiPlan conspiracy works because the Co-Conspirators collectively agreed to depart from alternatives—such as the traditional "usual and customary" pricing model, or FAIRHealth—and instead use MultiPlan as a hub to fix the prices for reimbursement of out-of-network claims. Further, participation in the conspiracy requires submission of real-time claims data to MultiPlan. Because each conspirator knows that it must contribute that data, it knows that all of its competitors—i.e., its fellow conspirators—are contributing their data as well. This information sharing increased the Co-Conspirators' motivation to conspire, because it reminded each one that any attempt to reduce prices unilaterally would fail due to the conspiracy's existence.

**B.      The Conspiracy Harms Competition in the Relevant Market.**

129. The conspiracy has harmed competition in the market for reimbursements of out-of-network healthcare services claims by commercial payors. By agreeing to use MultiPlan's repricing tools to suppress the reimbursement rate for out-of-network services, MultiPlan's Co-Conspirators have paid less on out-of-network reimbursement claims to healthcare providers than they would have in the absence of the conspiracy.

130. But for the conspiracy, MultiPlan and its Co-Conspirators would have competed to adequately compensate Plaintiff and Class members for out-of-network healthcare services. Doing so would ensure that more providers would accept their insurance; that their insureds could access a wider variety of healthcare providers; and make their health insurance plans more attractive to subscribers.

131. The underpayments to Plaintiff and the Class are a classic injury of the type the antitrust laws were intended to prevent. The conspiracy caused those injuries.

32

132.     Plaintiffs cannot avoid the conspiracy's anticompetitive effects. As explained above, practically speaking, healthcare providers cannot reject MultiPlan's offered reimbursement rates and negotiate to obtain a better rate. As one healthcare provider explained, "When we reject a [proposed MultiPlan reimbursement rate], it takes months to get any payment and we never get paid more than the amount" originally proposed. Indeed, sometimes MultiPlan will reduce the reimbursement rate even further if the healthcare provider does not immediately acquiesce.

133.     MultiPlan and its Co-Conspirators' market power allows them to enforce compliance with their reimbursement rates. Providers ultimately accept these sub-competitive rates as often as 99% of the time and appeal them as infrequently as 2% of the time.

134.     The conspiracy not only harms healthcare providers, but also healthcare consumers. For one thing, underpayments can push healthcare providers out of business, limiting the supply of healthcare services.

135.     In particular, the conspiracy puts providers in rural areas at risk of closing. As explained by the American Hospital Association ("AHA"): "America's rural and community hospitals need competitive reimbursements from commercial payors to carry out their core mission of providing care for their patients and communities." A recent study estimate[es] that "[m]ore than 200 rural hospitals are at immediate risk of closure because they aren't making enough money to cover the rising cost of providing care, and their low financial reserves leave them little margin for error." The same study found that another 400 rural hospitals "are at risk of closure in the near future."

136.     According to the same study, 58% of rural hospitals in Alabama are at risk of

33

closing, with 44% at immediate risk of closing.

| | | | Hospitals With Losses on Services | | Hospitals At Risk of Closing | | Hospitals At Immediate Risk | |
|---|---|---|---|---|---|---|---|---|
| State | Closures Since 2005 | Current Rural Hospitals | Number | Percent | Number | Percent | Number | Percent |
| Texas | 25 | 159 | 102 | 64% | 77 | 48% | 29 | 18% |
| Kansas | 10 | 101 | 83 | 82% | 57 | 56% | 26 | 26% |
| Mississippi | 6 | 73 | 45 | 62% | 38 | 52% | 25 | 34% |
| Alabama | 7 | 52 | 34 | 65% | 30 | 58% | 23 | 44% |

RURAL HOSPITALS AT RISK OF CLOSING

**C. No Procompetitive Benefits Justify the Anticompetitive Effects of the Scheme**

137. MultiPlan and its Co-Conspirators' collective pricing scheme has harmed competition while producing no procompetitive effects.

138. MultiPlan and its Co-Conspirators contend that its conspiracy has procompetitive benefits because it reduces health care costs for consumers. But this is not true. As one healthcare analyst explained: "Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . . somehow continue to rise."

139. Statistical evidence supports this analysis. The Centers for Medicare and Medicaid Services found that out-of-pocket health expenditures increased $67.3 billion, or 18.3%, from 2016, the year before the conspiracy started, to 2021. It projects that these figures will continue to grow, outpacing inflation and GDP growth, well into the future.

140. MultiPlan and its Co-Conspirators have systematically paid sub-competitive reimbursements for out-of-network healthcare services, which reduces the revenue available to healthcare providers to improve and expand access to healthcare. The conspiracy has also already

34

limited consumers' healthcare options by contributing to an increase in hospital closures. The conspiracy does not, however, contain healthcare costs. MultiPlan and its Co-Conspirators' burden healthcare providers, consumers and employers to benefit themselves alone, all while unfairly labeling healthcare reimbursement claims as "egregious" to justify their misconduct.

141.     Even though MultiPlan and its Co-Conspirators' misconduct has increased their profits by outsourcing reimbursement pricing to a single, automated decision-maker that processes and relies on all their non-public claim data to set prices, it has not in any way improved competition or healthcare quality, nor has it lowered healthcare costs overall. Simply put, the conspiracy provides no procompetitive benefits.

142.     Even assuming any de minimis procompetitive benefits from MultiPlan and its Co-Conspirators' misconduct exist (and they do not), they could not outweigh the significant and ongoing anticompetitive effects that the conspiracy has caused in the market.

## VI.    Market Power in the Relevant Market

### A.    Product Market

143.     To the extent that Plaintiff's claims require the definition of relevant markets, the relevant product market in which MultiPlan and its Co-Conspirators compete is the market for reimbursements paid by commercial insurers (irrespective of whether on the insurer's own behalf or on behalf of ASO clients) to healthcare providers for out-of-network medical services. Within this market, healthcare providers like Plaintiff and Class members function as sellers of out-of-network medical services, while commercial insurers like Defendant and the Co-Conspirators function as buyers of those services.

### B. Geographic Market

144.     The relevant geographic market is the United States.

145.     The relevant geographic market is not larger than the United States because medical providers in the United States cannot reasonably turn to payors in other countries—where private medical insurance is uncommon or non-existent and nearly all medical care is administered as part of a comprehensive government program—to be reimbursed for out-of-network medical services. The United States' healthcare industry, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries and is subject to a variety of unique federal and state laws and regulations that apply only in the United States.

146.     The relevant geographic market is not smaller than the United States because healthcare providers can and do turn to commercial insurers located in other parts of the country for reimbursement of out-of-network services. Healthcare providers can choose to file claims on behalf of their out-of-network patient and are not bound by the patient's contract with his or her health insurer.

### C. Market Power

147.     MultiPlan and its Co-Conspirators collectively possess market power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb out-of-network reimbursement payments. Although it is not coextensive with the market for reimbursement payments, the Kaiser Family Foundation estimates that the health insurance market in the United States has a Herfindahl-Hirschman Index—a common measure of market concentration—of 4,594. This indicates that the market is

36

highly concentrated, since a value above 2,500 indicates an anticompetitive market.

148.     Further, that MultiPlan is able to suppress reimbursements to providers in the Class is direct evidence that MultiPlan and its Co-Conspirators have the market power sufficient to do so.

## VII.     Parallel Conduct and Plus Factors

149.     To the extent that Plaintiff must plead parallel conduct and plus factors, the parallel conduct in which MultiPlan and its Co-Conspirators have engaged further evinces the conspiracy to diminish payments to healthcare providers for out-of-network claims.

150.     As detailed above, the nation's largest health insurers have all, in parallel, abandoned UCR pricing in favor of MultiPlan's repricing algorithms. At the same time, they have changed their agreements with ASO customers to implement "shared savings" strategies, that dovetail with MultiPlan's repricing.

151.     In addition to the parallel conduct by MultiPlan and its Co-Conspirators, various "plus factors" confirm the conspiracy, including the following.

### A.     High Collective Market Concentration

152.     As noted above, the relevant product market for Plaintiff's claims is the market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services. In this market, healthcare providers like Plaintiff function as sellers of out-of-network services and commercial insurers like MultiPlan function as buyers of those services.

153.     Healthcare providers have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services.

154.     MultiPlan faces only limited competition in the out-of-network claims repricing

business. MultiPlan claims that its repricing tools, like Data iSight, differentiate themselves through patented repricing methodology and MultiPlan's large, proprietary database of historical claims, whereas other claims repricing services base their methodologies on UCR rates or Medicare rates. Other claims repricing services are small-time players compared to MultiPlan. In 2022, MultiPlan's main competitor, Zelis, processed approximately two million claims for repricing. The same year, MultiPlan processed 546 million claims, accounting for $155 billion in claims. These competitors do not possess sufficient market share to discipline MultiPlan.

155.    But MultiPlan has not distinguished itself by creating a "superior product." To the contrary, as one investment analyst put it, "there is no discernible difference between MPLN and Zelis," and instead, "switching costs are the only barrier to entry."

156.    Nor can health care providers turn to patients for compensation. Under various federal and state laws, it can be illegal for healthcare providers to seek reimbursements from insureds for out-of-network claims (so-called "balance billing"). Even where statutes do not limit this conduct, MultiPlan and its Co-Conspirators—who dominate the market—force healthcare providers to forego any reimbursement from insureds as a condition of receiving the meager compensation that MultiPlan offers.

157.    In short, MultiPlan and its Co-Conspirators' high market concentration has allowed the MultiPlan conspiracy to flourish and lets MultiPlan impose anticompetitive effects on the entire relevant market.

158.    As a result of this market concentration, healthcare providers have no choice when seeking payment for out-of-network services. Often, their only option for reimbursement is submitting a claim to the patient's particular insurance company. If that insurance company is a

member of the MultiPlan conspiracy—and given the market power that MultiPlan and the Co-Conspirators possess, it likely is—the healthcare provider has no choice but to accept whatever reimbursement MultiPlan deigns to offer.

**B.     Motive to Conspire**

159.     MultiPlan and its Co-Conspirators have a pressing financial motive to suppress out-of-network payment rates. MultiPlan is paid a percentage of the underpayment to healthcare providers: the more the conspiracy curbs reimbursements, the more MultiPlan is paid.

160.     Likewise, the Co-Conspirators are incentivized to suppress payments to healthcare providers to increase their own profits. Just as MultiPlan charges insurance companies a percentage of the difference between the provider's billed amount and the amount actually paid, insurance companies charge their customers, often employers who provide coverage to employees through self-funded plans administered by the insurance company, a percentage of that same difference as a "shared savings fee" or "processing fee."

161.     Thus, MultiPlan and its Co-Conspirators' motives are aligned because the less they pay to healthcare providers, the more revenue they get to keep for themselves and split pursuant to their anticompetitive agreements.

**C.     High Barriers to Entry**

162.     Entering the Relevant Market is hindered by high barriers.

163.     To develop a third-party repricing service, a new entrant would need to spend copious amounts of money to develop source code and algorithms that effectively reprice out-of-network claims without infringing MultiPlan's patents, develop contractual relationships with hundreds of commercial insurers, and commit significant resources to consistently improving

its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt MultiPlan's repricing scheme.

164.     Even if a competitor could develop the software to compete with MultiPlan, it would be hard pressed to make a viable challenge to MultiPlan's dominant market share as long as MultiPlan maintained agreements with the nation's largest health insurance payors. Indeed, MultiPlan's use of the anticompetitive profits it generates from the scheme to pay its Co-Conspirators amounts to a substantial barrier to entry. By granting its Co-Conspirators a portion of the "savings" it generates by repricing out-of-network claims, MultiPlan is effectively sharing profits that it is able to generate only because of the collective participation of the other members of the conspiracy.

165.     These payments function as a barrier to entry and a way to raise rivals' costs. To acquire market share in the market for claim repricing, a rival would need not only to wait for the Co-Conspirators' agreements with MultiPlan to expire, but also to match or exceed the payments that MultiPlan offers. But rivals are not able to match the payments that MultiPlan pays to the Co-Conspirators because, unlike MultiPlan, they do not possess market power, and thus do not have anticompetitive profits to share.

166.     These numerous high barriers effectively prevent new entrants from interrupting MultiPlan's position of control.

**D.      Prior Collusion**

167.     Cours recognize that it is easier for competitors in the same market to conspire if they have conspired before. Here, as detailed above, many of MultiPlan's Co-Conspirators tried a similar scheme by using the UnitedHealth subsidiary Ingenix as the vehicle. There, too,

competing health insurance payors were sending detailed information on their out-of-network claims to a central database that was used to calculate reimbursement rates. UnitedHealth and its Co-Conspirators agreed to cease utilizing Ingenix and paid large sums toward the creation of the unbiased database, FAIR Health.

168.    Shortly after court orders stopped requiring them to use FAIR Health, however, the Co-Conspirators quickly joined the MultiPlan conspiracy.

169.    Even though MultiPlan was not itself involved in the Ingenix conspiracy, many of its Co-Conspirators were. It is plausible to infer that the same players have tried the same scheme again.

### E.    Opportunities to Collude

170.    MultiPlan and its Co-Conspirators have ample opportunities to conspire, including through MultiPlan's facilitation of private communications among them.

171.    MultiPlan and its Co-Conspirators frequently meet at Client Advisory Board meetings and other ad hoc meetings between MultiPlan and its customers to discuss how to improve their conspiracy's efficacy in suppressing out-of-network reimbursements to healthcare providers.

172.    MultiPlan's road shows also provided numerous opportunities for MultiPlan and its Co-Conspirators to conspire. For instance, in 2019, major health insurance executives, including those from many of the Co-Conspirators, met in Laguna Beach, CA. At this gathering, MultiPlan executive Dale White professed that "MultiPlan is Magic" and discussed "a few things up [its] sleeve" that might benefit the insurers.

173.    The Co-Conspirators also have opportunities to collude by way of their other

industry connections. For example, many Co-Conspirators are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). According to AHIP, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests." Numerous co-conspirator executives hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC. Multiple times a year, AHIP hosts conferences, committee meetings, and board meetings in which its members participate in closed-door meetings. A federal court in California has found that entities' overlapping membership in AHIP and participation in AHIP events presented sufficient opportunities to conspire so as to demonstrate a per se horizontal price-fixing agreement.

174.    What's more, MultiPlan's repricing databases are themselves an opportunity to collude, since MultiPlan and the Co-Conspirators effectively use those databases to launder their price fixing conspiracy. The database is the locus for the exchange of the conspirators' proprietary information, and it is the basis for generating the identical prices that payors offer to providers. As detailed above, the Co-Conspirators contribute their claims data to MultiPlan on a real-time basis, and they receive recommendations from MultiPlan that rest on the data collected from the Co-Conspirators in that database. Thus, the MultiPlan repricing tools are themselves an opportunity to collude.

### F.    Actions Against Self-Interest

175.    Members of the MultiPlan conspiracy have engaged in numerous actions against their own unilateral self-interests.

176.    In a competitive market, competing insurers would not agree to offer their proprietary data to facilitate their competitors' repricing through a common repricing tool. Instead, a competitive insurance provider would want to capture new insurance business through increasing its network of providers and, where otherwise appropriate, expand the universe of out-of-network providers that accept patients with its insurance. Such procompetitive expansions increase the value proposition of its product to subscribers. While competitive insurers would still seek to reprice their out-of-network claims using their own proprietary data (and not their competitors' data), they would not offer their own proprietary data to assist their competitors, and they would use repricing tools in procompetitive ways that would not undermine their ability to bring providers within network or to incentivize providers to take the insurers' insureds notwithstanding the providers' out-of-network status.

177.    When competitors share their sensitive, proprietary data to implement a common reimbursement suppressing tool, as they have here, they are able to collectively maximize profits while shielding themselves from the cost of disputes. They are no longer kept in line by the worry that their insureds will not be accepted for optional out-of-network care and can instead blindly and automatically accept lowered claims reimbursement suggestions. Meanwhile, the providers lose because they are forced into accepting MultiPlan's take-it-or-leave it reimbursement offers.

178.    If a single insurer entered into an agreement with MultiPlan to shift away from the traditional UCR methodology and drastically underpay out-of-network claims, healthcare providers would refuse to treat patients subscribing to that insurer. It follows that the insurer would then experience serious diminishment in the value and breadth of its insurance offerings

and in its number of subscribers. Moreover, the insurer would have more difficulty recruiting healthcare providers to its network, further reducing the network's value and potential earnings.

179.    The single contracting insurer would also likely be forced to undergo lengthy and expensive repricing negotiations after facing pushback from providers. But when numerous insurers enter a conspiracy to reprice claims, it becomes less effective for healthcare providers to negotiate due to the volume of repriced offers.

180.    Further, it would be in a given insurer's interest to develop its own repricing algorithm based only on its own proprietary data, as UnitedHealth sought to do with Naviguard. Such individual repricing efforts can give insurers competitive advantages over their rivals. Yet UnitedHealth, MultiPlan, and the other Co-Conspirators have refrained from doing so, despite the benefit to their unilateral self-interests, because the conspiracy makes their collective self-interest—though illegal—more valuable than their unilateral self-interest.

### G.    Information Exchange

181.    MultiPlan and its Co-Conspirators are unlikely to exchange large volumes of competitively sensitive information in the absence of an agreement ensuring the others would do the same.

182.    But here, MultiPlan and its Co-Conspirators have agreed to exchange non-public, sensitive, and proprietary data regarding health care providers' claims, reimbursement offers made in response to providers' claims, and the actual amount paid on those claims.

183.    MultiPlan and its Co-Conspirators' information exchange is of the type the courts have recognized as likely to have anticompetitive effects. MultiPlan and its Co-Conspirators exchange real-time, non-public pricing data by transmitting it automatically to

MultiPlan. MultiPlan touts that its analytics-based services are driven by "[p]roprietary and public data sources." But the "proprietary" data sources are non-public information that MultiPlan's subscribers—insurers that should be competitors—are sharing with one another. Finally, the shared data is granular and unblinded, meaning MultiPlan knows exactly what these competitors are charging for medical services.

184.     The insurer competitors participate in this scheme precisely because their competitors are doing so, creating common, fixed reimbursement prices between them that are lower than what the insurers would have to pay absent their collusion via the MultiPlan scheme. Specifically, MultiPlan is using this proprietary, real-time pricing data to explicitly share confidential pricing information among members of the conspiracy to fix prices. For example, when seeking to establish UnitedHealth's out-of-network reimbursement rates, MultiPlan told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

185.     Competing companies would not ordinarily risk sharing their real-time, competitively sensitive pricing information with their rivals. Moreover, they would not simultaneously pay those rivals—in this case MultiPlan—millions of dollars absent an agreement to restrain competition. MultiPlan and its Co-Conspirators' information exchange is more consistent with an agreement to restrain trade than with competition on the merits.

### H.     Patterns and Courses of Dealing

186.     MultiPlan has a long history of forming, maintaining, and stabilizing the conspiracy.

187.     MultiPlan boasts that it is "deeply embedded into [its Co-Conspirators'] claims

platforms."

188.     Moreover, MultiPlan boasts about the long-term nature of its relationships with its claims repricing clients. In a June 28, 2023, investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

189.     For over a decade, the leading commercial health insurance providers in the Relevant Market have been bound to multi-year contracts to use MultiPlan's claims repricing tools. MultiPlan's consistent public statements trumpeting this high level of market participation and promoting 99% acceptance rates of its reimbursement offers provide encouragement and reassurance to other members of the conspiracy.

190.     MultiPlan has effectively taken the lead in recruiting new members to its conspiracy, espousing the advantages of collusive pricing to them, warning they will suffer a drastic financial disadvantage if they do not participate in the cartel, and enforcing price discipline by encouraging members to match their competitors' repricing standards.

191.     These customary patterns, formulas, leadership, and other courses of dealing are circumstantial evidence of agreements and a conspiracy to suppress reimbursement rates.

## VIII.   Interstate Commerce

192.     MultiPlan and its Co-Conspirators' conduct as described herein has substantially affected interstate commerce. Healthcare providers that MultiPlan and its Co-Conspirators reimburse for out-of-network health services, such as Plaintiff, provide services, goods, and facilities to people who reside in many states. MultiPlan and its Co-Conspirators also operate PPOs throughout the United States. MultiPlan and its Co-Conspirators' conspiracy comes within the flow of and intentionally, directly, substantially, and foreseeably affects interstate

commerce in the United States.

## IX. Continuing Violation

193.    The MultiPlan conspiracy is ongoing, causing harm to Plaintiff and members of the Class every time they are paid a sub-competitive rate for out-of-network services as a result of the conspiracy. As such, the conspiracy causes continuing violations against Plaintiff that toll the statute of limitations.

194.    Further, MultiPlan and its Co-Conspirators renew their MultiPlan contracts to strengthen and continue the conspiracy, and these new agreements are continuing violations of the antitrust laws. These new agreements include the 2022 contract between MultiPlan and UnitedHealth, which kept the largest commercial health insurer in the conspiracy and ensured the conspiracy's survival.

## X. Antitrust Injury

195.    This conspiracy directly damages Plaintiff's business and property and restrains competition in the market for reimbursements for out-of-network healthcare services paid by commercial payors.

196.    The underpayments to Plaintiff and members of the Class are an injury of the type the antitrust laws were intended to prevent. The conspiracy by MultiPlan and its Co-Conspirators caused Plaintiff and members of the Class to suffer this underpayment injury.

197.    Plaintiff has sustained and continues to sustain economic losses—the full amount of which will be calculated after discovery and proven at trial—due to MultiPlan and its Co-Conspirators' artificially suppressing the reimbursement rate for out-of-network healthcare services.

198.    But for the MultiPlan conspiracy to fix the price paid for out-of-network healthcare services, Plaintiff would have received fair and competitive reimbursements for their out-of-network healthcare services.

199.    Moreover, use of MultiPlan's claim repricing tools to set collusive, artificially suppressed reimbursement rates subverts the competitive process more generally by depriving the market of independent centers of decision-making and replacing them with decision-making on prices by one shared pricing brain. The antitrust laws aim to prevent this anticompetitive conduct.

## XI.    Class Action Allegations

200.    Plaintiff brings this action on behalf of itself and the following class ("Class") of all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3):

> All persons or entities whom one or more of MultiPlan or Co-Conspirators, or a division, subsidiary, predecessor, agent, or affiliate of such entities, have reimbursed for out-of-network healthcare services from no later than July 24, 2020, until MultiPlan and its Co-Conspirators' unlawful conduct and anticompetitive effects cease. The class excludes federal and state governmental entities and judicial officers presiding over this case.

201.    The Class is so numerous that joinder of all members in this action is impracticable. There are thousands, if not millions, of geographically dispersed Class members.

202.    The Class members can be readily identified and notified in an administratively feasible manner using, among other information, the Class members' electronic transactional records of out-of-network claims reimbursements.

203.    Plaintiff's claims are typical of those of the Class. Plaintiff and all Class members claim that MultiPlan and its Co-Conspirators' alleged misconduct violates Sections 1

and 2 of the Sherman Act. Plaintiff and all Class members also allege and will show that the same anticompetitive and unlawful conduct injured them and caused them to receive reimbursements for out-of-network claims that were lower than what they would have received absent MultiPlan and its Co-Conspirators' collusive conduct.

204.     Plaintiff will fairly and adequately protect and represent the interests of the Class members. The interests of Plaintiff and Plaintiff's counsel fully align with, and are not antagonistic to, the interests of the Class members. Plaintiff will and can dispatch the duties incumbent on a class representative to protect the interests of all Class members.

205.     Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions, and they possess the resources needed to vigorously litigate the case to the greatest extent necessary for the Class.

206.     Legal and factual questions common to the Class and susceptible to proof with evidence common to all Class members include:

- Whether MultiPlan and its Co-Conspirators formed a horizontal agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the United States;

- Whether, in the alternative, MultiPlan and its Co-Conspirators formed a hub-and-spoke agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the United States;

- Whether MultiPlan and its Co-Conspirators' alleged misconduct constitutes a per se violation of Section 1 of the Sherman Act;

- Whether, in the alternative, MultiPlan and its Co-Conspirators' alleged misconduct violates Section 1 of the Sherman Act pursuant to a quick look or full rule of reason analysis;

- Whether MultiPlan's conduct violates Section 2 of the Sherman Act;

- Whether MultiPlan and its Co-Conspirators' alleged misconduct in fact caused Class members throughout the United States to receive artificially suppressed reimbursements on out-of-network healthcare service reimbursement claims;

- The proper measure of Class-wide damages;

- The scope and extent of injunctive relief needed to remedy the anticompetitive effects of MultiPlan and its Co-Conspirators' alleged conduct going forward; and

- Whether MultiPlan and its Co-Conspirators fraudulently concealed the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial agreement, thereby tolling the statute of limitations.

207.     Legal and factual questions common to Class members will predominate over any individualized legal or factual questions. MultiPlan and its Co-Conspirators have acted and refused to act on grounds generally applicable to the Class.

208.     In cases like this one that allege price-fixing among competitors, including those with a potential hub-and-spoke component, the common legal and factual question regarding the conspiracy's alleged existence by itself has been held to predominate over any possible individualized issues, thus warranting certification of the Class. That is the case here.

209.     Class treatment is the superior method for the fair and efficient adjudication of this controversy. It allows the many Class members to prosecute their common claims, and Defendants to defend themselves against these claims, in one court simultaneously and efficiently without the unnecessary duplication of effort and expense presented by separate actions. The benefits of proceeding with this procedural mechanism, including providing injured people with a way to obtain redress for claims that may be impracticable for them to pursue individually,

50

substantially outweigh any difficulties that may arise in the management of this case as a class action.

## XII.  CAUSES OF ACTION

**COUNT ONE**
**Horizontal Conspiracy in Restraint of Trade –**
**Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)**

210.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in paragraphs 1-209 of this Complaint.

211.    To the extent it is necessary to define the relevant markets, the relevant product market is the market for reimbursement of out-of-network healthcare services, and the relevant geographic market is the United States and its territories. MultiPlan and its Co-Conspirators possess market power in the relevant antitrust market.

212.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other Class members under Section 4 of the Clayton Act for conduct in violation of Section 1 of the Sherman Act.

213.    MultiPlan and its Co-Conspirators formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

214.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among MultiPlan and its Co-Conspirators to knowingly and collectively use MultiPlan's repricing tools to set reimbursement rates for out-of-network healthcare services. This conspiracy has caused Plaintiff and the Class to receive artificially suppressed reimbursements for out-of-network healthcare services during the class period.

215.    As detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy among competitors in the United States' commercial health insurance market.

216.    Direct evidence that MultiPlan and its Co-Conspirators agreed to curb out-of-network reimbursement payments includes (1) express contracts between MultiPlan and its Co-Conspirators setting forth the collusive conduct at issue; (2) public statements in which MultiPlan and its Co-Conspirators admit to the existence of these contracts and their knowledge of the Co-Conspirators' participation in the same scheme; (3) internal communications among conspirators that were revealed in other litigation; and (4) MultiPlan's patent, which describes MultiPlan's use of repricing technology to suppress out-of-network reimbursements to healthcare providers.

217.    To further this contract, combination, or conspiracy, MultiPlan and its Co-Conspirators have committed various acts, including that:

- Co-Conspirators shared real-time, private, confidential, and detailed internal claims data with MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

- MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators knowingly used the same out-of-network claim repricing tools that incorporated other Co-Conspirators' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

- The Co-Conspirators outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the

reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

- MultiPlan and its Co-Conspirators exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tools; and

- MultiPlan and its Co-Conspirators used many forms and methods of communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

218.    MultiPlan and its Co-Conspirators' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall far below competitive rates for such claims.

219.    As a direct and proximate result of MultiPlan and its Co-Conspirators' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business or property and will continue to be injured in their business and property by receiving reimbursements for out-of-network healthcare services claims that are far lower than what they would have received absent the conspiracy.

220.    There are no procompetitive justifications for MultiPlan and its Co-Conspirators' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

221.    MultiPlan and its Co-Conspirators' conspiracy is a per se violation of Section 1 of the Sherman Act. In the alternative, MultiPlan and its Co-Conspirators' conspiracy violates Section 1 of the Sherman Act under either a quick look or full Rule of Reason analysis.

## COUNT TWO
### Hub-and-Spoke Conspiracy in Restraint of Trade –
### Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)
### (Pled in the alternative to Counts 1 and 3)

222.    Plaintiff incorporates and realleges, as though fully set forth herein, the allegations in paragraphs 1-221 of this Complaint.

223.    To the extent it is necessary to define the relevant markets, the relevant product market is the market for reimbursement of out-of-network healthcare services, and the relevant geographic market is the United States and its territories. MultiPlan and its Co-Conspirators possess market power in the relevant antitrust market.

224.    In the alternative to Count One, and as detailed above, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and its Co-Conspirators to use MultiPlan's claim repricing tools served as spokes, and the agreement among the spokes to use MultiPlan's repricing tools to reprice reimbursement rates for out-of-network healthcare services claims serve as the rim.

225.    This conduct violates Section 1 of the Sherman Act.

226.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the Class under Section 4 of the Clayton Act for this violation.

227.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among MultiPlan and its Co-Conspirators to knowingly and collectively use MultiPlan's repricing tools. This conspiracy has caused Plaintiff to receive artificially suppressed reimbursements on claims for out-of-network healthcare services during the class period.

228.    Direct evidence that MultiPlan and its Co-Conspirators agreed to curb out-of-network reimbursement payments includes (1) express contracts between MultiPlan and its Co-Conspirators setting forth the collusive conduct at issue; (2) public statements in which MultiPlan and its Co-Conspirators admit to the existence of these contracts and their knowledge of the Co-Conspirators' participation in the same scheme; (3) internal communications among conspirators that were revealed in other litigation; and (4) MultiPlan's patent, which describes MultiPlan's use of repricing technology to suppress out-of-network reimbursements to healthcare providers.

229.    To further this contract, combination, or conspiracy, MultiPlan and its Co-Conspirators have committed various acts, including that:

- MultiPlan and its Co-Conspirators shared real-time, private, confidential, and detailed internal claims data for use in MultiPlan's out-of-network claim repricing tools;

- MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators knowingly used the same out-of-network claim repricing tools that incorporated other Co-Conspirators' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

- The Co-Conspirators outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

- MultiPlan and its Co-Conspirators exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network

claim repricing tools; and

- MultiPlan and its Co-Conspirators used many forms and methods of communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

230. MultiPlan and its Co-Conspirators' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below competitive rates for such claims.

231. As a direct and proximate result of MultiPlan and its Co-Conspirators' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business or property and will continue to be injured in their business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what they would have received absent the conspiracy.

232. There are no procompetitive justifications for MultiPlan and its Co-Conspirators' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

233. MultiPlan and its Co-Conspirators' conspiracy is a per se violation of Section 1 of the Sherman Act. In the alternative, MultiPlan and its Co-Conspirators' conspiracy violates Section 1 of the Sherman Act under either a quick look or full Rule of Reason analysis.

**COUNT THREE**
**Conspiracy to Restrain Trade –**
**Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)**
**(Pled in the alternative to Counts 1 and 2)**

234.     Plaintiff incorporates and realleges, as though fully set forth herein, the allegations in paragraphs 1-233 of this Complaint.

235.     To the extent it is necessary to define the relevant markets, the relevant product market is the market for reimbursement of out-of-network healthcare services, and the relevant geographic market is the United States and its territories. MultiPlan and its Co-Conspirators possess market power in the relevant antitrust market.

236.     In the alternative to Counts 1 and 2, and as detailed above, MultiPlan engaged in a continuing agreement with its Co-Conspirators to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act. Each agreement between MultiPlan and its Co-Conspirators to outsource the pricing of reimbursements for out-of-network healthcare services claims to MultiPlan unreasonably restrains trade in violation of Section 1 of the Sherman Act.

237.     Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the Class under Section 4 of the Clayton Act for this violation.

238.     The contract, combination, or conspiracy alleged herein has consisted of continuing agreements between MultiPlan and its Co-Conspirators to knowingly and collectively use MultiPlan's repricing tools to artificially suppress the reimbursement rates for out-of-network healthcare services claims. This conspiracy has intentionally harmed the market for reimbursements for out-of-network healthcare services claims by artificially suppressing the reimbursement rates for out-of-network healthcare services claims and has harmed Plaintiff and

the Class by causing them to receive artificially suppressed reimbursements for out-of-network healthcare services claims during the class period.

239.     Direct evidence that MultiPlan and its Co-Conspirators agreed to curb out-of-network reimbursement payments includes (1) express contracts between MultiPlan and its Co-Conspirators setting forth the collusive conduct at issue; (2) public statements in which MultiPlan and its Co-Conspirators admit to the existence of these contracts and their knowledge of the Co-Conspirators' participation in the same scheme; (3) internal communications among conspirators that were revealed in other litigation; and (4) MultiPlan's patent, which describes MultiPlan's use of repricing technology to suppress out-of-network reimbursements to healthcare providers.

240.     To further this contract, combination, or conspiracy, MultiPlan and its Co-Conspirators have committed various acts, including that:

- MultiPlan and its Co-Conspirators shared real-time, private, confidential, and detailed internal claims data for use in MultiPlan's out-of-network claim repricing tools;

- MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators knowingly used the same out-of-network claim repricing tools that incorporated other Co-Conspirators' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

- MultiPlan and its Co-Conspirators paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

- The Co-Conspirators outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

- MultiPlan and its Co-Conspirators exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tools; and

- MultiPlan and its Co-Conspirators used many forms and methods of communication across various settings and venues concerning the reimbursement rate of out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

241.     MultiPlan and its Co-Conspirators' agreements have led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the competitive rates for such claims.

242.     As a direct and proximate result of MultiPlan and its Co-Conspirators' past and continuing violations of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business or property and will continue to be injured in their business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what they would have received absent these agreements in restraint of trade.

243.     There are no procompetitive justifications for MultiPlan and its Co-Conspirators' agreements, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

244.     MultiPlan and its Co-Conspirators' agreements, therefore, violate Section 1 of the Sherman Act under a Rule of Reason analysis.

### COUNT FOUR
**Monopolization –**
**Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Pled in the alternative to Counts 1, 2 and 3)**

245.     Plaintiff incorporates and realleges, as though fully set forth herein, the

allegations in paragraphs 1-244 of this Complaint.

246.     To the extent it is necessary to define the relevant markets, the relevant product market is the market for commercial health insurance repricing, and the relevant geographic market is the United States and its territories. MultiPlan and its Co-Conspirators possess market power in the relevant antitrust market.

247.     In the alternative to Counts 1, 2, and 3, and as detailed above, MultiPlan possessed monopoly power in the market for commercial health insurance repricing. No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time period. MultiPlan had and has the ability to control commercial health insurance repricing and excludes competitors.

248.     MultiPlan willfully and unlawfully maintained its market power in the market for commercial health insurance repricing by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. MultiPlan's monopoly has been maintained by its anticompetitive misconduct and not as a result of providing a superior product, business acumen, or historic accident.

249.     MultiPlan's course of anticompetitive misconduct, as alleged herein, required its Co-Conspirators to use MultiPlan's repricing tool exclusively or nearly exclusively. MultiPlan has substantially foreclosed the market from actual and potential competition.

250.     There are no valid procompetitive justifications for MultiPlan's exclusionary conduct in the commercial health insurance repricing market. Even if there were (and there are not), any such ostensible procompetitive benefit could have been obtained through a less restrictive means.

251.    As a result of this scheme, Plaintiff and Class members received artificially suppressed reimbursements for the healthcare services they provided. Plaintiff and Class members have been injured by MultiPlan's antitrust violations. Such injury is of the type the antitrust laws were designed to prevent and flows from that which makes MultiPlan's misconduct unlawful.

252.    Plaintiff is the proper entity to bring a case concerning this conduct. The direct purchasers of MultiPlan's repricing services—insurers—are all subject to MultiPlan's control with respect to out-of-network claims repricing, are MultiPlan's co-conspirators, and benefit from the scheme.

253.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the Class under Section 4 of the Clayton Act for this violation.

254.    MultiPlan's conduct has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the competitive rates for such claims.

255.    As a direct and proximate result of MultiPlan and its Co-Conspirators' past and continuing violations of Section 2 of the Sherman Act, Plaintiff and the Class have been injured in their business or property and will continue to be injured in their business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what they would have received absent MultiPlan's illegal conduct.

256.    There are no procompetitive justifications for MultiPlan's conduct, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

257. MultiPlan's anticompetitive acts violate Section 2 of the Sherman Antitrust Act.

## XIII. Request for Relief

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others similarly situated,

respectfully requests judgment against MultiPlan and its Co-Conspirators as follows:

A. The Court determines that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel as separately requested and as indicated below, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against MultiPlan in an amount to be trebled under applicable law;

D. Plaintiff and the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

E. Plaintiff and the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

F. MultiPlan, its affiliates, successors, transferees, assignees, officers, directors, partners, agents, and employees thereof, and all other people acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G. Plaintiff and the Class be awarded any other relief as the case may require and the Court may deem just and proper.

Dated: <u>July 24, 2024</u>

Respectfully submitted,


<u>/s/ Kathleen C. Chavez</u>
Kathleen C. Chavez, Esq. (#6255735)
Elizabeth C. Chavez, Esq. (#6323726)
Bret K. Pufahl, Esq. (#6325814)
FOOTE, MIELKE, CHAVEZ &
O'NEIL, LLC
1541 E. Fabyan Parkway
Suite 101
Geneva, IL 60134
Tel: 630.232.7450
kcc@fmcolaw.com
kcc@fmcolaw.com
bkp@fmcolaw.com

Bruce E. Gerstein*
David Rochelson*
Deborah Elman (#4305264)
GARWIN GERSEIN & FISHER LLP
88 Pine Street, 28th Floor
New York, NY 10005
Tel: (212) 398-0055
bgerstein@garwingerstein.com
drochelson@garwingerstein.com
delman@garwingerstein.com

David F. Sorensen*
Patrick F. Madden*
Zachary D. Caplan*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
dsorensen@bm.net
pmadden@bm.net
zcaplan@bm.net

Daniel J. Walker*
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9745

dwalker@bm.net

Stuart Des Roches*
Andrew Kelly*
Dan Chiorean*
Chris Letter*
ODOM & DES ROCHES LLC
Poydras Center
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
stuart@odrlaw.com
akelly@odrlaw.com
dchiorean@odrlaw.com
cletter@odrlaw.com

Susan Segura*
David C. Raphael*
Erin R. Leger*
SMITH SEGURA RAPHAEL &
LEGER LLP
1111 Bagby Street, Suite 2100
Alexandria, LA 71303
Tel: (318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com
eleger@ssrllp.com

D.G. Pantazis, Jr.*
Dennis G. Pantazis*
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Tel: (205) 314-0557
dgpjr@wigginschilds.com
dgp@wigginschilds.com

*Counsel for Plaintiff and the Proposed
Class*

*Pro Hac Vice pending*

64