# U.S. District Court
## California Northern District (San Jose)
## CIVIL DOCKET FOR CASE #: 5:24-cv-04508-EJD

Mehrnaz Jamali MD, Inc. v. MultiPlan, Inc. et al          Date Filed: 07/25/2024
Assigned to: Judge Edward J. Davila                        Jury Demand: Plaintiff
Demand: $5,000,000                                         Nature of Suit: 410 Anti-Trust
Cause: 15:15 Antitrust Litigation                          Jurisdiction: Federal Question

**Plaintiff**

**Mehrnaz Jamali MD, Inc.**          represented by  **Shinae Kim-Helms**
*A California Corporation*                             BoiesBattin LLP
                                                       4041 University Dr
                                                       Ste Fifth Floor
                                                       Fairfax, VA 22030
                                                       571-335-3490
                                                       Email: skimhelms@straus-boies.com
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MultiPlan, Inc.**

**Defendant**

**MultiPlan Corporation**

**Defendant**

**UnitedHealth Group Inc.**

**Defendant**

**Aetna Inc.**

**Defendant**

**Elevance Health, Inc.**

**Defendant**

**Centene Corporation**

**Defendant**

**Cigna Group**

**Defendant**

**Health Care Service Corp.**

**Defendant**

**Humana Inc.**

**Defendant**

**Kaiser Permanente LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405, receipt number ACANDC-19660853.). Filed by Mehrnaz Jamali MD, Inc.. (Attachments: # 1 Civil Cover Sheet)(Kim-Helms, Shinae) (Filed on 7/25/2024) (Entered: 07/25/2024) |
| 07/26/2024 | 2 | Case assigned to Magistrate Judge Susan van Keulen.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/9/2024. (sec, COURT STAFF) (Filed on 7/26/2024) (Entered: 07/26/2024) |
| 07/26/2024 | 3 | **ORDER OF RECUSAL. Signed by Judge Susan van Keulen on 7/26/2024. (svklc1, COURT STAFF) (Filed on 7/26/2024) (Entered: 07/26/2024)** |
| 07/26/2024 | 4 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Magistrate Judge Thomas S. Hixson for all further proceedings. Magistrate Judge Susan van Keulen no longer assigned to case. (smc, COURT STAFF) (Filed on 7/26/2024) (Entered: 07/26/2024)** |
| 07/26/2024 | 5 | CLERK'S NOTICE OF REASSIGNMENT. Case Management Statement due by 10/31/2024. Initial Case Management Conference set for 11/7/2024 10:00 AM. (tshlc1, COURT STAFF) (Filed on 7/26/2024) (Entered: 07/26/2024) |
| 07/26/2024 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: (hdj, COURT STAFF) (Filed on 7/26/2024) (Entered: 07/29/2024)** |
| 07/29/2024 | 7 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 8 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 9 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 10 | CLERK'S NOTICE RE: ECF No. 6 Initial Case Management Scheduling Order with ADR Deadlines. As the scheduling order was generated prior to reassignment, the parties are instructed to disregard the case management conference date. The July 26, 2024 Notice of Reassignment (ECF No. 5 ) contains the correct deadlines.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tshlc1, COURT STAFF) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 11 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 12 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 13 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 14 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | 15 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/30/2024 | | Electronic filing error. Incorrect PDF attached. Submit ONE proposed summons listing all defendants. Attach additional pages if needed. [err201]This filing will not be processed by the clerks office.Please re-file in its entirety. Re: 12 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 9 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 15 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 11 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 8 Proposed |

| | | |
|---|---|---|
| | | Summons filed by Mehrnaz Jamali MD, Inc., 13 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 7 Proposed Summons filed by Mehrnaz Jamali MD, Inc., 14 Proposed Summons filed by Mehrnaz Jamali MD, Inc. (hdj, COURT STAFF) (Filed on 7/30/2024) (Entered: 07/30/2024) |
| 07/30/2024 | 16 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Mehrnaz Jamali MD, Inc... (Kim-Helms, Shinae) (Filed on 7/30/2024) (Entered: 07/30/2024) |
| 07/30/2024 | 17 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (tshlc1, COURT STAFF) (Filed on 7/30/2024) (Entered: 07/30/2024) |
| 07/30/2024 | 18 | Certificate of Interested Entities by Mehrnaz Jamali MD, Inc. (Kim-Helms, Shinae) (Filed on 7/30/2024) (Entered: 07/30/2024) |
| 07/31/2024 | 19 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Edward J. Davila for all further proceedings. Magistrate Judge Thomas S. Hixson no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by Clerk on 07/31/2024. (Attachments: # 1 Notice of Eligibility for Video Recording)(mbc, COURT STAFF) (Filed on 7/31/2024) (Entered: 07/31/2024)** |
| 07/31/2024 | 20 | **CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE FOLLOWING REASSIGNMENT.**<br><br>Joint Case Management Statement due by 9/20/2024. Initial Case Management Conference set for 10/3/2024 at 10:00 AM in San Jose, Courtroom 4, 5th Floor before Judge Edward J. Davila.<br><br>The Court does not issue a revised Initial Case Management Scheduling Order with ADR Deadlines. Standing orders can be downloaded from the court's web page at https://cand.uscourts.gov/judges/davila-edward-j-ejd/. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (lrt, COURT STAFF) (Filed on 7/31/2024) (Entered: 07/31/2024) |
| 07/31/2024 | 21 | Proposed Summons. (Kim-Helms, Shinae) (Filed on 7/31/2024) (Entered: 07/31/2024) |
| 08/01/2024 | 22 | Summons Issued as to Aetna Inc., Centene Corporation, Cigna Group, Elevance Health, Inc., Health Care Service Corp., Humana Inc., Kaiser Permanente LLC, MultiPlan Corporation, MultiPlan, Inc., UnitedHealth Group Inc.. (hdj, COURT STAFF) (Filed on 8/1/2024) (Entered: 08/01/2024) |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISCTRICT OF CALIFORNIA

| | |
|---|---|
| MEHRNAZ JAMALI MD, INC., | Case No. 3:24-cv-04508 |
| Plaintiff, | **CLASS ACTION COMPLAINT JURY TRIAL DEMAND** |
| v. | |
| MULTIPLAN, INC., MULTIPLAN CORP., UNITEDHEALTH GROUP, INC., AETNA, INC., ELEVANCE HEALTH, INC., CENTENE CORP., CIGNA GROUP, HEALTH CARE SERVICE CORP., HUMANA INC., AND KAISER PERMANENTE LLC | |
| Defendants. | |

Table of Contents

I. INTRODUCTION AND NATURE OF ACTION                                      3
II. PARTIES                                                              11
III. JURISDICTION AND VENUE                                              15
IV. DIVISIONAL ASSINGMENT                                                16
V. FACTUAL BACKGROUND                                                    16
  A. Industry Background                                                 16
  B. MultiPlan 2.0                                                       19
  C. Relevant Antitrust Market                                           24
VI. MULTIPLAN ENGAGED IN HORIZONTAL PRICE FIXING WITH
COMPETING HEALTH INSURANCE PAYORS                                        26
  A. MultiPlan is in Direct Competition with other Health Insurance Payors Who
  Are Members of the MultiPlan Cartel.                                   26
  B. MultiPlan Organized a Cartel and Entered into Industry-Wide Agreements
  to Suppress Out-of-Network Claims                                      30
  C. Plus Factors                                                        35
  D. Health Insurance Companies Were Repeat Antitrust Violators          49
VII. MARKET POWER                                                        52
VIII. FRAUDULENT CONCEALMENT AND CONTINUING VIOLATION                    53
  A. Fraudulent Concealment                                             53
  B. Continuing Violation                                               55
IX. ANTICOMPETITIVE EFFECTS                                              55
  A. Harm to Competition                                                55
  B. Underpayment to Providers                                          56
  C. Unfair Burden due to Emergency Care Mandate                        56
  D. Lack of Procompetitive Benefits                                    59
X. MULTIPLAN'S PRICE-FIXING AGREEMENT IS PER SE UNLAWFUL
UNDER SECTION 1 OF THE SHERMAN ACT                                       60
XI. CLASS ACTION ALLEGATIONS                                             61
XII. CAUSES OF ACTION                                                    64
  COUNT ONE: Horizontal Agreement in Restraint of Trade in Violation of Section 1 of the
  Sherman Act (15 U.S.C. § 1)                                            64
XIII. PETITION FOR RELIEF                                                66
XIV. JURY DEMAND                                                         67

I. **INTRODUCTION AND NATURE OF ACTION**

1.       This case is brought on behalf of a class of healthcare providers ("Providers") to challenge a cartel of virtually all the major health insurance companies ("Insurers") in the United States. By agreeing to collectively use the repricing software created by MultiPlan, Inc. ("MultiPlan"), the cartel entered into an on-going, industry-wide conspiracy to fix the reimbursement rates paid to Providers for out-of-network healthcare claims (the "MultiPlan Cartel").

2.       The difference between "out-of-network" and "in-network" healthcare claims derives from healthcare providers' contractual agreements with insurance companies. In-network providers agree to significantly discounted rates for their healthcare services in exchange for access to the insurer's plan members. These agreements supply healthcare providers with consistent and predictable access to patients due to insurers' large member pool. Conversely, out-of-network providers are healthcare providers who have declined to enter into contractual agreements with that specific Insurer. Out-of-network providers often do so because they deem the offered in-network rates to be unreasonably low. Therefore, when providing out-of-network services providers are free to set prices based on their interpretation of the market.

3.       Healthcare patients often choose or require treatment from out-of-network providers. This choice is made for numerous reasons, including lack of access to in-network options, familiarity with a doctor, or exceedingly specialized treatment needs. One compelling reason a patient may require out-of-network care is in cases of emergency. During medical emergencies, patients often lack a choice of which provider to be treated by due to the urgent need for the treatment. Instead, patients are brought to the nearest or most convenient location where crucial treatment can be administered. Under the federal

3

1    Emergency Medical Treatment and Labor Act ("EMTLA"), healthcare providers who

2    receive emergency patients are required to treat them.

3         4.     For these reasons, there is constant consumer demand and need for out-of-

4    network provider services. Unsurprisingly, Insurers have identified this demand, and many

5    insurance plans offer out-of-network coverage to plan members. In fact, out-of-network

6    benefits are the defining quality of the most popular insurance plan type in the United

7    States: the preferred provider organization ("PPO"). PPOs fundamentally differ from health

8    management organizations ("HMO"), which usually limit coverage to care from in-network

9    providers. PPO plans offer the ability to seek care from out-of-network providers. This

10   access to out-of-network Providers comes at a price in the form of higher premiums.

11   Although PPOs allow access to out-of-network care, they still require plan holders to pay

12   some out-of-pocket costs for out-of-network care.

13        5.     Insurers with PPO networks are incentivized to provide PPO subscribers

14   with a wide array of access to out-of-network treatment options to justify the high

15   premiums associated with PPOs. Outside of emergency services, out-of-network providers

16   can simply elect not to provide services to a particular Insurer's members for any reason,

17   including if they feel the Insurer does not offer sufficient reimbursement for out-of-network

18   services.

19        6.     Insurers therefore must compete with one another for out-of-network

20   providers to maintain consistent access to those providers' treatment to avoid significant

21   subscriber loss. In a competitive market, insurers pay providers with competitive

22   reimbursement rates. This satisfies both the providers' interest in getting paid what they

23   deserve for their highly sought-after services and the patients' interest in accessing wide-

4

ranging out-of-network providers. If insurers were to offer providers submarket

reimbursement rates for out-of-network, they would run the risk of providers simply

refusing to treat their subscribers seeking out-of-network care, reducing the desirability of

the insurer's network to subscribers. Alternatively, the insurers would risk providers billing

subscribers for the portions of their claims not covered by insurance (known as "balance

billing"), which can be extremely expensive for the subscriber and would therefore reduce

the desirability of the insurer's network.

7.     Insurers thus must compete with one another for out-of-network providers to

avoid significant subscriber loss. This competition amongst insurers for out-of-network

providers naturally drives up reimbursement rates, increasing out-of-network costs for all

insurers. Therefore, the individual interest of each insurer to compete for out-of-network

providers inherently conflicts with the insurance industry's collective desire to universally

lower out-of-network reimbursements.

8.     UnitedHealth Group ("UnitedHealth") identified this problem in the late

1990s. It attempted to solve the issue by reworking the method for calculating

reimbursement rates through its new subsidiary, Ingenix, Inc. ("Ingenix"). Ingenix

purchased the two then-largest claims databases used to calculate "usual, customary, and

reasonable" reimbursement rates ("UCR"): Medical Data Resource (1997) and Prevailing

Healthcare Charges System (1998). Before Ingenix, UCR was the traditional method

insurers used to calculate out-of-network reimbursement rates. The UCR system calculates

out-of-network reimbursements using statistical benchmarks for medical costs based on

common market rates, or retail prices charged by doctors in a certain geographic area.

9.     After these purchases, UnitedHealth's Ingenix became the standard

5

Class Action Complaint

calculator of UCR rates for insurers across the industry. An investigation by the New York Attorney General's Office later uncovered that Ingenix manipulated its claims database by including discounted in-network payment data to impact its out-of-network pricing, a practice MultiPlan has since reinstituted. As a result, Ingenix, and its modern counterpart Multiplan, significantly suppressed out-of-network reimbursement rates.

10.     In 2009, twelve insurers, including Blue Cross/Blue Shield, UnitedHealth, Cigna, and Aetna, settled with the New York Attorney General for their participation in the Ingenix scheme. They agreed to heavily invest in the creation of a new and independent UCR database to take over Ingenix, which became FAIR Health ("FAIR"). FAIR is an independent non-profit organization that calculates UCR rates from objective data. As part of a consent decree, the defendant insurers also agreed not to develop an alternative to FAIR for at least five years, which expired in 2015. Immediately upon the expiration of that consent decree, those insurers began to seek a new method to fix reimbursement rates.

11.     MultiPlan is the facilitator of collaborative out-of-network reimbursement rate-setting as Ingenix illegally did from the late 1990s to 2008. Instead of setting their out-of-network reimbursement rates independently, most of the nation's insurers (roughly 700 out of 1,100 total, including all the top 15 largest insurers) now outsource this rate-setting task to one common entity: MultiPlan. MultiPlan resembles Ingenix, the very entity that FAIR was created to replace. MultiPlan acts as the facilitator of collaborative out-of-network reimbursement rate-setting, just as Ingenix illegally did from the late 1990s to 2008. Through this outsourcing, insurers completely erase competition between themselves for out-of-network provider services, in blatant violation of antitrust laws.

12.     Further, MultiPlan is not merely a third-party data analyst and pricing firm

6

but is in fact a direct competitor with insurers who offer PPO plans. Like other health

insurance companies, MultiPlan owns and operates several PPO networks. MultiPlan's PPO

plans include nationwide primary PPO networks, nationwide complementary PPO

networks, and regional PPO networks.[1] Therefore, not only does MultiPlan facilitate a

conspiracy amongst competitors, but it facilitates the conspiracy *as a competitor itself*.

13.     To participate in the conspiracy, insurers are required to provide MultiPlan

proprietary competitively sensitive information ("CSI"). This CSI includes claims pricing

data and reimbursement strategies. Insurers' CSI is synthesized by MultiPlan to effectively

fix reimbursement rates paid to providers for out-of-network services. MultiPlan pushes a

consistently low reimbursement rate to all its co-conspirators, leaving providers with no

competitive alternatives. On top of this, because of the obligation imposed upon them

through EMTLA, providers are left with no means of seeking proper pay for services they

were mandated to deliver.

14.     As MultiPlan euphemistically states, it "leverages reimbursement data from

millions of claims" to help insurers to reprice out-of-network claims by "remov[ing] the

guesswork." This "guesswork [,]" in reality, is healthy and law-abiding competition

amongst industry rivals. MultiPlan's remedying of "guesswork" is unlawful coordination of

reimbursement pricing through illegally sharing insurer's proprietary CSI.

15.     MultiPlan claims that its patent protected program, "Data iSight," determines

out-of-network reimbursement rates "algorithmically." MultiPlan admits that Data iSight

calculates its reimbursement rates through determining the median reimbursement levels

---

[1] *Increased Access to Healthcare Programs with MultiPlan's Networks*, MULTIPLAN,
https://www.multiplan.us/healthcare-providers/our-networks.

7

Class Action Complaint

from its collaborators' CSI reimbursement information. However, this "median" is manipulated by MultiPlan. MultiPlan artificially lowers the median calculation by feeding Data iSight's algorithm rate junk data that pushes the median rates down. This includes using data from what insurers paid to in-network providers, rates that are steeply discounted compared to out-of-network reimbursements due to the contractual stipulations of in-network agreements. In-network rates do not remotely represent typical reimbursements to out-of-network providers, who do not gain any of the benefits that in-network providers receive. This in-network junk data distorts the median reimbursement rate of out-of-network payments to an unreasonable level.

16.     MultiPlan also instructs insurers to cap the rates that insurers should offer to Providers. For example, MultiPlan may instruct an Insurer not to "pay more than X% of the Medicare rate." These capped reimbursements are then fed back into MultiPlan's Data iSight to recalculate reimbursement rates. As time passes, the enactment of such price caps will lower the average reimbursement rate to Providers. These caps allow MultiPlan to effectively manipulate its own "algorithmic" tool by controlling the reimbursement rate data used for its median calculations. The longer MultiPlan can continue this behavior, the more it will be able to steadily lower the rate cap agreed upon by its co-conspirators, further lowering Provider reimbursement rates.

17.     The extent of MultiPlan's control runs even further. MultiPlan itself negotiates with Providers on behalf of its Insurer clients that have agreed to its calculated reimbursement rates. Providers accept MultiPlan's initial reimbursement almost all of the time.[2] Providers also agree as a condition of reimbursement not to balance bill patients at

---

[2] *Data iSight Methodology*, MULTIPLAN, https://www.multiplan.us/services/analytics-based/data-isight/.

Class Action Complaint

the same rate. Consequently, MultiPlan's out-of-network reimbursement rate "recommendation" often operates as the final payment.

18.    The high provider acceptance rate of MultiPlan reimbursement payment proposals is not proof that the reimbursements are reasonable or fair. Rather, it is a glaring indicator of the MultiPlan Cartel's existence and dominance. Providers do not accept MultiPlan's offer because they are satisfied with the exceedingly low payments. Rather, they are forced to accept MultiPlan's offer because there are no legitimate alternatives. Virtually all patients are covered by insurers that coordinate their reimbursement rates through MultiPlan. Providers have lost negotiation leverage because competitor insurers have established a price fixing cartel in order to eliminate competition.

19.    The sheer size of the MultiPlan Cartel makes it nearly impossible for Providers to challenge MultiPlan's proposed reimbursements. While there are state and federal laws that establish procedures for providers to dispute reimbursement amounts through arbitration, the overwhelming amount of underpaid claims by MultiPlan make arbitrating each individual claim practically and financially unfeasible.

20.    MultiPlan upended the fittingly named FAIR UCR method of calculating reimbursement with its own repricing scheme at the direct expense of providers. Further, MultiPlan fundamentally differs from FAIR in that it has a direct economic stake in the price of the reimbursement rate it produces. FAIR charges insurers a flat annual fee for its services. MultiPlan, however, is compensated *more* the *lower* it reimburses Providers. Specifically, MultiPlan's client insurers pay MultiPlan a percentage of the difference between the Provider's initial reimbursement claim and what the Insurer ends up paying. MultiPlan gets paid more when Providers get paid less. Insurers are willing to pay

9

MultiPlan's sliding fees in order to avoid competition with other Insurers. MultiPlan's annual revenues paint the picture. MultiPlan's revenues from their repricing services have starkly risen, from $23 million in 2012, to $564 million in 2020 and $709 million in 2021. The MultiPlan Cartel dates back roughly to 2015.

21.     MultiPlan's reimbursement suppression is extremely harmful to hospitals and providers around the country. The low reimbursement rates offered are often unable to cover Providers' operating costs, particularly with rural hospital systems. Low out-of-network reimbursement rates also affect in-network rates because providers' lack of profitability from out-of-network treatment reduces their ability to offer beneficial in-network rates.

22.     According to the amicus brief filed by the American Hospital Association (AHA), many hospitals are operating on little or no margin due to rising costs and insufficient reimbursement from government payors.[3] Hospitals are in dire need of generating enough revenue to continue providing healthcare services to their patients and communities. Without appropriate reimbursement, many practices have been forced to close for good, to cease unprofitable services, or leave their communities by joining behemoth hospital conglomerates. The natural result of the Multiplan Cartel has been the improper reduction of reimbursement rates, which has resulted in fewer healthcare options for patients across the country.

23.     The situation is especially critical in rural areas, where hospitals serve less populated areas and are therefore less likely to see enough patients to cover costs. A total of 141 rural hospitals have closed since 2010, while another 453 rural hospitals risk closure in

---

[3] *Adventist Health System Sunbelt Healthcare Corp. V. MultiPlan, Inc., 23-cv-07031* ECF 69-1.

Class Action Complaint

the near future because of their severe financial problems. If the MultiPlan Cartel continues

to illegally fix reimbursement rates, access to healthcare, particularly in rural areas, will

only become more challenging.

24.     As a result of Defendants' unlawful agreement, health care providers,

including Plaintiff and the Class members, throughout the United States have received

artificially repressed reimbursements for out-of-network healthcare services they have

provided beginning no later than July 1, 2017, and running through the present (the "Class

Period"), in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

## II. PARTIES

25.     Plaintiff Mehrnaz Jamali MD, Inc., is a stock corporation incorporated in

California with its principal place of business in Pleasanton, California. Plaintiff provided

high-quality, often life-saving primary care treatments to its patients to help prevent stroke,

heart failure, and other conditions. Plaintiff participated in several insurance networks and

regularly treated patients on an out-of-network basis during the Class Period.

26.     Defendant MultiPlan, Inc. is a provider of healthcare data and analytics

products and services. It is incorporated in New York with its principal place of business

located at 115 Fifth Avenue, 7th Floor, New York, NY 10003.

27.     Defendant MultiPlan, Inc. is wholly owned by MultiPlan Holding

Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan

Corporation, a publicly traded company.

28.     Defendant MultiPlan operates as a single integrated business with a single

board and executive team, a single set of financial statements, and a single corporate entity

overseeing its PPO networks and its claims-repricing business.

11

29.     Defendant MultiPlan was previously known as Churchill Capital Corp. III, a special-purpose acquisition company created to raise funds to take a private company public. Churchill Capital Corp. III is incorporated in Delaware and headquartered in New York. In October 2020, after completing the acquisition of MultiPlan, Inc. and its related entities, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

30.     In 2010, Defendant MultiPlan acquired Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Delaware and headquartered in Illinois, and Viant Payment Systems, Inc., a healthcare payment solutions company incorporated in Delaware and headquartered in Illinois.

31.     In 2011, Defendant MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, health cost management companies incorporated in Delaware and headquartered in Illinois.

32.     Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan Holding Corporation, MultiPlan Corporation, MultiPlan, Inc., Churchill Capital III, Viant, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC collectively as "MultiPlan."

33.     As set forth in this Complaint, virtually all of the largest commercial health insurance companies in the United Stated participated as co-conspirators in the MultiPlan Cartel, including the entities specifically identified below.

34.     Defendant Aetna, Inc. ("Aetna"), a subsidiary of CVS Health Corporation, is a company incorporated in Pennsylvania and headquartered in Connecticut. Aetna has a commercial insurance network that pays in and out-of-network healthcare claims from healthcare providers in all 50 states and Washington, D.C. Aetna is the parent company, or

12

otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Aetna joined the MultiPlan Cartel and started using MultiPlan's repricing tool for its out-of-network claims in 2015.

35.    Defendant The Cigna Group ("Cigna") is a large insurance company incorporated in Delaware and headquartered in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Cigna joined the MultiPlan Cartel and started using MultiPlan's repricing tool for its out-of-network claims in 2015.

36.    Defendant UnitedHealth Group Inc. ("UnitedHealth") is one of the largest commercial health insurance companies in the United States. It is headquartered in Minnesota and incorporated in Delaware. Their plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. UnitedHealth joined the MultiPlan Cartel and started using MultiPlan's repricing tool for its

13

1    out-of-network claims in 2016.

2        37.    Defendant Centene Corporation ("Centene") is a large commercial health

3    insurance company. It is headquartered in Missouri and incorporated in Delaware. Their

4    plans issue insurance or provide administrative services concerning healthcare claims in the

5    form of (1) fully insured commercial health insurance plans, (2) self-funded administrative

6    service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans,

7    and (5) Medicaid plans. Centene is believed to be a co-conspirator in the MultiPlan Cartel.

8        38.    Defendant Humana Inc. ("Humana") is a large commercial health insurance

9    company. It is headquartered in Louisville, Kentucky and incorporated in Delaware. Their

10   plans issue insurance or provide administrative services concerning healthcare claims in the

11   form of (1) fully insured commercial health insurance plans, (2) self-funded administrative

12   service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans,

13   and (5) Medicaid plans. Humana is believed to be a co-conspirator in the MultiPlan Cartel.

14       39.    Defendant Kaiser Permanente LLC (Kaiser Permanente) is a large

15   commercial health insurance company. Kaiser is headquartered in Oakland, California, and

16   also incorporated in California. They provide plans such as (1) fully insured commercial

17   health insurance plans; (2) self-funded administrative service only health plans; (3)

18   Medicare Advantage plans; and (4) Medicaid plans. Kaiser Permanente is believed to be a

19   co-conspirator in the MultiPlan Cartel.

20       40.    Defendant Elevance Health, Inc. ("Elevance") is a large commercial health

21   insurance company. Elevance is headquartered in Indianapolis, Indiana and incorporated in

22   Indiana as well. Elevance licenses certain trademarks and service marks from the Blue

23   Cross Blue Shield Association in 14 states. Their plans issue insurance or provide

14

1  administrative services concerning healthcare claims in the form of (1) fully insured

2  commercial health insurance plans, (2) self-funded administrative service only health plans,

3  (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

4  Elevance is believed to be a co-conspirator in the MultiPlan Cartel.

5          41.     Health Care Service Corporation ("HCSC") is a large health insurance

6  company, which licenses certain trademarks and service marks from the Blue Cross Blue

7  Shield Association in 5 states. Their plans issue insurance or provide administrative services

8  concerning healthcare claims in the form of (1) fully insured commercial health insurance

9  plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health

10  plans, (4) Medicare Advantage plans, and (5) Medicaid plans. HCSC is believed to be a co-

11  conspirator in the MultiPlan Cartel.

12          42.     DOE Defendants 1–100 are other individuals or entities who engaged in or

13  abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiff may amend

14  this Complaint to allege the names of additional Defendants as they are discovered.

15  **III. JURISDICTION AND VENUE**

16          43.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and

17  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiff seeks damages for

18  their injuries, and those suffered by members of the Class, resulting from Defendants'

19  anticompetitive conduct; to enjoin Defendants from entering into, or from honoring or

20  enforcing, any agreements in furtherance of anticompetitive conduct; and for other such

21  relief as is afforded under the laws of the United States. This Court has subject matter

22  jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and

23  15 U.S.C. § 15 (antitrust).

Class Action Complaint

44.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §

1332(d) because this is a class action in which the aggregate amount in controversy exceeds

$5,000,000, exclusive of interest and costs, and at least one member of the putative class is

a citizen of a state different from that of each Defendant.

45.     This Court has personal jurisdiction over MultiPlan because it transacts

business throughout the United States, including in this district (including repricing claims

for out-of-network healthcare services performed in this district); and is engaging in the

alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing

injury to the business or property of persons and entities residing in, located in, or doing

business throughout the United States, including in this district.

46.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15

U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain

unlawful acts by the Defendants were performed in this district, and those and other

unlawful acts caused harm to interstate commerce in this district. No other forum would be

more convenient for the parties and witnesses to litigate this case.

## IV. DIVISIONAL ASSINGMENT

47.     Pursuant to Civil Local Rule 3-2(d), this case should be

assigned to the San Francisco Division because a substantial part of the

events or omissions giving rise to the claim occurred within the County of

Alameda.

## V. FACTUAL BACKGROUND

### A. Industry Background

48.     Generally, there are two types of relationships between a healthcare provider

16

1    and an insurance company: in-network and out-of-network. The distinction lies in whether

2    the healthcare provider has a contractual agreement with the insurance company.

3        49.    In an in-network relationship, healthcare providers agree to charge patients at

4    a pre-negotiated, often heavily discounted, contract rate for the services provided and

5    receive reimbursement in full from the insurance company. In return, the providers gain

6    access to a broader pool of patients covered by that insurer's plans.

7        50.    Out-of-network health providers, however, are generally not bound by any

8    contract. Therefore, they are free to set rates they deem appropriate for services and are not

9    obligated to render out-of-network services, except for emergency care. Under the EMTLA,

10   emergency healthcare providers are obligated to "provide for an appropriate medical

11   screening examination" and to "stabilize [an emergency] medical condition" without asking

12   about the "individual's method of payment or insurance status."[4]

13       51.    After providing out-of-network services, providers submit a claim to the

14   patient's insurance company for reimbursement. Whether or to what extent they would be

15   reimbursed depends on the terms outlined in the patient's insurance policy, as well as

16   negotiation with the insurance company for the services provided. If an out-of-network

17   claim is not covered or only partially covered by the insurance company, the patient

18   becomes responsible for paying the difference, which is often referred to as balance billing.

19   52. While there are many reasons a patient may desire particular out-of-network services, not

20   all health insurance plans cover out-of-network services. Health Maintenance Organization

21   (HMO) and Preferred Provider Organization (PPO) are the two most common commercial

22   health insurance plans in the United States. Unlike HMO, which covers only in-network

---

[4] *See* 42 U.S.C. §§1395dd(a)–(b), (d), (h).

Class Action Complaint

services except in emergencies, PPO allows its plan members (or "subscribers") to choose

between any provider — in or out-of-network. Because of its greater flexibility and

freedom, PPO has become the most popular insurance plan type.[5]

53.     Like other health insurance companies, MultiPlan owns and operates several

PPO networks, including nationwide primary PPO networks, nationwide complementary

PPO networks, and regional PPO networks.[6]

54.     The reach of MultiPlan's PPO networks is enormous. According to

MultiPlan, its PHCS Network is the "largest independent, nationwide primary" PPO with

"more than one million health care providers nationwide: 920,000 practitioners, 4,800 acute

care hospitals and 87,000 ancillary facilities."[7] A national primary PPO network like PHCS

serves as the network for health insurance companies that lack "their own direct contractual

discount arrangements with providers."[8]

55.     MultiPlan recruits providers, negotiates reimbursement rates with them, and

sets certain quality and credential expectations for its in-network healthcare providers. It

then sells its extensive PPO networks to other health insurance companies as part of their

health insurance plans.

56.     Historically, health insurance companies offering PPO plans used the "usual,

customary, and reasonable" system to calculate the maximum reimbursement rate for out-

of-network claims. The UCR rate is calculated using data from independent benchmarking

---

[5]*2023 Employer Health Benefits Survey*, KFF (Oct. 18, 2023), https://www.kff.org/report-section/ehbs-2023-section-5-market-shares-of-health-plans.
[6]*Increased Access to Healthcare Programs with MultiPlan's Networks*, MULTIPLAN, https://www.multiplan.us/healthcare-providers/our-networks.
[7] *PHCS Network Brings Stability and Flexibility to an Evolving Market*, MULTIPLAN (May 4, 2023), https://www.multiplan.us/phcs-network-brings-stability-and-flexibility-to-an-evolving-market.
[8] MultiPlan, Inc., Annual Report (Form-10K) (Feb. 25, 2022), https://www.sec.gov/Archives/edgar/data/1793229/000179322922000021/mpln-20211231.htm.

18

Class Action Complaint

1    databases showing the prevailing market price for similar services offered in the same

2    geographic area.

3        57.    While insurance companies have discretion to set their UCR rates

4    individually within a certain percentage range, in a competitive market, they would compete

5    against each other by offering competitive reimbursement rates to incentivize providers to

6    continue offering out-of-network services. Essentially, the UCR system functions as a

7    safeguard in the insurance industry as it prevents overcharges by providers while still

8    ensuring fair reimbursement to providers by insurers.

9        58.    The insurance industry was not fond of this market-driven, competitive

10   system. As the rising cost of UCR rates cut into its profit, Insurers started to see their

11   obligation to reimburse out-of-network services as a "pain point" and "major area of

12   concern."[9]

### B. MultiPlan 2.0

14       59.    In 2006, after being acquired by a private equity firm, MultiPlan pursued a

15   "more aggressive approach" by evolving into MultiPlan 2.0.[10] MultiPlan 2.0 added a data

16   analytics business to its PPO network.

17       60.    Multiplan built its data analytics business through a series of acquisitions of

18   companies and their analytical tools. In August 2009, three months after the Ingenix

19   settlement, MultiPlan acquired Viant, a data analytics firm. In June 2011, MultiPlan

20   acquired National Care Network LLC and its repricing tool, Data iSight, which later

21   became the focal point of the MultiPlan Cartel. In 2014, MultiPlan acquired Medical Audit

---

[9] *Schedule 14A*, CHURCHILL CAPITAL
CORP.,https://www.sec.gov/Archives/edgar/data/1793229/000110465920096934/tm2028994-2_defa14a.htm.
[10] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, NY TIMES (Apr. 9, 2024),
https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

Class Action Complaint

1    & Review Solutions, a repricing tool provider. In 2023, MultiPlan acquired Benefits

2    Science Technologies, an artificial intelligence ("AI") company, and introduced Pro Price,

3    an AI-enabled out-of-network claim pricing tool that "leverages 40+ years of data and

4    experience."[11]

5          61.    MultiPlan markets its analytics-based services as "cost containment

6    solutions," aiming to "strike a balance between healthcare savings and member satisfaction"

7    across the industry.[12] In reality, the tool uses an agreed-upon methodology to fix prices for

8    out-of-network services for far less than what Providers would reasonably claim for

9    reimbursement and what in a fair market competitive insurance companies would otherwise

10   pay.

11         62.    MultiPlan utilizes this tool when determining what reimbursement to offer

12   for emergency services. After providing treatment, the healthcare provider submits an out-

13   of-network claim to the patient's insurer, who sends the claim to MultiPlan. MultiPlan then

14   uses its repricing tool to calculate the reimbursement rates and sends the repriced claim

15   back to the Provider.

16         63.    Similarly, in a non-emergency-room setting, the out-of-network healthcare

17   provider may decide to provide treatment (even if they are not obligated to), at least partly

18   on the understanding that the patient's health insurance company would pay some kind of

19   reimbursement. Once the insurance company is billed, it sends the claim to MultiPlan, who

20   then uses the same methodology to reprice the claim.

21         64.    In cases when Providers dispute the repriced claims and request a higher

---

[11] *Analytics-Based Services*, MULTIPLAN, https://www.multiplan.us/services/analytics-based/.
[12] *Building Blocks to Help Healthcare Payors Thrive in Our New Normal*, MULTIPLAN (May 20, 2020), https://www.multiplan.us/building-blocks-to-help-healthcare-payors-thrive-in-our-new-normal/.

20

Class Action Complaint

reimbursement rate, MultiPlan also provides negotiation services. But the negotiations are mostly one-sided, which pressures Providers by offering low payments on a take-it-or-leave-it basis.

65.     Providers have less than ten days to respond to MultiPlan's offer. If a Provider does not relent within MultiPlan's timeframe, MultiPlan threatens to cut the offer even lower. In one fax to a doctor, MultiPlan only gave the doctor eight days to respond to its low offer and warned that "if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient."[13]

66.     As a condition of receiving reimbursement, MultiPlan also often requires healthcare providers to agree to not balance bill the patient. This practice helps MultiPlan hide from patients how little their insurance company reimburses providers compared to the ever-increasing premiums Insurers charge.

67.     According to its website, MultiPlan's Data iSight repriced claims are accepted by providers 96% of the time and facilities 93% of the time.[14] In 2023, MultiPlan's CEO, Travis Dalton, told Axios that the acceptance rate of its repriced claims is 98%.[15] An article from 2023 revealed that the acceptance rate is as high as 99.4%.[16]

68.     The high acceptance rate, however, is not a reflection of the reasonableness of MultiPlan's repricing tool or the quality of its negotiation services. Rather, it is the result

---

[13] *MultiPlan, the Secret Back-End to Most of the Insurer Industry, Is Going Public*, ACUTE CONDITION (Aug. 5, 2020), https://www.acutecondition.com/p/multiplan-the-secret-back-end-to.
[14] *Data iSight Methodology*, MULTIPLAN, https://www.multiplan.us/services/analytics-based/data-isight/.
[15] Aaron Weitzman & Erin Brodwin, *Axios Pro: Health Tech Deals*, AXIOS PRO (Apr. 18, 2024), https://www.axios.com/pro/health-tech-deals/newsletters/2024/04/18/health-tech-multiplans-close-up.
[16] *AdventHealth Alleges MultiPlan Operates as "Cartel" in Antitrust Lawsuit*, DistilINFO (Aug. 14, 2023), https://distilinfo.com/healthplan/adventhealth-alleges-multiplan-operates-as-cartel-in-antitrust-lawsuit/.

Class Action Complaint

of an insurance-industry-wide conspiracy to adopt MultiPlan as the price setter for all out-of-network claims.

69.     Initially used only within MultiPlan's own PPO networks, the repricing tool quickly drew the interest of other insurance companies with PPO networks. As sophisticated market players, the insurance industry was well aware of the fact that if only a few companies engaged in repricing, out-of-network healthcare providers would simply switch to other PPO networks, and the market pressure would make the repricing tool worthless. Instead, the tool only works when it is collectively adopted by the industry—so the industry did exactly that.

70.     Insurance company executives regularly attended meetings and roadshows organized by MultiPlan to discuss the repricing tool, their experiences using it, and new ways to make the scheme more effective. They shared confidential, highly detailed pricing information with MultiPlan's database in real time, including claims received from providers, reimbursement amounts paid to those providers, and proprietary pricing preferences and strategies. In addition, they were updated on which competitors had already entered agreements with MultiPlan and the pricing levels adopted by those competitors. In this way, insurance companies know that they will benefit from their competitors' data in the same way that their competitors will benefit from theirs.

71.     Over time, as major insurance companies agreed to adopt MultiPlan's repricing tool, out-of-network service providers were left with no choice but to accept the repriced reimbursement rate, even when the rate is unprecedentedly low.

72.     MultiPlan is now the "leader in out-of-network cost containment." [17]In 2020

---

[17] Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wp-content/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

Class Action Complaint

1  alone, MultiPlan worked with a customer base of over 700 commercial insurers and

2  processed 370,000 claims per day which saved the industry over $19 billion annually.[18]

3  Revenue generated by its repricing tool skyrocketed from $23 million in 2012 to more than

4  $323 million in 2019.[19] In 2022, MultiPlan's analytics-based services generated $713

5  million making up 66% of its $1 billion in total revenue.[20]

6        73.    MultiPlan admitted in a conference call that its incentive is "completely

7  aligned with" other insurance companies.[21] MultiPlan's analytics-based services profit by

8  charging insurance companies a percentage (usually 5-7%) of the difference between the

9  healthcare provider's billed amount and the actual reimbursement amount. Insurers are

10  potentially even more incentivized than MultiPlan to suppress reimbursements for out-of-

11  network services as they also profit by charging their customers a higher percentage

12  (usually 30-35%) of that same difference as a processing fee, or "shared saving fee." There

13  are even instances of insurance companies suppressing the rate so aggressively that the

14  saving fee exceeded the amount the healthcare providers received for their services. [22]And

15  every dollar they saved went to the industry's ever-growing profits.

16        74.    While the insurance industry continues to earn record profits every year,

17  American healthcare providers are struggling. According to the American Hospital

---

[18]*Id.*

[19]Chris Hamby, *In Battle Over Health Care Costs, Private Equity Plays Both Sides*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-private-equity.html.

[20]MultiPlan, Inc., Annual Report (Form-10K) (Mar. 1, 2023), https://s26.q4cdn.com/607044225/files/doc_financials/2022/ar/bdc31236-5334-4868-beff-64de9d4ec3ca.pdf.

[21] *MultiPlan Corp.* Lake Cornelia Research Mgmt. Inc. (Nov. 16, 2020), https://res.cloudinary.com/dx34nupzw/image/upload/v1613365285/post/hp0bureetiymupiqf2b4.pdf (detailing analysis of MultiPlan's business lines and structure for purposes of investment considerations).

[22] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill.*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

Class Action Complaint

1    Association ("AHA"), many hospitals are operating on little or no margin due to rising costs

2    and insufficient reimbursement from government payors. Now, more than ever, competitive

3    reimbursements from commercial payors are "a matter of survival" for hospitals to generate

4    enough revenue to continue providing healthcare services to their patients and communities.

5                                    **C. Relevant Antitrust Market**

6    **1. Product Market**

7         75.    The relevant product market for this claim is the market for out-of-network

8    reimbursements paid by Insurers to Providers.

9         76.    In this market, healthcare providers are the sellers of out-of-network medical

10   services, while commercial insurers like MultiPlan and its co-conspirators are the buyers of

11   those services.

12        77.    Healthcare providers in this market do not have reasonable substitutes.

13   Under federal law and some state laws, healthcare providers often cannot seek

14   reimbursement directly from the insured. In addition, MultiPlan and its co-conspirators

15   force healthcare providers to agree not to balance bill for the remainder of the fee from any

16   other sources as a condition of receiving any reimbursement at all for their out-of-network

17   services. Effectively, if Providers cannot be reimbursed by the Insurer they often are left

18   without adequate payment for their services.

19        78.    Government reimbursement programs such as Medicare, Medicaid, and

20   TRICARE that provide reimbursements are not alternatives for commercial reimbursements

21   and do not compete against commercial insurers for several reasons. First, healthcare

22   providers typically cannot negotiate the reimbursement fees set by government insurers, as

23   they are unilaterally determined. Providers can, however, negotiate rates with commercial

                                                   24

Class Action Complaint

1  insurers. Second, government insurers typically serve a different population than

2  commercial insurers, as government reimbursement programs only apply to specific

3  populations. Third, government reimbursements are less than commercial insurance.

4  Providers rely on commercially insured patients for financial sustainability, particularly out-

5  of-network patients, to whom they typically charge higher reimbursement rates than

6  patients covered by government programs or in-network patients.

7         79.    MultiPlan recognizes government payors and commercial payors as two

8  separate markets. On its homepage, a drop-down menu titled "Markets" lists Government

9  and Commercial separately.[23] In its most recent Form 10-K filed with the Securities and

10  Exchange Commission (SEC), government programs and commercial programs are listed

11  separately under the section "Markets We Serve."[24] For government programs, MultiPlan

12  states the "market segment includes Medicare, Medicaid, TRICARE, Federal Employees

13  Health Benefits, Veterans Administration and other federal health programs (state and

14  municipal government health plans typically are managed as commercial plans).

15  Commercial insurers and health plans also participate in this market segment, but there also

16  are payors that operate government plans exclusively. Most, but not all, of MultiPlan's

17  commercial healthcare services also are of value to Payors of government programs."[25]

18         80.    MultiPlan also recognizes in-network and out-of-network as two separate

19  markets. This is indicated by its latest project MultiPlan 3.0, through which MultiPlan aims

20  to branch into the in-network reimbursement market using its repricing tool.[26]

---

[23] MULTIPLAN, https://www.multiplan.us/.

[24] MultiPlan, Inc., Annual Report (Form-10K), https://s26.q4cdn.com/607044225/files/doc_financials/2023/ar/00ed039b-35d4-4b46-a346-469655531943.pdf.
[25] Id.
[26] Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wp-content/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

Class Action Complaint

## 2. Geographic Market

81.    The relevant geographic market is the United States. Healthcare providers within the United States cannot practically seek reimbursement for out-of-network services from commercial healthcare insurers located in other countries. Insurance markets are highly regulated and governed by laws that differ significantly between countries. The U.S. healthcare industry, especially concerning reimbursement for out-of-network services, is distinctly different from healthcare systems in foreign countries and is governed by a set of federal and state laws and regulations that apply only in the United States. Outside the United States, private medical insurance is rare or non-existent, with medical care predominantly administrated as a part of a comprehensive government program.

82.    The relevant geographic market is not smaller than the United States. Healthcare providers in the United States can practically seek reimbursement for out-of-network services from commercial healthcare insurers located in other parts of the country.

## VI. MULTIPLAN ENGAGED IN HORIZONTAL PRICE FIXING WITH COMPETING HEALTH INSURANCE PAYORS

### A. MultiPlan is in Direct Competition with other Health Insurance Payors Who Are Members of the MultiPlan Cartel.

83.    In the relevant market, Multiplan is in direct horizontal competition with other commercial healthcare insurance payors. MultiPlan's PPO networks are also in direct horizontal competition with other commercial health insurance companies that offer PPO plans and operate their own networks.

84.    MultiPlan is an insurance payor. Healthcare providers submit claims directly to MultiPlan's PPO network, and MultiPlan pays claims on its PPO network. In fact, MultiPlan openly markets its payment services on its website.

26

Class Action Complaint

85.     MultiPlan also holds various certifications and accreditations for the healthcare insurance industry. For example, since August 2001, MultiPlan has held a certification from the National Committee for Quality Assurance ("NCQA"), an industry association that provides independent health plan accreditations.[27] Receipts of this certification also include competing health insurance companies such as Aetna.[28] Similarly, MultiPlan has received an accreditation for healthcare insurance network credentialing from the Utilization Review Accreditation Commission ("URAC"), an organization that credentials health plans, pharmacies, and provider organizations.

86.     Major hospital systems refer to MultiPlan as a payor of health insurance claims in public filings. For example, Mountain States Health Alliance and Wellmont Health System, two hospital systems operating in the Appalachia Highlands, designated MultiPlan as a "Payor" in their Application for Cooperative Agreement to the Commonwealth of Virginia.[29]

87.     MultiPlan is registered with the Maine Bureau of Insurance as a Preferred Provider Arrangement. In its annual disclosures, MultiPlan says that it "negotiates discounted reimbursement rates for health care services with the providers in its network. Participating Providers agree, through the provider agreement, to accept the negotiated discounted reimbursement rates for health care services provided to enrollees and bill enrollees only for applicable copay, deductible and/or co-insurance."

---

[27] *MultiPlan's PHCS Network Receives Tenth Consecutive NCQA Certification/Accreditation*, MULTIPLAN (July 16, 2019), https://www.multiplan.us/multiplans-phcs-network-receives-tenth-consecutive-ncqa-certification-accreditation/.
[28] *Aetna Earns Physician Quality Certification from National Committee for Quality Assurance*, AETNA (Feb. 22, 2022), http://myplanportal.com/news/newsReleases/2012/0222-Aetna-Aexcel-NCQA-Certification.html.
[29] Letter from Commonwealth of VA Dept. of Health, to Alan Levine, President and CEO, Mountain States Health Alliance, and Bart Hove, President and CEO, Wellmont Health Systems (Oct. 30, 2017), https://www.vdh.virginia.gov/content/uploads/sites/96/2017/10/Order-and-letter-authorizing-a-cooperative-agreement.pdf.

27

88.     Testimonies from MultiPlan's executives also confirm that MultiPlan is a health insurance payor. In *Jonathan Hott, M.D. v. MultiPlan, Inc*, MultiPlan's Senior Counsel, Marjorie G. Wilde offered the following testimony: "MultiPlan provides healthcare cost management services and operates a network only PPO that does business nationwide by contracting, on the one hand, with healthcare providers, such as hospitals, physicians, physician groups and ancillary providers. These contracted providers agree to give discounts off of medical services rendered to the beneficiaries of clients of MultiPlan . . . On the other hand, MultiPlan also contracts with its clients, which include health insurance carriers, health maintenance organizations, self-funded health plans, third party administrators, and other third-party payors."[30]

89.     Even if MultiPlan is not an insurance payor, all of its PPO networks compete with other commercial health insurance companies that offer PPO plans and operate their own networks, such as United, Cigna, Elevate, and Aetna. For example, Aetna offers Aetna Open Choice PPO plans; UnitedHealth offers UnitedHealthcare Options PPO plans.

90.     MultiPlan owns and operates several PPO networks in various states. It profits from each of the networks by contracting with insurers and others to permit their plain subscribers to access the healthcare providers who signed up with the network. Therefore, in the competition to secure contracts with providers and attract subscribers, all of MultiPlan's PPO networks are in direct competition with other Insurers.

91.     Regardless of its marketing, MultiPlan operates its PPO networks in the same manner and provides similar services as its competitors. First, MultiPlan signs Participating Professional Group Agreements with physicians' groups and Participating

---

[30] No. 1:21-cv-02421-LLS, ECF 38-2 ¶¶ 3–4 (S.D.N.Y. Aug. 15, 2022).

Class Action Complaint

1    Facility Agreements with hospitals. It also enters into agreements with healthcare providers

2    to set the rates for their services.

3          92.    Second, like its competitors, MultiPlan ensures that participating healthcare

4    providers meet certain requirements, issues administrative handbooks to participating

5    providers, audits the billing and medical records of participating providers, and conducts

6    on-site reviews of participating provider' offices to ensure they are complying with the

7    terms of their agreements with MultiPlan.

8          93.    Third, like its competitors, MultiPlan's PPO networks accept claims from

9    healthcare providers using either pre-approved paper forms or electronic data interchange.

10         94.    Lastly, like its competitors, MultiPlan maintains a "find a doctor or facility"

11   website that allows patients and subscribers to search for providers within its

12   comprehensive PPO networks.

13         95.    In its most recent Annual Report filed with the SEC, under the section "Our

14   Competitors - Network-Based Services," Multiplan stated that it "compete[s] directly with

15   other independent PPO networks, which are primarily regional, and with PPO network

16   aggregators."[31] Similar statements were included in MultiPlan's previous annual reports

17   from 2020 to 2022.[32]

18         96.    MultiPlan executives admitted that their PPO networks compete against

19   other commercial insurance networks. For example, during a 2020 presentation, MultiPlan's

20   then-Chief Revenue Officer, Dale White, admitted that in the network market, MultiPlan

21   "compete[s] with regional PPOs targeting primary network business, and network

---

[31]MultiPlan, Inc., Annual Report (Form-10K) (Feb. 29, 2024).
https://s26.q4cdn.com/607044225/files/doc_financials/2023/ar/00ed039b-35d4-4b46-a346-469655531943.pdf.
[32]*Financial Summary Total*, MULTIPLAN, https://investors.multiplan.us/financials/quarterly-results/.

Class Action Complaint

1    aggregators offering complimentary network access."[33] More recently, during the 2023

2    Piper Sandler Healthcare Conference, White, as MultiPlan's CEO, stated that "our clients

3    are our competitors; our competitors are our clients."

4        97.    Competing health insurance companies also see MultiPlan as a competing

5    network operator. In sworn trial testimony, John Haben, the former Vice President of

6    Networks at United, testified that "MultiPlan has the largest network in the country . . .

7    They have a broad network. Broader than United."

8    **B. MultiPlan Organized a Cartel and Entered into Industry-Wide**
9    **Agreements to Suppress Out-of-Network Claims**
10       98.    If MultiPlan alone set unreasonably low reimbursement rates for out-of-

11   network services, providers would start refusing patients from MultiPlan. By agreeing on

12   prices with its competitors, MultiPlan could pressure providers into accepting its

13   unreasonably low rates.

14       99.    MultiPlan successfully enlisted its competitors into its conspiracy to suppress

15   out-of-network reimbursements to healthcare providers. As early as 2017, MultiPlan

16   propositioned UnitedHealth to join its conspiracy, after already enlisting Cigna, Aetna, and

17   Blue Cross Blue Shield.[34] Since 2017, the conspiracy grew to encompass 90% of the

18   relevant market. It currently encompasses over 700 healthcare payors, including the top 15

19   largest companies.[35]

20       100.   To attract new members and maintain its price fixing scheme, MultiPlan was

21   very open about its expansive cartel. On multiple occasions over several years, MultiPlan

---

[33] Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wp-content/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.
[34] Chris Hamby, *Collusion in Health Care Pricing? Regulators Are Asked to Investigate*, N.Y. TIMES, May 1, 2024, https://www.nytimes.com/2024/05/01/us/multiplan-health-insurance-price-fixing.html.
[35] *Who is MultiPlan?*, MULTIPLAN, https://www.multiplan.us/company/.

Class Action Complaint

1    has boasted about the major players that continue to use their repricing methods.[36]

101.   MultiPlan entered into licensing agreements with its competitors so those competitors could

3    use Data iSight ("iSight"). MultiPlan received anywhere from 5-12% of the savings from

4    reduced reimbursement rates Insurers gained as a result of iSight's usage. MultiPlan further

5    collaborated with co-conspirators to agree on prices before using the iSight algorithm.

6    MultiPlan is incentivized to price reimbursements as low as possible as it charges Insurers a

7    percentage fee based on the savings iSight provided.[37]

8        102.   According to the DOJ and FTC, prices fixed through "an agreed upon,

9    shared algorithm" are still illegal.[38] MultiPlan supplied its algorithm with in-network data to

10    calculate reimbursement levels for out-of-network payments, which artificially lowered the

11    outcome. In-network payments can be up to 100 times lower than customary methods for

12    calculating costs.[39] Depending on the service provided, MultiPlan's repricing scheme

13    offered reimbursements from 1.5 to 49 times lower.[40]

14        103.   MultiPlan admitted in filings to the SEC that it enters into repricing

15    agreements with its competitors.[41] Its competitors also admitted that MultiPlan helps them

16    control costs,[42] with Aetna admitting it uses iSight for both rate setting and negotiating out-

---

[36] Churchill Capital Co., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act. https://www.sec.gov/Archives/edgar/data/1793229/000110465920096934/tm2028994-2_defa14a.htm.

[37] Chris Hambry, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, N.Y. Times (Apr. 9, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

[38] *FTC and DOJ File Statement of Interest in Hotel Room Algorithmic Price-Fixing Case*, Fed. Trade Comm'n (Mar. 28, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/03/ftc-doj-file-statement-interest-hotel-room-algorithmic-price-fixing-case.

[39] Thomas P. DiNapoli, *An Analysis of Reasonable and Customary Out-of-Network Reimbursement Rates*, OFF. OF THE N.Y. STATE COMPTROLLER, 19 (Apr. 2020), https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2020-18d2.pdf.

[40] *Id*.

[41] MultiPlan, Inc., Annual Report (Form-10K) (Feb. 29, 2024).

[42] Hambry, *supra* note 41.

31

Class Action Complaint

of-network claims.[43]

104.    MultiPlan does more than just suggest prices through Data iSight. While MultiPlan claims insurer clients can decline to use the suggested price, in practice Providers are forced to accept the suggested price in almost all situations. Despite iSight's deficit in comparison with more traditionally competitive prices, Providers accept the algorithm's price 96% of the time.[44] This acceptance rate is only possible because of the Multiplan Cartel controls a dominant portion of the market. Providers have learned they have no reasonable alternative other than to accept MultiPlan's artificially diminished rates.

105.    Competitors rely on the reimbursement rates "suggested" by iSight, and even seek to enforce it amongst Providers. In a form submitted to UnitedHealth, MultiPlan told Insurers to call for support if the Provider asked for more than the amount calculated. MultiPlan went on to say that its support staff will work with the Provider on the Insurer's behalf if the Provider does not accept the suggested rate.

106.    MultiPlan purportedly makes independent reimbursement recommendations to its competitor-customer base.[45] However, the only portion allowing for individualization of suggested rates that would be based on the individual client is discouraged within MultiPlan's own module.[46]

107.    For inpatient calculations, a claim is first sorted into a group. iSight begins by grouping a claim into one of three different levels of severity.[47] Next, the claim is benchmarked around

---

[43] Aetna Corp., Large Group and Public & Labor Self-Funded Medical Underwriting Disclosures (as of May 15, 2022), https://www.aetnacvshealth.com/content/dam/aetna/pdfs/aetnacom/large-group-public-labor-self-funded-medical-underwriting-disclosures-5-15-2022.pdf.
[44] *Data iSight Methodology*, MultiPlan, https://www.multiplan.us/services/analytics-based/data-isight/.
[45] Hambry, *supra* note 41.
[46] Nat'l Care Network LLC, *Data iSight Product and Methodology Inpatient Module* (June 2019), https://static01.nyt.com/newsgraphics/documenttools/5dad5f4bd288d4d9/bcf6f253-full.pdf.
[47] Nat'l Care Network LLC, *Data iSight Product and Methodology Inpatient Module* (June 2019), https://static01.nyt.com/newsgraphics/documenttools/5dad5f4bd288d4d9/bcf6f253-full.pdf.

Class Action Complaint

1   cost reports based on similar hospitals on a national scale.[48] The cost is then adjusted

2   according to the hospital's wage index.[49] After that, the algorithm calculates the service's

3   median benchmark, which set bounds for the price.[50] The same benchmarking process is

4   employed by every single payor that uses iSight to reprice its claims.[51] At this this point the

5   Insurer can voluntarily add in a margin cost that can affect the outcome the algorithm, but

6   MultiPlan recommends this individualization be minimal.[52]

7         108.    Lastly, upper and lower limits were set as overrides to potentially change the

8   outcome of the algorithm.[53] For example, a default override for iSight is to not pay more

9   than 250% of any claim's Medicare reimbursement rate.[54] This override is set so that even

10  if the price provided by iSight would normally be over 250% it will automatically be

11  reduced. These overrides were a way for MultiPlan and its competitors to further artificially

12  lower payments.

13        109.    MultiPlan coordinated with its competitors to close the gap between their

14  own reimbursements rates and Medicare's minimal reimbursement rates over time.[55]

15  MultiPlan considers paying as low as 120% of Medicare payments, knowing how

16  misleading to "the average consumer" the percentage can be, given the extremely low

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, THE CAPITOL FORUM (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/#:~:text=%E2%80%9CThe%20recommendation%20at%20that%20point,about%20Multiplan's%20specific%20pricing%20recommendation.

Class Action Complaint

1    Medicare payments.[56] iSight recommends prices as low as 260%, which MultiPlan's own

2    employees recognize as "ridiculously low."[57] UnitedHealth followed suit as it lowered its

3    override ceiling from 500% down to 250%.

4         110.    In addition to setting prices through iSight, MultiPlan communicated with is

5    co-conspirators through regular exchanges of performance reports to dedicated email

6    addresses.[58] These reports detailed MultiPlan's out-of-network pricing, state reports, and

7    specialty reports. Additionally, MultiPlan sent out preference sheets to its competitors to

8    suppress out-of-network reimbursements.

9         111.    The industry-wide use of iSight allowed MultiPlan to gather over 12 million

10   gigabytes of their competitor's reimbursement data.[59]Outside of implicit understandings to

11   use iSight's recommendations, MultiPlan's contracts included explicit specifications for the

12   repricing method the payor would use.[60] In practice, iSight's rates are not altered by

13   insurers. Insurers process hundreds of thousands of claims per day and do not have the

14   resources to evaluate the reasonableness of each individual claim. Streamlining the process

15   even further, MultiPlan amended its agreements with competitors, so that it not only set the

16   rate, but negotiate it on their behalf.[61]

17        112.    Although an iSight client can customize its preferences into the algorithm,

18   this is subject to a mutual agreement. A competitor's pricing preferences must be approved

19   by MultiPlan before being considered by iSight, through agreed upon business concerns.

---

[56] Chris Hambry, *In Battle Over Health Care Costs, Private Equity Plays Both Sides*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-private-equity.html.
[57] *Id*.

[59] Churchill Capital & MultiPlan, *Virtual Analyst Day*, 39 (Aug. 18, 2020), https://www.multiplan.us/wp-content/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

[61] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, NY TIMES (Apr. 9, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

Class Action Complaint

113.    The cartel members knew of MultiPlan's agreements with other competitors through presentations, sales pitches, and MultiPlan's own advertising. MultiPlan updated its competitors on how its other co-conspirators were pricing reimbursements.[62]

114.    MultiPlan used its customer base to induce other competitors to take part in its scheme. Dale White, MultiPlan's former Chief Revenue Officer, emailed UnitedHealth Executives in 2016 to recruit them into the cartel by pointing out that 7 of UnitedHealth's top 10 competitors were using MultiPlan's repricing services. White further solicited UnitedHealth's participation would help bring it in line with its major competition (those competitors being part of MultiPlan's conspiracy).

115.    After this email, John Haben, a UnitedHealth executive, sent an email internally referencing Blue Cross Blue Shield as being "even more aggressive" in using iSight to have "IPR/OPR (R&C Pricing) which is option 3." In this email, Mr. Haben reveals his knowledge of Blue Cross Blue Shield's pricing options obtained through Data iSight.

116.    While under oath, Rebecca Paradise credited iSight's wide usage by their competitors as *the* motivating factor to working with MultiPlan.[63] MultiPlan first suggested to United that they set a ceiling reimbursement price of 350% of Medicare payments.[64]

### C. Plus Factors

### 1. High Market Concentration

---

[62] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, NY TIMES (Apr. 9, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html.

[63] *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, THE CAPITOL FORUM (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/#:~:text=%E2%80%9CThe%20recommendation%20at%20that%20point,about%20Multiplan's%20specific%20pricing%20recommendation.

[64] *Id*.

117. The U.S. Commercial Reimbursement Market is highly concentrated among a few major firms. MultiPlan has detailed that the top 15 commercial health insurance companies use its claims repricing services.[65] According to Forbes in 2024, the top 15 healthcare insurance companies operate nearly 60% of the entire commercial health plan enrollment in the United States.[66] MultiPlan itself has acknowledged the high level of concentration present in the industry. In an August 18, 2020 Analyst Day presentation, MultiPlan wrote that "[t]he health insurance sector has consolidated to four top insurers."[67]

118. The members of the MultiPlan Cartel collectively control at least 90% of the relevant market. In 2022, the AMA found that 86% of PPO markets are highly concentrated as calculated under the Herfindahl-Hirschman Index ("HHI").[68] The Insurer Defendants alone account for more than 60% of the market. (For example, UnitedHealth currently controls 14% of the healthcare market, Elevance 12%, Aetna 11%, Cigna 10%, Kaiser 7%, and HCSC 6%).[69]

119. MultiPlan dwarfs its main competitor, Zelis. In 2022, Zelis processed approximately 2 million repricing claims. In the same year, MultiPlan processed 546 million repricing claims, totaling $155 billion.[70] Using claims processed as a measure of market power, MultiPlan would hold 99.6% of the market.

---

[65] *Who is MultiPlan?* MULTIPLAN, https://www.multiplan.us/company/.
[66] *50 Largest Health Insurance Companies in the U.S. Overall*, FORBES ADVISOR (Feb. 26, 2024), https://www.forbes.com/advisor/health-insurance/largest-health-insurance-companies/.
[67] Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wp-content/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.
[68] *Competition in Health Insurance: A Comprehensive Study of U.S. Markets*, AM. MED. ASS'N, 9 (2023), https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf.
[69] *AMA Identifies Market Leaders in Health Insurance,* AM. MED. ASS'N, (Dec. 12, 2023), https://www.ama-assn.org/press-center/press-releases/ama-identifies-market-leaders-health-insurance.
[70] *Analyst and Investor Day Presentation*, MULTIPLAN, 33 (June 28, 2023), https://s26.q4cdn.com/607044225/files/doc_presentations/2023/MultiPlan-Analyst-and-Investor-Day-2023-1.pdf.

Class Action Complaint

120.    Further, healthcare providers have no reasonable substitute from MultiPlan and its Co-Conspirators for reimbursements from commercial insurers for out-of-network medical services. It is illegal under federal law and numerous state laws for healthcare providers to seek reimbursements from insureds (i.e. "balance billing") for most out-of-network claims. In addition, market-dominating MultiPlan and its Co-Conspirators force healthcare providers to forego any reimbursement from insureds as a condition of receiving any compensation at all for out-of-network claims.

121.    Moreover, while healthcare providers may receive reimbursement payments from governmental sources such as Medicare, Medicaid, and TRICARE, these sources of payment do not compete against commercial health insurance. These forms of government-paid insurance address populations are not typically served by commercial health insurance.

122.    Healthcare providers' most accessible option for reimbursement is to submit a claim to the patient's insurance company. If that insurer is a member of MultiPlan's conspiracy, which the majority are, the healthcare provider has no choice but to seek reimbursement from a repriced MultiPlan claim.

123.    Providers' remedy in normal market conditions would be to arbitrate or litigate over the correct amount of reimbursements. However, because MultiPlan is providing similarly low rates for all the major insurance companies, providers would quickly be swamped with costs attempting to dispute every out-of-network payment it was making.

**2. High Barriers to Entry**

124.    There are major barriers to entry into the U.S. Commercial Reimbursement Market. Extreme time and financial expenditures are required to develop a network of

37

healthcare providers large enough to compete as a commercial healthcare insurer. Once time and investment has been committed, industry newcomers must then contend with the massive economies of scale and long-entrenched name recognition maintained by the large incumbent insurers. Even if a new entrant is initially successful, they must survive and thrive long enough to develop widespread business to properly spread risk amongst its insureds.

125.    Additionally, new health insurance networks face an actuarial risk. They must balance claims paid with revenue generated through premiums or network access fees in order to maintain business and avoid dipping into their capital reserves.

126.    New entrants also face regulatory hurdles. Provision of health insurance is highly regulated at both the federal and state level, which poses a difficult-to-navigate regulatory system. Healthcare regulation is also ever-changing, which requires new entrants to monitor regulatory shifts and reforms that may impact their operations.

127.    These barriers to entry outline the MultiPlan Cartel's firm grip over the industry. The cartel's market power renders them overwhelmingly influential. Because of this, new entrants who reject the MultiPlan Cartel's price-fixing scheme are unable to undermine the Cartel's ability to impose agreed-upon reimbursement rates on healthcare providers for out-of-network services.

128.    Moreover, there are high barriers to entry in repricing services themselves. Development of a third-party repricing service requires a new entrant to develop a source code and algorithm that effectively reprices out-of-network claims without infringing MultiPlan's patents. It also requires industry newcomers to agree to contracts with hundreds of commercial insurance networks and invest in high-power server capacity.

38

129.    These dual-layered barriers render it unlikely that a new entrant could compete and disrupt the MultiPlan Cartel. These barriers to entry contribute to support an interference of collusive agreements.

**3. Information Exchange**

130.    MultiPlan and competing health insurance companies have exchanged data containing claims submitted by healthcare providers, reimbursement offers made by commercial health insurance companies in response to those submitted claims, and the specific dollar amounts paid in response to those claims.

131.    The quantity of data exchanged is too massive to visualize. In June 2023, MultiPlan noted that it had "10+ petabytes of [claims] data."[71]

132.    Witnesses from multiple health insurance providers have affirmed the length of the MultiPlan Cartel's information sharing scheme. During a deposition in an ERISA litigation, a Cigna witness noted that "from my experience, if I asked for information, they would provide it to me" when asked whether there was any information that MultiPlan would not provide for Cigna if Cigna asked. Further, a UnitedHealth witness in a related case stated a similar sentiment, saying "I have no reason for MultiPlan not to share or provide answers to any questions that we have asked" and that MultiPlan would answer "any question specific to the program…"

133.    The data exchanged between the Cartel has specific characteristics that render their exchange anticompetitive. First, the pricing data is transmitted to MultiPlan in real-time automatically through electronic data links from its health insurance clients.[72]

---

[71] *Analyst and Investor Day Presentation*, MULTIPLAN, 33 (June 28, 2023), https://s26.q4cdn.com/607044225/files/doc_presentations/2023/MultiPlan-Analyst-and-Investor-Day-2023-1.pdf.
[72] MULTIPLAN, https://www.multiplan.us/tackling-out-of-network-medical-bills-with-data-isight/

Second, the data is specific to commercial insurance claims.[73] Third, the real-time data is not generally publicly available. Fourth, the data is granular and unblinded, meaning that MultiPlan knows precisely what its competitors charge for specific medical services and procedures. This type of data exchanged by MultiPlan, and other members of the Cartel has been recognized by courts as having a high likelihood of anticompetitive effects.[74]

134.    MultiPlan's information sharing aligns with the concerns expressed by the U.S. Supreme Court and Second Circuit. MultiPlan uses this data to explicitly share confidential pricing information among members of the MultiPlan Cartel to fix prices, and co-conspirators enter the MultiPlan Cartel knowing that MultiPlan will share their commercially sensitive pricing information with their competitors. For example, when seeking to establish UnitedHealth's out-of-network reimbursement rates, MultiPlan told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and UnitedHealth would be "leading the pack along with another competitor."[75]

135.    Though Multiplan shares information about its pricing methodology with competing payors, it does not share those details with Providers. In an email sent on July 10, 2019 at 7:50 a.m., Bruce Singleton, MultiPlan's Senior Vice President for Network Development Strategy, told Mike McEttrick, MultiPlan's Vice President of Healthcare Economics, that he wanted to keep the discussion with that provider at "eye level," which

---

[73] *Id.*

[74] *See United States v. U.S. Gypsum Co.,* 148 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."); *Todd v. Exxon Corp.,* 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive.").

[75] *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say,* THE CAPITOL FORUM (Mar. 07, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/.

1    meant that he wished not to share how MultiPlan's pricing formula actually operated with

2    the provider.

3        136.    The information exchanges between MultiPlan and members of the

4    MultiPlan Cartel represent an agreement to restrain trade rather than a competition on the

5    merits. For this reason, this type of information exchange is circumstantial evidence of a

6    cartel agreement amongst competitors.

7    **4. Motives to Conspire**

8        137.    MultiPlan and its Cartel are financially incentivized to suppress

9    reimbursement payments for out-of-network services. Since MultiPlan is paid a percentage

10   of the underpayment to Providers, MultiPlan gets paid more the more the Cartel suppresses

11   payments. These payments amount to massive gross payments to MultiPlan. In one year,

12   United paid $300 million for their out-of-network reimbursement claim suppression

13   services, which accounted for around 20% of MultiPlan's annual revenue.

14       138.    Similarly, the Co-Conspirator insurance companies have a motive to

15   suppress payments to healthcare providers to increase their own profits, which sharply

16   increase even after paying MultiPlan for their repricing service. United executives

17   themselves have identified the benefit to suppressing out-of-network claim payment. In an

18   internal email, United executives noted that United could generate more profits by "driving

19   all out-of-network claims to a more aggressive pricing" rather than continuing to pay out-

20   of-network claims at usual and customary rates.[76]

21       139.    The motives of MultiPlan and its Co-Conspirators are mutualistic because

22   the less the MultiPlan Cartel pays to healthcare providers, the more profit each member of

---

[76] *Id.*

Class Action Complaint

the Cartel receives. MultiPlan has itself recognized this alignment of incentives. In a presentation to investors, a MultiPlan representative stated that its payor-customers' "incentives are completely aligned with their own."[77]

### 5. Opportunities to Conspire

140.    The MultiPlan Cartel has maintained consistent opportunities to conspire for years, which supports an inference of conspiracy. MultiPlan is the facilitator of extensive private communication between competing health insurance companies, which presents the opportunity and forum for the parties to conspire.

### a. Client Advisory Meetings

141.    For example, MultiPlan operates a Client Advisory Board which hosts annual multi-day retreats and other events to bring MultiPlan and its co-conspirators together.[78] MultiPlan's 30(b)(6) witness Jacqueline Kienzle, when testifying at a deposition in the *LD, et al. v. United Behavioral Health, et al,* 4:20-cv-02254-YGR (N.D. Cal.) litigation, stated that the meetings planned by the Client Advisory Board are meant to bring clients together to speak about "industries, bring in industry experts," and to "talk amongst their peers." In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California. Executives from MultiPlan, UnitedHealth, Aetna, Cigna, Humana, and several other commercial insurers were present at the event.[79]

142.    MultiPlan's presentations at these retreats outline cost reductions

---

[77] *Id.*
[78] *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, THE CAPITOL FORUM (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/.
[79] *Id.* at 75.

Class Action Complaint

accomplished through Data iSight. Additionally, MultiPlan has also used Client Advisory Meetings to attract new members into MultiPlan's Cartel. A 2017 MultiPlan document revealed that the 2015 Client Advisory Board meeting contained prospective clients seated next to current ones in hopes of recruiting them.[80] MultiPlan's Client Advisory Board hosted another retreat at Montague Laguna Beach resort from September 26-28 in 2021.[81]

### b. Road Shows

143.    Further, MultiPlan has regularly hosted numerous other Client Advisory Board meetings and "road shows," which offered frequent opportunities for the Cartel members to conspire. At road shows, MultiPlan visits numerous insurance companies, including the insurer Co-Conspirators, and provides updates regarding its repricing services. MultiPlan executives Dale White and Susan Mohler have shared detailed descriptions of Data iSight's repricing methodology, its savings for its customers, and future recommendations to further reduce out-of-network reimbursements.[82] During a fall 2021 road show, MultiPlan gloated that it had reduced payments for out-of-network services by 61% to 81%.

### c. Trade Association Meetings

144.    Moreover, there are other industry organizations that provided the MultiPlan Cartel additional opportunities to conspire. For example, most of the largest commercial health insurance payors are members of industry associations like AHIP (formerly "America's Health Insurance Plans"). Defendant members of AHIP include Aetna, Centene,

---

[80] *Id*. at 75.
[81] *MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, THE CAPITOL FORUM (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/.
[82] *Id*.

Class Action Complaint

Cigna, CVS Health, Elevance, HCSC, and Humana.[83] AHIP hosts a variety of closed-door conferences, committee meetings, and board meetings.[84] AHIP themselves state that it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests." MultiPlan sponsored AHIP's annual conference in 2023, and had representatives attend the event.[85]

145. Defendant executives are featured extensively on AHIP's Board of Directors, including:

      1.    Gail K. Boudreaux, President and CEO of Elevance;

      2.    David Cordani, Chairman and CEO of Cigna;

      3.    Sarah London, CEO of Centene;

      4.    Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna); and

      5.    Maurice Smith, President, CEO and Vice Chair of HCSC[86]

146. Many of the same Defendants in this case were also co-conspirators in the Ingenix lawsuit. In 2011, a California federal court examining the Ingenix scheme ruled that the plaintiffs challenging Ingenix' relationship with these similar plaintiffs sufficiently alleged a *per se* horizontal price-fixing agreement, based in large part on findings of significant opportunity for these entities to conspire from their mutual membership in AHIP and presence at AHIP events.[87] The same reasoning should be applied to this case.

147. Lastly, in 2017, MultiPlan, UnitedHealth and Humana formed a new

---

[83] *Our Member Organizations*, AHIP, https://www.ahip.org/members.
[84] *Conferences*, AHIP, https://www.ahip.org/conferences. s
[85] *Id.*
[86] *Board of Directors*, AHIP, https://www.ahip.org/board-of-directors.
[87]*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1001, 1028 (C.D. Cal. 2011).

Class Action Complaint

1   industry partnership known as the Synaptic Health Alliance ("SHA"), an organization

2   dedicated to leveraging blockchain technology to "tackl[e] the challenge of accurate and

3   efficient provider data management and sharing."[88] To accomplish this aim, SHA created a

4   "cooperatively owned" data exchange to collect and share changes to provider data.[89] This

5   platform is invitation-only, and contains technology that enables "approved participants to

6   blur industry lines to share and exchange information in a cooperatively-owned,

7   synchronized, distributed ledger, addressing administrative cost and data quality issues that

8   impact all stakeholders."[90] MultiPlan, UnitedHealth, and Humana developed this entity

9   explicitly for sharing sensitive data. The development of this tool fuels the ongoing

10   conspiracy and opens the door in the future for widespread opportunities for collusion.

11   **6. Enforcement Mechanisms**

12   148.   Cartel agreements are explicitly illegal. Therefore, cartels must create

13   informal means of detecting and preventing defections from the cartel.

14   149.   An example of a Cartel member's attempted defection is UnitedHealth's

15   plan to use its in-house Naviguard system to reprice out-of-network claims instead of

16   MultiPlan. Since UnitedHealth is the largest healthcare payor in the United States, the loss

17   of UnitedHealth in the MultiPlan Cartel would weaken MultiPlan's control over the

18   industry and potentially lead to additional defectors.

19   150.   To stave off this risk, MultiPlan offered UnitedHealth a sweetheart deal. In

20   2022, MultiPlan and UnitedHealth entered into a new contract for repricing services that

---

[88] *Improving Provider Data Accuracy: A Collaborative Approach Using a Permissioned Blockchain*, SYNAPTIC HEALTH ALLIANCE, 3, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2018/Synaptic-Health-Alliance-Blockchain.pdf.
[89] *Id*. at 9.
[90] *Id*.

Class Action Complaint

took effect in 2023.This contract contained incredibly favorable terms for UnitedHealth that allowed them to retain nearly all of the underpayments gleaned from MultiPlan's claims suppression formula.[91]

151.    MultiPlan suffered a decrease in financial performance as a result of this sweetheart contract. MultiPlan's revenues dropped 20.6% in quarter one of 2023 compared to quarter one of 2024.[92] This drop amounted to 30.7% in earnings before interest, taxes, depreciation, and amortization versus the first quarter of 2022.[93] This immediate loss in revenue illustrates MultiPlan's willingness to sacrifice, retain, and stabilize their powerful cartel to eventually recuperate losses experienced as a result of the sweetheart deal.

152.    MultiPlan also appeared to make non-monetary concessions to UnitedHealth in order to retain them in their Cartel. On June 27, 2023, MultiPlan appointed John Prince, the former President and Chief Operating Officer of Optum (UnitedHealth Group's health services subsidiary) to MultiPlan's board of directors.[94]

153.    Moreover, the MultiPlan Cartel maintains methods for monitoring and enforcing compliance. MultiPlan and its co-conspirators have entered into formal contracts with each other that contain dispute resolution provisions. For example, MultiPlan's contract with Aetna maintains a clause enforcing their out-of-network pricing agreement through "mediation … administered by the American Arbitration Association under its Mediation Rules for Commercial Financial Disputes … in the city of New York." The contract also notes that if that mediation was unsuccessful, MultiPlan reserves the ability to

---

[91] *Id*.
[92] MultiPlan, Inc., Quarterly Report (Form 10-Q) (May 10, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001793229/dfa6b4f7-059d-4eb3-9bb8-f0f36f3e14eb.pdf.
[93] *Id.*
[94] *MultiPlan Appoints John Prince to its Board of Directors*, MULTIPLAN (June 27, 2023), https://www.multiplan.us/multiplan-appoints-john-prince-to-its-board-of-directors/.

46

Class Action Complaint

1    sue Aetna to enforce the out-of-network pricing terms."[95] The threat of litigation acts as a

2    looming threat and check on Cartel members to comply with the Cartel's terms.

3        154.    MultiPlan also operates a means for payors to monitor one another's

4    compliance with suppressing out-of-network reimbursements through their data and

5    decision science solution suite: PlanOptix. PlanOptix allows access to 500 billion records

6    accumulated from national and regional payers.[96] PlanOptix shows competitor pricing for

7    varying treatment services. This allows payors to monitor each other's adherence to

8    suppressing out-of-network reimbursement claims by allowing them to directly compare

9    each other's prices on an open forum.

10       **7. Actions Against Unilateral Self-Interest**

11       155.    Commercial health insurance networks that are members of the MultiPlan

12   Cartel have engaged in actions against their own self-interest in three primary ways.

13       156.    First**,** the agreements between MultiPlan and commercial health insurance

14   networks are economically irrational absent coordination. If a single insurance network

15   entered into an agreement with MultiPlan to abandon the UCR pricing methodology in

16   favor of underpaying out-of-network claims, healthcare providers would simply respond by

17   refusing to treat patients under that plan due to their low reimbursement. The health

18   insurance provider would lose access to different subjects of care, resulting in a loss of

19   customers.

20       157.    Further, if only a single (or relatively few) insurance networks abandoned

21   the UCR pricing methodology those insurance networks would also be spending precious

---

[95] *Id*.
[96] *Illuminating Healthcare Price Transparency Data*, MultiPlan, https://www.multiplan.us/data-decision-science-services/planoptix/.

Class Action Complaint

1   time and resources from undergoing widespread repricing negotiations with providers.

2   Providers would presumably resist lower payments, thereby reducing the likelihood that the

3   insurer would be able to settle a deal with providers to provide them in-network.

4       158.   MultiPlan's pricing scheme is only rational for an insurance network if they

5   know that all other major competitors also agree to join the MultiPlan Cartel.

6       159.   Second, since Insurers have joined the MultiPlan Cartel, they have refrained

7   from unilaterally acting in self-interest, which is expected from a for-profit business.

8   However, such typical conduct would destabilize the Cartel.

9       160.   For example, Insurers have refused to develop an in-house claims repricing

10  tool to provide the exact same services as MultiPlan without paying their fees. UnitedHealth

11  is the foremost example of this refusal. As the nation's largest commercial health insurance

12  provider, UnitedHealth is easily capable of analyzing its own claims database to discern

13  pricing for out-of-network reimbursements.[97] They could do this while cutting out

14  MultiPlan as the middleman, allowing them to save as much as 9.75% on each repriced

15  claim, totaling hundreds of million dollars per year.

16      161.   In fact, as noted earlier, UnitedHealth had such a product in development:

17  Naviguard. Naviguard was designed to be an in-house replacement for MultiPlan. However,

18  UnitedHealth renewed its contract with MultiPlan in January 2023 instead.[98]

19      162.   UnitedHealth's decision to scrap their in-house repricing tool in favor of

20  working collaboratively with a competitor does not make economic sense absent a

21  conspiracy. UnitedHealth could have reduced a major overhead cost associated with their

---

[97] *AMA Identifies Market Leaders in Health Insurance*, AMA (Dec. 12, 2023), https://www.ama-assn.org/press-center/press-releases/ama-identifies-market-leaders-health-insurance.
[98] Dan Primack & Bob Herman, *Court Testimony Could Help Save the Sputter MultiPlan SPAC*, Axios (Nov. 16, 2021), https://www.axios.com/2021/11/16/spac-multiplan-unitedhealthcare-court-testimony.

Class Action Complaint

1    business and weaken a competitor's strength but chose not to do so. This action against

2    unilateral self-interest implies a context of horizontal conspiracy in which MultiPlan is

3    fixing prices for out-of-network reimbursements in collaboration with a range of payors,

4    including UnitedHealth.

5           163.    This opportunity is not unique to UnitedHealth. Other large payors like

6    Cigna, Elevance, and Aetna are more than equipped to create their own in-house repricing

7    tools to reduce the cost of contracting a third-party like MultiPlan to do so for them. Rather,

8    these wealthy companies choose to share information on submitted claims and repricing

9    adjudications with their competitors, affirmatively implying the existence of a collaborative

10   Cartel at play.

11          164.    Third, it is irrational for an individual insurance network to pay for

12   MultiPlan's expensive claims re-pricing services when there are much cheaper, yet

13   comparable services present in the market. One of these alternatives is FAIR Health, Inc.[99]

14   FAIR charges insurers a modest, flat annual fee whereas MultiPlan charges its clients a fee

15   for each repriced claim based on a percentage of the difference between the billed amount

16   and the sum ultimately paid. Such contingent fees charged by MultiPlan far exceed the flat

17   annual fee that insurers would have to pay to use FAIR. Without such suspected collusion,

18   it would be irrational for individual insurers to choose a far more expensive market option

19   in MultiPlan when a far cheaper alternative exists in the market.

20          **D. Health Insurance Companies Were Repeat Antitrust Violators**

21          **1. The Ingenix Cartel (1998-2008)**

22          165.    The MultiPlan Cartel resembles a contemporary version of a collusive effort

---

[99] FAIR HEALTH CONSUMER, https://www.fairhealthconsumer.org/.

1    by Insurers to suppress out-of-network reimbursement rates: the Ingenix Cartel.

2        166.    Between 1997 and 1998, a UnitedHealth Group subsidiary called Ingenix

3    purchased the two then-largest claims databases used to calculate UCR: MDR (1997) and

4    PHCS (1998).[100]

5        167.    With UnitedHealth's purchase of MDR and PHCS, they became virtually

6    responsible for determining UCR rates for the entire industry, all while being one of the

7    largest insurance companies in the world themselves. This was a clear conflict of interest.

8    Ingenix was incentivized to skew its claims data downwards to reduce the apparent UCR

9    rates. This is precisely what Ingenix did. Every cent saved on out-of-network

10   reimbursements based on Ingenix's claims data represented increased profits for

11   UnitedHealth, and also for its insurance industry rivals.

12       168.    Ingenix's rates were overwhelmingly used in the health insurance industry to

13   set reimbursement rates for out-of-network claims for more than a decade. However,

14   providers and consumers began to complain in the late 2000s about unreasonably low out-

15   of-network claims reimbursement rates that forced them to balance bill patients significant

16   sums.[101] These complaints sparked numerous investigations and lawsuits against Ingenix,

17   which uncovered that it had been deliberately manipulating data to reduce UCR rates.[102]

18       169.    Ingenix reduced UCR rates in numerous ways. First, Ingenix blended in in-

19   network data for calculating out-of-network reimbursements. In-network rates do not

20   represent a reasonable reimbursement for out-of-network claims because a provider does

---

[100] *Ingenix BenchMarking Products*, INGENIX, 4 (Apr. 2005),
https://www.dmhc.ca.gov/Portals/0/AbouttheDMHC/FSSB/Meetings/050419ipp.pdf.
[101] *$350 Million Dollar Settlement with United Healthcare/Ingenix Will Compensate Providers for Insurer's Failure to Properly Reimburse for Out-of-Network Services*, ABRAMS AND FENSTERMAN,
https://www.abramslaw.com/media/announcements/350-million-dollar-settlement-with-united-healthcare-ingenix-will-compensate-providers-for-insurers-failure-to-properly-reimburse-for-out-of-network-services/.
[102] Staff of Charman Rockefeller, *supra* note 134 at 7.

Class Action Complaint

1    not get contractual benefits associated with in-network participation. Therefore, Ingenix

2    including heavily discounted in-network charges in the same database as out-of-network

3    charges artificially reduces the apparent market rates for such services, thus lowering the

4    UCR rate calculation.

5          170.    Second, Ingenix removed higher-end reimbursement claims from their

6    databases using formulaic edits to discard around 5% of all submitted claims without first

7    investigating whether the claim was valid. Insurers that contributed to Ingenix's database

8    also did the same.[103] For example, Ingenix's largest contributor, Aetna, "pre-scrubbed" its

9    data before submitting it, which eliminated the highest 20% of legitimate medical claims

10   before sending their claims data to Ingenix.[104]

11         171.    This data manipulation resulted in medical charges appearing in Ingenix's

12   UCR databases 10-28% lower than they actually were.[105] This skew resulted in

13   underpayments to health care providers, higher bills for patients, and massive gains for

14   Insurers. These same parties are again involved in the same exact scheme, this time through

15   MultiPlan.

16         172.    Ingenix and UnitedHealth would be later forced to admit that Ingenix's

17   overlapping ties with the industry and its status as UnitedHealth's subsidiary created

18   significant conflicts of interest. Numerous lawsuits were eventually filed against insurers by

19   underpaid physicians and patients who were balance billed from Ingenix's manipulation of

20   the UCR database. The American Medical Association (AMA) and several state-specific

21   medical associations filed a class-action against Ingenix and UnitedHealth alleging the

---

[103] *Id*. at 26-27.
[104] *Id*.
[105] *Id*.

51

Class Action Complaint

1  improper reduction to healthcare providers in violation of the Racketeer Influences and

2  Corrupt Organizations Act ("RICO") and antitrust laws. The suit settled in 2009, and

3  UnitedHealth agreed to pay $350 million to members of the class.[106]

4  **VII. MARKET POWER**

5       173.    MultiPlan and its Co-Conspirators hold dominant market power in the out-

6  of-network reimbursement market through their conspiratorial agreements with each other.

7  MultiPlan maintains agreements with nearly every commercial insurer that participates in

8  the relevant market. The members of the MultiPlan Cartel include Cigna, UnitedHealth,

9  Humana, Elevance, Aetna, and numerous others, who collectively hold at least 90% of the

10  relevant market.[107]

11       174.    MultiPlan has repeatedly affirmed that each of the "top 15" health insurance

12  companies and over 700 payors subscribe to Data iSight.[108] In 2024, Forbes concluded that

13  those top 15 healthcare insurance companies controlled nearly 60% of the entire

14  commercial health plan enrollment in the United States.[109]

15       175.    Moreover, the nationwide market for out-of-network commercial

16  reimbursements is approximately $130 billion annually. In 2019, for example, MultiPlan

17  claims that it processed $106 billion in charges, which amounts to 81.5% of the market.[110]

18  If the remainder of the market were divided amongst 19 other firms with 1% of market

19  share, the HHI index of the market amounts to over 6,500. MultiPlan has only grown since

---

[106] *Am. Med. Ass'n. v. United Healthcare Corp.*, 00 Civ. 2800 (LMM) (S.D.N.Y. May. 7, 2009).
[107] *AMA Identifies Market Leaders in Health Insurance*, AMA (Dec. 12, 2023), https://www.ama-assn.org/press-center/press-releases/ama-identifies-market-leaders-health-insurance; *MultiPlan/PHCS Client Listing*, MULTIPLAN, https://www.nelapho.com/images/pdf/MultiPlanAndPHCSClientListing.pdf.
[108] *Who is MultiPlan?* MULTIPLAN, https://www.multiplan.us/company/.
[109] *Largest Health Insurance Companies 2024*, FORBES ADVISOR (Feb. 26, 2024), https://www.forbes.com/advisor/health-insurance/largest-health-insurance-companies/.
[110] *Id.*

Class Action Complaint

2019.

176.    MultiPlan is largely alone in the out-of-network claims repricing business. MultiPlan's repricing business is distinct in that Data iSight operates on patented repricing methodology supplemented by its massive database of historical claims. Other claims repricing services base their operations on UCR or Medicare rates, suggesting that their methodologies are not on the same playing field.

177.    MultiPlan's "biggest" competitor is Zelis. However, in 2022 Zelis processed only 2 million repricing claims compared to MultiPlan's 546 million claims processed. It is clear that MultiPlan is on a completely different level than even its chief competitor.

178.    Adding to the dominant collective market power, each Insurer has complete buyer-side market power in the submarket for reimbursements of out-of-network healthcare services provided to its own insureds. When providers provide out-of-network services to a patient, their only option for reimbursement is from the insurer to which the patient is enrolled. This illustrates the complete buyer-side power over out-of-network services reimbursement provided by its own insureds. Thus, an Insurer's agreement with MultiPlan on the methodology for suppressing reimbursements for out-of-network services amounts to a price fixing agreement backed by complete market power in the relevant submarket. This ensures that healthcare providers have no legitimate alternative to the Cartel's suppressed reimbursement.

## VIII. FRAUDULENT CONCEALMENT AND CONTINUING VIOLATION

### A. Fraudulent Concealment

179.    From at least July 1, 2017, through the present, MultiPlan and members of the MultiPlan Cartel have fraudulently concealed the MultiPlan Cartel's existences through

Class Action Complaint

1    various means and methods.

2         180.   As this complaint explains, MultiPlan continues to collude with its co-

3    conspirators by entering into horizontal agreements that reduce reimbursement payments to

4    providers of out-of-network treatment. No members of this class are privy to the agreements

5    and contracts between MultiPlan and its Co-Conspirators. Because of non-disclosure and

6    confidentiality clauses contained in these contracts, plaintiff class members may not access

7    the underlying terms contained within that would aid in members establishing an antitrust

8    claim.

9         181.   Additionally, MultiPlan publicly releases false and misleading information

10   that conceals their existence as a commercial health insurance company. These actions

11   obscure its collusion with its competitors to out-of-network provider reimbursements.

12        182.   Multiplan's deceptive public dissemination is apparent with a visit to their

13   website. The front page of MultiPlan's website states "We are not an insurance company" at

14   the top of the page.[111] Further, MultiPlan's FAQ page states that "MultiPlan is not a health

15   insurance company and does not sell insurance directly or indirectly through agents or

16   brokers."[112] This statement is highly misleading, if not entirely wrong. MultiPlan is a health

17   insurance company. MultiPlan has one of the oldest and largest PPO networks in the United

18   States. MultiPlan itself has boasted about this, naming itself as "the largest independent

19   primary PPO network in the US" as early as 2006. MultiPlan's insurance network works the

20   same as other health insurance networks. Users pay a fee to access the healthcare providers

21   in MultiPlan's PPO network, and MultiPlan administers and adjudicates claims made for

22   medical services in that network. For this reason, MultiPlan's claims denying its existence

---

[111] *MultiPlan*, MULTIPLAN, https://www.multiplan.us/.
[112] *Solicitation FAQs*, MULTIPLAN, https://www.multiplan.us/members/solicitations-faqs/.

Class Action Complaint

1    as a health insurance company are incorrect.

2                        **B. Continuing Violation**

3         183.   MultiPlan and its Co-Conspirators continue to violate antitrust laws against

4    class members. After MultiPlan and Insurer's initial agreement, they have committed overt

5    acts that each are a part of the ongoing violation alleged.

6         184.   As previously described, members of the MultiPlan Cartel frequently meet to

7    refine and reconfigure their Cartel agreement and to ensure that the agreement was as

8    effective as possible in accomplishing their goal to suppress out-of-network reimbursement

9    payments to providers. MultiPlan Cartel members met during Client Advisory Board

10   meetings to discuss the results of MultiPlan's products toward cutting out-of-network

11   payments to healthcare providers.

12   **IX. ANTICOMPETITIVE EFFECTS**

13                        **A. Harm to Competition**

14        185.   The MultiPlan conspiracy has significantly harmed competition in the

15   market for reimbursements of out-of-network healthcare services claims. MultiPlan has

16   facilitated a program allowing for Insurers to pay far less than they would have for out-of-

17   network reimbursements without the conspiracy. Without the conspiracy, insurance

18   companies would have been in direct competition with one another to compensate

19   healthcare providers for out-of-network services to provide insureds with a breadth of

20   access to healthcare providers both in and outside of their network.

21        186.   Commercial health insurers seek to obtain wide-ranging access to out-of-

22   network healthcare providers in order to market the extensive reach of their insurance

23   products and gain more customers. Commercial health insurers thus directly compete with

                                        55

one another to sign healthcare providers to their own networks, which requires insurers to offer "more generous reimbursement terms" to out-of-network healthcare providers to persuade providers to accept patients from their insurance network.[113]

## B. Underpayment to Providers

187.    The harm to Providers is most prominent. The coordinated underpayment of out-of-network reimbursements has left Providers with less money for services they have provided to out-of-service patients. This underpayment has a broad ripple effect.

188.    Even worse, Providers have no means of avoiding the MultiPlan Cartel's anticompetitive force. Practically, healthcare providers cannot reject MultiPlan's offered reimbursement rate and negotiate for a better rate because MultiPlan sets the status quo for all potential reimbursements. MultiPlan and its Co-Conspirators' all-encompassing market power allows them to enforce compliance with their reimbursement rates, and providers know that there is no alternative. Providers ultimately accept the offered sub-competitive rates as near at 99.4% of the time, while appealing them as little as 2% of the time.

## C. Unfair Burden due to Emergency Care Mandate

189.    Moreover, the MultiPlan Cartel exploits hospitals' emergency departments that may not lawfully avoid the Cartel's manipulative underpayment scheme. Use of emergency services is extremely prevalent in the United States. According to the Center for Disease Control and Prevention (CDC), there were 139.8 million emergency department visits in 2021, which equated to 42.7 visits per 100 people.[114] Of these 139.8 million emergency department visits, around 40 million of them were covered by a form of health

---

[113] *U.S. v. Anthem* (1:16cv-01493), ECF 1, ¶ 64 (D.D.C. filed July 21, 2016).
[114] *Emergency Department Visits*, CDC NATIONAL CENTER FOR HEALTH STATISTICS, https://www.cdc.gov/nchs/fastats/emergency-department.htm.

Class Action Complaint

1    insurance. This means that in 2020, more than 90 million emergency room visits involved

2    out-of-network patients.

3         190.    Demand for emergency care is also highly inelastic. Patients typically do not

4    have a choice regarding which hospital they are taken and are rarely able to avoid and deny

5    emergency medical treatment unto them.

6         191.    Emergency Departments also play a major role in the dispersal of healthcare

7    to patients across the country. From 1993 to the present day, emergency department visits

8    have become the primary means that patients are admitted to hospitals.[115]

9         192.    Hospitals are also mandated to serve all patients who enter into an

10   emergency department. Under the federal Emergency Medical Treatment and Labor Act

11   ("EMTLA"), 42 U.S.C. §§ 1395(a)-(b), (d), and (h), hospitals and physicians in emergency

12   departments must "provide for an appropriate medical screening evaluation" when a person

13   seeks emergency care. If there is an emergency medical condition, physicians are required

14   to "stabilize the medical condition" without inquiry into "the individual's method of

15   payment or insurance status."[116]

16        193.    Violations of EMTLA are subject to civil liability.[117] Any physician

17   responsible for examination and treatment who negligently violates EMTLA is subject to

18   civil penalties of up to $50,000 per violation.[118] Additionally, Numerous states like New

19   York and Florida contain similar emergency health treatment mandates.[119]

20        194.    Further, hospitals do not need to seek insurance preauthorization before

---

[115] *Id.* at 107.

[116] 42 U.S.C. §§ 1395(a)-b, (d), (h).

[117] *Id*. § 1395dd(d)(2)(A).

[118] *Id*. § 1395dd(d)(1)(B); *see also Hardy v. N.Y. City Health Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (EMTALA was crafted to protect against "patient dumping[,]" the practice of refusing to provide emergency medical treatment to patients that are unable to pay).

[119] N.Y. Comp. Codes R. & Regs. Tit. 10, § 405.19(e)(1) ; Fla. Stat. § 395.1041(3)(a), (f).

Class Action Complaint

1    administering emergency medical services.[120] Typically, insurance networks require

2    medical providers to seek preauthorization before providing certain medical services.

3         195.   Because hospitals are required to treat all people seeking emergency medical

4    treatment, these providers wholly rely on commercial insurance networks like the MultiPlan

5    Cartel members to fairly reimburse them for their out-of-network services. However, the

6    MultiPlan Cartel pays Providers far below reasonable reimbursement rates. Due to

7    Providers' lack of alternatives, they are forced to accept MultiPlan's prices while adhering

8    to the statutory mandates imposed on them.

9         196.   COVID-19 amplified the harmful effects of this conspiracy. While hospitals

10   and emergency care centers experience an extreme number of out-of-network claims from

11   saving patient lives, the MultiPlan Cartel is able to generate massive profits for themselves

12   and their co-conspirators by cooperatively underpaying out-of-network claims.

13        197.   MultiPlan has argued that its conspiracy benefits consumers by reducing

14   consumer healthcare costs. However, this theory does not accurately portray reality. As

15   healthcare analyst Olivia Webb explains, MultiPlan's negotiations tactics in theory should

16   be good for health care costs in that they could lower costs by insurers negotiating lower

17   prices on behalf of the patient.[121] However, MultiPlan has instead acted as an enforcer,

18   mandating doctors to accept their low reimbursement offers while insurance premiums for

19   consumers continue to rise.

20        198.   Statistical evidence reflects this situation. The Centers for Medicare and

21   Medicaid Services found that out-of-pocket health expenditures increased from $364 billion

---

[120] *See* 26 U.S.C. § 9816(a)(1)(A).
[121] Olivia Webb, *MultiPlan, the Secret Back=End to Most of the Insurer Industry, is Going Public*, ACUTE CONDITION (Aug 5, 2020), https://www.acutecondition.com/p/multiplan-the-secret-back-end-to.

Class Action Complaint

1     in 2017 to $471 billion in 2022.[122] These researchers project another $80 billion increase in

2     out-of-pocket expenditures to 2025.

3     **D. Lack of Procompetitive Benefits**

4         199.     MultiPlan and its Co-Conspirators' pricing scheme has significantly harmed

5     competition while yielding no procompetitive benefits.

6         200.     The MultiPlan Cartel has realized massive increases in revenues and profits

7     for its members. However, it has significantly harmed healthcare providers, consumers, and

8     competition at large. MultiPlan and its Cartel members have systematically paid sub-

9     competitive reimbursements for out-of-network healthcare services, which reduces the

10    healthcare providers' revenue possible to use for improvement and expanded access to

11    healthcare. The MultiPlan conspiracy has also limited consumers' healthcare options due to

12    hospital closures spurred by the conspiracy's coordination. The conspiracy does not contain

13    healthcare costs. The MultiPlan Cartel burdens healthcare providers and consumers to

14    benefit only themselves. They benefit themselves in this way while unfairly labeling

15    healthcare reimbursement claims as egregiously high to justify their gross misconduct.[123]

16        201.     The MultiPlan Cartel has surely increased their operational efficiencies and

17    profit margins by outsourcing reimbursement pricing to a single decisionmaker that relies

18    on collective non-public claim data sharing. However, MultiPlan has equally contributed to

19    artificially lowered payments to healthcare providers who provide crucial out-of-network

---

[122] *National Health Expenditures 2017 Highlights*, CNTRS. FOR MEDICARE & MEDICAID SERVS.,
https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-
reports/nationalhealthexpenddata/downloads/highlights.pdf; *NHE Fact Sheet, Historial NHE 2022*, CNTRS FOR
MEDICARE & MEDICAID SERVICES, https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-
expenditure-data/nhe-fact-
sheet#:~:text=Historical%20NHE%2C%202022%3A&text=Medicaid%20spending%20grew%209.6%25%20to,11
%20percent%20of%20total%20NHE.
[123] *Id*. at 66.

Class Action Complaint

1    care that the healthcare system relies upon.

2       202.   Even if MultiPlan and its Co-Conspirators are able to establish de minimis

3    procompetitive benefits stemming from their conduct (which they can not), that marginal

4    "procompetitive" gain could not begin to balance out the overwhelming anticompetitive

5    effects that their conspiracy has imprinted unto the market.

6    **X. MULTIPLAN'S PRICE-FIXING AGREEMENT IS PER SE**
7    **UNLAWFUL UNDER SECTION 1 OF THE SHERMAN ACT**

8       203.   MultiPlan is a horizontal competitor with the other commercial health

9    insurance payors that are participating in the MultiPlan Cartel. Therefore, MultiPlan's

10   agreements with other health insurance payors to suppress and "reprice" out-of-network

11   reimbursements to healthcare providers are a horizontal restraint of trade and thus a *per se*

12   violation of Section 1 of the Sherman Act.

13      204.   MultiPlan and its co-conspirators collaborated to combine sensitive and

14   nonpublic claims data into Data iSight, then relying on Data iSight's outcome as the means

15   of setting reimbursement rates for out-of-network healthcare claims. The MultiPlan Cartel

16   members did this with knowledge of its competitors' cooperation.

17      205.   This behavior is a classic price-fixing conspiracy camouflaged by new

18   technology. Courts have deemed this type of behavior *per se* illegal for over a century. The

19   Sherman Act specifically declares that every "combination in the form of a trust or

20   otherwise, or conspiracy, in restraint of trade or commerce"[124] is illegal (emphasis added).

21   This open-ended statutory language ensures that new technology like MultiPlan employed

22   to operate their price-fixing scheme is not immune from the *per se* rule.[125]

---

[124] 15 U.S.C. § 1.
[125] *United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 85-86 (1912).

Class Action Complaint

206.    Moreover, members of the MultiPlan Cartel may not escape *per se* rule scrutiny by arguing that there is no specific agreement on the final reimbursement rate for a given service. The *per se* rule applies because members of the Cartel agreed to use a shared method, MultiPlan's repricing tools, to set their reimbursement rates. Each party did this knowing that each of their peer competitors would similarly rely on the same repricing tool because MultiPlan specifically informed them of this before and throughout the conspiracy. This mindful decision to proceed with their usage of MultiPlan's repricing tool in the face of understanding that their competitors would also be doing so suffices for application of the *per se* rule against horizontal price-fixing.

## XI. CLASS ACTION ALLEGATIONS

207.    Plaintiff brings this action on behalf of itself and under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of members of the following Class:

> All healthcare providers and practices in the United States and its territories that submitted claims for out-of-network healthcare services to any third-party payer that used MultiPlan's repricing services during the Class Period and were reimbursed for those claims after MultiPlan's "repricing" of such claims.

208.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Plaintiff believes there are at least tens of thousands of members in the Class due to the nature of the product market. Further, members of the Class are readily identifiable from information and records in Defendants' possession.

209.    Plaintiff's claims are typical of the claims of Class members. Plaintiff and all Class members were damaged by the same anticompetitive, collusive conduct of the Defendants in violation of Section 1 of the Sherman Act. Plaintiff and all Class members

1   received artificially suppressed out-of-network reimbursement rates paid to healthcare

2   providers.

3        210.   Plaintiff will fairly and adequately protect and represent the interests of all

4   Class members. Plaintiff's interests are coincident with, and not antagonistic to, all Class

5   members. Plaintiff can and will carry out the duties incumbent on class representatives to

6   protect the interests of all Class members.

7        211.   Plaintiff is represented by counsel with experience in the prosecution of class

8   action antitrust litigation, and with particular experience with class action antitrust litigation

9   involving the healthcare industry. Plaintiff's counsel possesses the resources needed to

10   vigorously litigate the case for the Class.

11        212.   Questions of law and fact common to the members of the Class predominate

12   over questions that may affect only individual class members because Defendants have

13   acted on grounds generally applicable to the entire Class thereby making damages with

14   respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in

15   Defendants' wrongful conduct.

16        213.   Questions of law and fact common to the members of the Class predominate

17   over questions that may affect only individual Class members, thereby making an award of

18   damages to all Class members appropriate. Questions of law and fact common to members

19   of the Class include, but are not limited to:

20        1.   Whether Defendants formed a purely horizontal agreement,

21             combination, conspiracy, or common understanding in which they

22             artificially suppressed the rate paid on out-of-network healthcare

23             claims throughout the United States;

62

2.    Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act;

3.    Whether Defendants' alleged misconduct, in the alternative, violates Section 1 of the Sherman Act pursuant to a quick look or full Rule of Reason analysis;

4.    Whether Defendants' alleged misconduct in fact caused Class members in the United States to receive artificially suppressed out-of-network reimbursement rates;

5.    Whether the unlawful scheme alleged herein has substantially affected interstate commerce;

6.    Whether Defendants' anticompetitive conduct caused antitrust harm to Plaintiff and all Class members;

7.    The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward;

8.    Whether Defendants fraudulently concealed the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial agreement, thereby tolling the statute of limitations;

9.    The proper measure of Class-wide damages; and

10.   Aggregate damages suffered by Plaintiff and all Class members.

214.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that

63

Class Action Complaint

1   numerous individual actions would engender. The benefits of proceeding through the class

2   mechanism, including providing injured persons or entities a method for obtaining redress

3   on claims that could not practicably be pursued individually, substantially outweighs

4   potential difficulties in management of this class action.

5        215.   Plaintiff knows of no special difficulty to be encountered in the maintenance

6   of this action that would preclude its maintenance as a class action.

7        216.   Plaintiff reserves the right to amend the definition of the Class, including,

8   without limitation, the Class Period.

9   **XII. CAUSES OF ACTION**

10                        **COUNT ONE**

11                  **Horizontal Agreement in Restraint of Trade**
12   **in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

13       217.   Plaintiff incorporates and realleges, as though fully set forth herein, each and

14   every allegation set forth above.

15       218.   Plaintiff seeks monetary and injunctive relief on behalf of itself and all Class

16   members under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in

17   violation of Section 1 of the Sherman Act.

18       219.   Defendants, directly and through their divisions, subsidiaries, agents, and

19   affiliates, engage in interstate commerce in the purchase and reimbursement of out-of-

20   network healthcare services for subscribers, and in the sale of health insurance plans.

21       220.   Beginning on or before July 1, 2017, Defendants entered into and engaged in

22   an unlawful contract, combination, or agreement, in restraint of interstate trade and

23   commerce in violation of the Sherman Act, 15 U.S.C. § 1.

24       221.   Specifically, Defendants formed a cartel in the healthcare insurance industry

64

1    and engaged in horizontal price-fixing conspiracy to artificially suppress out-of-network

2    reimbursement rates paid to healthcare providers in the United States.

3          222.   In furtherance of this conspiracy, Defendants have committed various acts,

4    including the acts alleged above as well as:

5                1.    Defendants shared competitively sensitive, non-public internal claims

6                      data to MultiPlan in real time for use in MultiPlan's repricing tool.

7                2.    MultiPlan sold and operated its repricing tool that repriced the

8                      reimbursement rate for out-of-network healthcare claims.

9                3.    Defendants knowingly used the same out-of-network claim repricing

10                     tool that incorporated other Defendants' real-time, competitively

11                     sensitive, non-public internal claims data to calculate reimbursement

12                     rates for out-of-network healthcare claims.

13               4.    Defendants outsourced out-of-network healthcare claims handling to

14                     MultiPlan knowing that MultiPlan would set the reimbursement rates

15                     for out-of-network healthcare claims using its repricing tool.

16               5.    Defendants reimbursed out-of-network healthcare providers for their

17                     services at rates recommended, or more accurately, set by

18                     MultiPlan's repricing tool.

19               6.    MultiPlan communicated, directly and indirectly, with competing

20                     healthcare insurance companies to solicit them to join the conspiracy.

21         223.   Defendants possess market power in the relevant antitrust market, as alleged

22    herein: the relevant product market is reimbursement paid by commercial insurers to

23    healthcare providers for out-of-network services, and the relevant geographic market is the

65

1    United States.

2        224.    As a direct and proximate result of Defendants' past and continuing violation

3    of Section 1 of the Sherman Act, Plaintiff has been injured in its business and property and

4    will continue to be injured in its business and property by receiving reimbursements for out-

5    of-network healthcare claims that were lower than what they would have received but-for

6    Defendants' unlawful conduct. The antitrust laws intended to prevent this type of injury

7    suffered by Plaintiff as a result of the conspiracy.

8        225.    Defendants' conspiracy is a per se violation of Section 1 of the Sherman

9    Antitrust Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman

10   Antitrust Act under either a quick look or full Rule of Reason analysis.

11       226.    There are no procompetitive justifications for Defendants' conspiracy, and

12   any proffered procompetitive justifications, to the extent any exist, could have been

13   achieved through less restrictive means.

14   **XIII. PETITION FOR RELIEF**

15   WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for

16   judgment against Defendants as to each count and respectfully requests that:

17       227.    The Court determine that this action may be maintained as a class action

18   under Federal Rule of Civil Procedure 23(a) and (b)(3), appoint Plaintiff as Class

19   Representative and their counsel of record as Class Counsel, and direct that notice of this

20   action, as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class, once

21   certified.

22       228.    The Court adjudge and decree that Defendants' alleged unlawful conduct,

23   conspiracy, or combination is a per se violation (or alternatively, illegal as a quick look or

66

full-fledged rule of reason violation) of antitrust and competition laws as alleged above.

229.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

230.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

231.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and all Class members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law.

232.    The Court award Plaintiff and all Class members such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XIV. JURY DEMAND

233.    Plaintiff, on behalf of itself and the proposed class, respectfully demands a

1    jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

2

3    Dated: July 25, 2024                      */s/ Shinae Kim-Helms*

Shinae Kim-Helms (CA Bar No. #242484)
Christopher V. Le (*pro hac vice*
forthcoming)
Joshua Callister (*pro hac vice* forthcoming)
Nathan Cihlar (*pro hac vice* forthcoming)
**BoiesBattin, LLP**
4041 University Drive
Fairfax, VA 22030
T: (703) 764-8700
skimhelms@boiesbattin.com
cle@boiesbattin.com
jcallister@boiesbattin.com
ncihlar@boiesbattin.com

*Counsel for Plaintiff Mehrnaz Jamali MD,
Inc. and the Proposed Class*

Class Action Complaint