**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: MULTIPLAN HEALTH INSURANCE PROVIDER LITIGATION<br><br>*This Document Relates to:*<br><br>*Ng. v. Dalton, et al.*, No. 1:26-cv-06968 (S.D.N.Y.) | MDL No. 3121 |

**ANTITRUST LITIGATION PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-7)**

The Panel expects parties seeking a transfer under Section 1407 to consider "alternatives to centralization including, but not limited to, engaging in informal coordination of discovery and scheduling, and seeking Section 1404 transfer." Notice of Hearing Session, Oct. 9, 2026, Dkt. No. 139; *see also In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) ("Indeed, centralization under Section 1407 should be the last solution after considered review of all other options."). Because the transfer proponents satisfy none of the statutory criteria and alternatives to centralization are readily available, the Panel should vacate Conditional Transfer Order No. 7.

*First,* the Stockholder Derivative Plaintiff and Defendants have failed to identify any common, core factual questions underlying both the Antitrust and Derivative Actions. The Derivative Action does not seek to adjudicate healthcare providers' antitrust claims, determine whether they were underpaid, or establish the resulting damages. And the Antitrust Litigation does not seek to adjudicate whether Claritev's directors and officers adequately monitored and responded to compliance risks, made proper disclosures to shareholders, and fulfilled their fiduciary obligations.

*Second,* the Stockholder Derivative Plaintiff and Defendants have failed to demonstrate that transfer and centralization will serve the convenience of the parties and witnesses. They have not demonstrated significant overlap; together, they have identified only one overlap witness by name. Any common discovery can be shared without transfer, including through amended protective orders.

*Finally,* the Stockholder Derivative Plaintiff and Defendants have failed to demonstrate that transfer would promote the just and efficient conduct of the actions or that alternatives to centralization would be insufficient. The MDL Court has spent years managing hundreds of antitrust cases and carefully constructing a schedule and bellwether process. Adding a separate derivative track to this mature antitrust litigation would be inefficient and cause undue delay. And the first contested question in the Derivative Action may be whether Defendants' own Delaware forum-selection clause bars it from federal court altogether.

## ARGUMENT

The proponents of transfer bear the burden of demonstrating that transfer under 28 U.S.C. § 1407 is warranted. *See, e.g.*, *In re Linear Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, 341 F. Supp. 3d 1381, 1382 (J.P.M.L. 2018) ("[M]ovants have failed to demonstrate that any common questions of fact and law are sufficiently complex or numerous to justify centralization."). They have not carried that burden.

### A. THE DERIVATIVE ACTION AND THE ANTITRUST LITIGATION DO NOT SHARE THE SAME CORE QUESTIONS OF FACT.

Contrary to the Derivative Plaintiff's and Defendants' Oppositions, the two actions do not seek "redress for the same underlying misconduct." Dkt. No. 140 at 4 ("Ng Opp."); *see also* Dkt. No. 141 at 9 ("Def. Opp."). The Antitrust Litigation seeks redress for Claritev's participation in an unlawful conspiracy to suppress prices for out-of-network healthcare services. *See, e.g.*, Consol.

Master Direct Action Plaintiff Complaint, *In re MultiPlan Health Ins. Provider Litig.*, 1:24-cv-06795 (N.D. Ill. Dec. 2, 2024), Dkt. No. 182 ¶¶ 131–380. The Derivative Action does not seek redress for anticompetitive conduct. Instead, it seeks redress for Defendants' alleged breaches of fiduciary duty: their failure to respond to red flags concerning antitrust compliance, their concealment of the risks and facts concerning the antitrust suits and investigations, and their trading on material nonpublic information. *See* Ng Opp. at 3.[1]

Any factual overlap between the Derivative Action and the Antitrust Litigation is minimal and incidental; the two actions do not share common, core factual questions. The Derivative Plaintiff identifies five factual questions that she asserts underlie both actions:

> (i) How did Claritev's out-of-network repricing methodology operate, and what role did it play in the alleged coordination among competing payors? (ii) What characteristics of the methodology allegedly created antitrust risk, and what information about those characteristics was known to Claritev? (iii) What did the Company and its personnel know about the challenged practices, and when did they acquire that knowledge? (iv) What did the progression of the Antitrust Action and government investigations reveal about the nature and seriousness of the legal risks? (v) What, if any, actions did Claritev take in response to those risks, and how did its business practices change or not change over time?

Ng Opp. at 4–5. None of these is a core factual question common to both cases.

The first factual question—the operation of the out-of-network repricing methodology—does not underlie the Derivative Action. The Derivative Plaintiff need not demonstrate that the out-of-network repricing services were actually anticompetitive to prove her claims. Defendants appear to agree, carefully stating that if Antitrust Plaintiffs do not "secure an adjudication that antitrust violations occurred," then "the premises for the Derivative Action will *shrink*

[1] FTX and BPS are distinguishable for that reason. *See* Ng Opp. at 4. Unlike here, the actions centralized in each concerned the same underlying misconduct: fraud in the operation and promotion of a cryptocurrency exchange, *In re FTX Cryptocurrency Exchange Collapse Litig.*, 677 F. Supp. 3d 1379, 1382 (J.P.M.L. 2023), and the recording of website users' activity with session replay code, *In re BPS Direct, LLC, & Cabela's, LLC, Wiretapping Litig.*, 677 F. Supp. 3d 1363, 1364 (J.P.M.L. 2023).

significantly." Def. Opp. at 2 (emphasis added). Even that overstates the point. The Derivative Action rests on alleged failures to address and disclose litigation and investigation *risks*, not on legal violations. *See, e.g.*, *Ng v. Dalton et al.*, No. 1:26-cv-06968 (S.D.N.Y. Aug. 14, 2026), Dkt. No. 1 ¶¶ 70, 73, 75. Questions about those alleged failures are distinct from whether the Antitrust Litigation ultimately results in an adjudication against Claritev.

Nor does the Derivative Action's claim that the Individual Defendants knowingly continued an unlawful practice change the analysis. Defendants contend that the claim—that the Individual Defendants "knowingly caus[ed]" Claritev to continue "a business practice they knew to be substantially likely unlawful"—will "ultimately require findings regarding the legality of the Company's practices." Def. Opp. at 5. But that claim turns on what the Individual Defendants knew, believed, and decided at the board and executive level—evidence found in board minutes, committee materials, and communications among directors and officers, not in the payor-side discovery about the operation of the alleged cartel. To the extent any element of the claim depends on whether Claritev's practices were unlawful, that question will be answered in the Antitrust Litigation regardless of which court hears the Derivative Action. A claim that awaits the outcome of another case does not need to be litigated alongside it.

The other three questions concern what Claritev knew about its legal exposure, when, and how it responded—none of which Antitrust Plaintiffs must prove.

Defendants point to the Antitrust Plaintiffs' pending motion to compel discovery related to the Department of Justice's parallel antitrust investigations. Def. Opp. at 5. That motion underscores the difference between the two actions. Antitrust Plaintiffs seek those materials as evidence of the alleged conspiracy—what Claritev and its payor co-conspirators did and agreed to do. They do not seek to establish when Claritev's Board learned of a grand jury subpoena, whether

Claritev was obligated to disclose it, or what Claritev insiders knew when they sold stock. Those are the questions on which the Derivative Action's disclosure and insider-trading claims turn.

Each case on which the Derivative Plaintiff relies is distinguishable because each involved actions that shared core factual questions. *AOL Time Warner*, *Bank of America*, *Fleming*, and *Zimmer* each centralized some combination of securities, shareholder, and ERISA actions that focused on the same alleged misstatements and omissions. *In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002); *In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 626 F. Supp. 2d 1327, 1328 (J.P.M.L. 2009); *In re Fleming Cos., Inc. Sec. & Derivative Litig.*, 269 F. Supp. 2d 1374, 1375 (J.P.M.L. 2003); *In re Zimmer Holdings, Inc. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 626 F. Supp. 2d 1319, 1320 (J.P.M.L. 2009). In all four decisions, the Panel recognized that the actions differed in nature but ordered centralization because the actions focused on the same statements and omissions.[2] Here, by contrast, the Antitrust Plaintiffs need not prove that Defendants made any false or misleading statements about their conduct to recover on their claims.[3]

---

[2] *See AOL Time Warner*, 235 F. Supp. 2d at 1381 (explaining that the various actions all focus on "alleged misrepresentations or omissions by AOL Time Warner and/or AOL concerning accounting practices relating to recognition of certain types of revenue"); *Bank of America*, 626 F. Supp. 2d at 1327 (explaining that the various actions all focus on "alleged misrepresentations and omissions made in the context of Bank of America's acquisition of Merrill Lynch & Co., Inc."); *Fleming*, 269 F. Supp. 2d at 1375 (explaining that the various actions all focused on the same "alleged misrepresentations or omissions by defendants . . . which allegedly artificially inflated the price of Fleming securities"); *Zimmer*, 626 F. Supp. 2d at 1320 (explaining that the various actions all arose from "allegations that the defendants made materially false and misleading statements about Zimmer's business operations, financial prospects and stock price, which allegedly caused injury to investors in Zimmer securities").

[3] Defendants rely on similarly distinguishable cases. *See* Def. Opp. at 8. In each of those cases, all actions shared the same core factual question. *See, e.g.*, *In re Chiquita Brands Int'l, Inc.*, 536 F. Supp. 2d 1371, 1372 (J.P.M.L 2008) (whether defendants provided financial and other support to a Colombian right-wing paramilitary organization); *In re Nat'l City Corp. Sec., Deriv. and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 588 F. Supp. 2d 1362, 1363 (J.P.M.L. 2008) (whether defendants made materially false and misleading statements); *In re Pfizer Inc. Secs., Deriv. & "ERISA" Litig.*, 374 F. Supp. 2d 1348, 1349 (J.P.M.L. 2005) (whether defendants misrepresented and/or concealed safety risks of COX-2 inhibitor drugs); *In re UnumProvident Corp. Secs., Derivative, & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003) (whether UnumProvident engaged in improper claims handling practices); *In re WorldCom, Inc., Sec. & "ERISA" Litig.*, 226 F. Supp. 2d 1352, 1354 (J.P.M.L. 2002) (whether defendants made misrepresentations or omissions); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (whether defendants engaged in negligent and/or fraudulent conduct relating to Enron's financial collapse).

*CenturyLink* is inapposite. In that decision, the Panel denied a motion to vacate the conditional transfer of three shareholder derivative actions into an MDL to which the Panel had *already* transferred securities actions. Transfer Order, *In re CenturyLink Sales Pracs. and Sec. Litig.*, MDL No. 2795 (J.P.M.L. Oct. 3, 2018), Dkt. No. 176 at 1. Indeed, the Panel observed that the complaints in two of those actions "specifically aver that the allegations are based, in part, on the pleadings, papers, and any documents filed in the *securities actions earlier transferred to the MDL*." *Id.* (emphasis added). Derivative actions premised on the same allegations as already-transferred securities actions naturally share a common, core set of factual questions. That is not the case here, and nothing in *CenturyLink* supports transfer of the Derivative Action.

Defendants also fault Antitrust Plaintiffs for not identifying a decision in which the Panel declined to transfer a derivative action into an MDL. Def. Opp. at 3. The more telling gap is in Defendants' own authorities. None involved the transfer of a stockholder derivative action, as a tag-along, into a mature antitrust MDL. All but one placed the derivative actions alongside securities actions arising from the same alleged conduct. The lone exception, *Chiquita*, centralized the derivative actions in the Panel's initial transfer order, not as tag-alongs to a mature proceeding. 536 F. Supp. 2d at 1372. Here, by Defendants' own account, the Derivative Action would be the first in an MDL that has always been an antitrust proceeding. *See* Def. Opp. at 13 n.6.

Finally, Defendants argue that the two actions share a factual core because the Derivative Action references the Antitrust Litigation and because "[t]he existence and amount of . . . damages [available to the Stockholder Derivative Plaintiff may] hinge on how the MDL is litigated and resolved." Def. Opp. at 9. But the Derivative Plaintiff's use of the antitrust allegations as a predicate for her separate allegations does not require adjudication of common, core factual questions. Her damages do not depend solely on whether antitrust violations occurred. They may

also include the costs of defending private and public enforcement actions, damages ultimately paid in those actions, and other alleged injuries, such as inflated compensation paid to Claritev executives and reputational harm. And even if Defendants' defense costs in the Antitrust Litigation could affect her damages, the actions still do not raise the same core questions of fact. To the extent any part of her recovery turns on the outcome of the Antitrust Litigation, that outcome will be the same whichever court hears the Derivative Action.

### B. TRANSFER WOULD NOT PROMOTE THE CONVENIENCE OF THE PARTIES OR WITNESSES.

The Stockholder Derivative Plaintiff argues that transfer would be convenient because Claritev and the individual defendants have not objected. *See* Ng Opp. at 6. But Defendants' support is not enough. The Panel must consider the convenience of *all* parties and witnesses. *See In re Watson Fentanyl Patch Prods. Liab. Litig.*, 883 F. Supp. 2d 1350, 1351–52 (J.P.M.L. 2012) ("[I]n deciding issues of transfer under Section 1407, [the Panel] look[s] to the overall convenience of the parties and witnesses, not just those of a single plaintiff or defendant in isolation."). And where, as here, the action would join an existing MDL, "the Panel must always consider the impact that transfer of that action could have on the cases already in the MDL." *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 437 F. Supp. 3d 1365, 1366 (J.P.M.L. 2020).

The Derivative Plaintiff and Defendants do not dispute that the vast majority of witnesses in the Antitrust Litigation will likely come from healthcare payors who are not defendants in the Derivative Action.[4] The Derivative Plaintiff asserts that "much" of the Antitrust Litigation discovery will "almost assuredly" be relevant to the Derivative Action. Ng Opp. at 6. But she fails

[4] *See* Antitrust Litig. Plaintiffs' Memorandum in Support of Mot. to Vacate Conditional Transfer Order (CTO-7), Sept. 18, 2026, Dkt. No. 136-1 at 8 (citing Joint Submission on Deposition Protocol and Disputed Issues, *In re MultiPlan Health Ins. Provider Litig.*, 1:24-cv-06795 (N.D. Ill Sep. 8, 2025), Dkt. No. 511 (Plaintiffs' proposal for fact depositions provided for 30 MultiPlan witnesses out of 200; Defendants' proposal provided for 15 MultiPlan witnesses out of 120)).

to identify a single deposition or document request that the parties would necessarily duplicate absent a transfer. Defendants identify only one overlap witness by name, Mr. White. *See* Def. Opp. at 10.[5] Even as to him, the Derivative Action asks what he knew, what he decided, and what he told the Board and stockholders, not how the alleged conspiracy operated across payors. And neither disputes that overlapping witnesses will require separate depositions because the testimony will focus on different issues in each matter. The Derivative Plaintiff does not dispute that the parties can address the alleged overlap in witnesses and discovery through ordinary coordination mechanisms without a transfer.[6] Instead, she merely responds that a transfer "guarantees" coordination. *See* Ng Opp. at 7.

The guarantee she seeks is not only unnecessary: it is also costly. Transfer and centralization would almost certainly disrupt the detailed schedule governing pretrial events in the Antitrust Litigation. They would also require Antitrust Plaintiffs to monitor, and potentially participate in, discovery and motion practice concerning demand futility, board processes, director independence, compensation, stockholder disclosures, and trading conduct. None of those issues forms part of their case. The Derivative Plaintiff's preference for the MDL cannot outweigh the Antitrust Plaintiffs' interest in avoiding disruption and unnecessary discovery burdens—especially when less disruptive coordination mechanisms are available.

[5] One out of 290 (the number of authorized depositions in the Antitrust Action) is limited overlap. *See* Case Mgmt. Order No. 28 – Deposition Protocol, *In re MultiPlan Health Ins. Provider Litig.*, 1:24-cv-06795 (N.D. Ill. Mar. 3, 2026), Dkt. No. 663 at 8.

[6] For example, she does not dispute that "the parties could seek to agree upon a stipulation that any discovery relevant to more than one action may be used in all those actions." Antitrust Litig. Pls.' Mem. in Supp. of Mot. to Vacate Conditional Transfer Order (CTO-7), Sept. 18, 2026, Dkt. No. 136-1 at 9 (quoting *In re Eli Lilly & Co. (Cephalexin Monohydrate) Pat. Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978)).

## C. TRANSFER WILL NOT ADVANCE THE JUST AND EFFICIENT CONDUCT OF THE ACTIONS.

The Stockholder Derivative Plaintiff does not contend that the Derivative Action should be consolidated with the Antitrust Litigation. *See* Ng Opp. at 7 ("Transfer does not mean consolidation"). She and Defendants both attempt to dismiss Antitrust Plaintiffs' concerns by proposing a separate track for the Derivative Action. *See* Ng Opp. at 7–8; Def. Opp. at 12.

Defendants also assert that Antitrust Plaintiffs "concede that the Derivative Action could proceed on a separate track without delaying the MDL." Def. Opp. at 12. Antitrust Plaintiffs made no such concession. They explained that a separate track "would deliver no benefits to either the Antitrust Litigation or *Ng* and would instead increase the burden on the transferee court." Dkt. No. 136-1 at 10–11. The proposed separate derivative track confirms the absence of any genuine efficiencies. It would burden the Antitrust Litigation by requiring additional status conferences, scheduling orders, discovery protocols, confidentiality determinations, and dispositive-motion practice directed to issues outside that litigation. And it would undoubtedly burden the transferee court, which is already managing a complex MDL well into discovery. Nor need the Panel transfer a case merely because the transferee court might have tools to mitigate the resulting burdens.[7]

The threshold issues the Derivative Action presents also undercut Defendants' claim that the transferee judge is "uniquely positioned to swiftly resolve pleading-stage issues." Def. Opp. at

---

[7] Defendants cite several cases in which the Panel discussed its role in determining how cases are managed post-transfer. *See* Def. Opp. at 11. But in each case, that discussion was separate from the Panel's determination that centralization would promote the just and efficient conduct of the actions. *See In re Bear Creek Tech., Inc. ('722) Patent Litig.*, 858 F. Supp. 2d 1375, 1377–80 (J.P.M.L. 2012) (discussing post-transfer role before determining centralization would promote the just and efficient conduct of actions which all concerned a single US Patent); *In re UnumProvident*, 280 F. Supp. 2d at 1379–80 (discussing post-transfer role after determining centralization would promote the just and efficient conduct of actions which all alleged UnumProvident engaged in improper claims handling practices); *In re Pfizer*, 374 F. Supp. 2d at 1349 (discussing post-transfer role after determining centralization would promote the just and efficient conduct of actions which all concerned the same misrepresentations and acts of concealment); *In re Franklin Nat'l Bank Sec. Litig.*, 393 F. Supp. 1093, 1094–95 (J.P.M.L. 1975) (discussing post-transfer role after determining centralization would promote the just and efficient conduct of actions which all concerned the same failure to disclose "certain losses and financial weaknesses" of Franklin National Bank). But none of these cases resolve the threshold question of whether a transfer and centralization are supported in this case.

2. Defendants expressly preserve their right to enforce a charter provision designating a Delaware state court as "the sole and exclusive forum for any derivative action brought on behalf of the Company." *Id* at 2 n.1. The first contested question in the Derivative Action thus may be whether it belongs in federal court at all. Transfer would ask the transferee court to resolve collateral threshold disputes that offer no benefit to the Antitrust Litigation, and that Defendants themselves may use to send the case to another forum entirely.

The cases on which the Derivative Plaintiff relies demonstrate why the Panel should not transfer the Derivative Action. Unlike in *Marriott*, the actions here are not all at the pleading stage, and the Antitrust Litigation has carefully constructed discovery schedules to protect. *See* Case Mgmt. Order No. 3, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 8:19-md-2879 (D. Md. June 10, 2019), Dkt. No. 279. And unlike in *Zantac*, the actions here do not concern the same common, core issues, and the threshold questions the Derivative Action presents are far more complex than a jurisdictional question. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2021 WL 5848067, at *2 (J.P.M.L. Dec. 3, 2021) (rejecting the argument that the actions lacked common, core factual questions merely because the action that the movant sought to transfer concerned a retailer, and explaining that the original transfer order had already recognized that retailers were part of the litigation).

**CONCLUSION**

For the foregoing reasons, and those set forth in the Antitrust Plaintiffs' opening memorandum in support of the motion to vacate, the Panel should vacate Conditional Transfer Order No. 7 as to *Ng v. Dalton, et al.*, No. 1:26-cv-06968 (S.D.N.Y.).

Dated: October 16, 2026

Respectfully submitted,

*/s/ Matthew M. Lavin*
Matthew M. Lavin
**GILBERT LLP**
700 Pennsylvania Ave, S.E.
Suite 400
Washington, D.C. 20037
Tel: (202) 772-2200
LavinM@gilbertlegal.com

Jennifer Scullion
**SEEGER WEISS LLP**
55 Challenger Road, 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
jscullion@seegerweiss.com

Hunter Shkolnik
**NS PR LAW SERVICES, LLC**
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tel: (787) 493-5088
Hunter@NSPRLaw.com

Stephen M. Medlock
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W.
Suite 500W
Washington, D.C. 20037
Tel: (202) 639-6500
smedlock@velaw.com

*Direct Action Plaintiffs' Executive Committee*

Christopher Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Fl.
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
cseeger@seegerweiss.com

*Plaintiffs' Coordinating Counsel*

**EDELSON PC**
Natasha J. Fernández-Silber
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370
Fax: (312) 589-6378
nfernandezsilber@edelson.com

Sarah R. LaFreniere (*pro hac vice*)
Brandon Baum-Zepeda (*pro hac vice*)*
1255 Union Street NE
Suite 850
Washington, DC 20002
Tel: (202) 270-4777
slafreniere@edelson.com
bbaum-zepeda@edelson.com

**not admitted to practice in DC; practice authorized by D.C. Rule 49(c)(3).*

**SUSMAN GODFREY LLP**
William Christopher Carmody (*pro hac vice*)
Shawn J. Rabin (*pro hac vice*)
Stephanie N. Spies (*pro hac vice*)
Thomas K. Boardman (*pro hac vice*)
One Manhattan West
50th Floor
New York, NY 10001-8602
Tel: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
sspies@susmangodfrey.com
tboardman@susmangodfrey.com

Halley W. Josephs (*pro hac vice*)
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
hjosephs@susmangodfrey.com

**BERGER MONTAGUE PC**
Eric L. Cramer (*pro hac vice*)
Zachary D. Caplan (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
Jordan T. Hollinger (*pro hac vice*)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com
zcaplan@bergermontague.com
pmadden@bergermontague.com
thollinger@bergermontague.com

Zachary R. Shelley (*pro hac vice*)
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
zshelley@bergermontague.com

*Interim Co-Lead Class Counsel*